KATHERINE E. JOHNSON, *admitted pro hac vice*
kjohnson3@ftc.gov
KRISTY M. TILLMAN, *admitted pro hac vice*
ktillman@ftc.gov
CHRISTOPHER ERICKSON, *admitted pro hac vice*
cerickson@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
(202) 326-2185 (Johnson); -3025 (Tillman); -3671 (Erickson)

Local Counsel
DELILAH VINZON
Cal. Bar No. 222681; dvinzon@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300; Fax: (310) 824-4380

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| FEDERAL TRADE COMMISSION, | ) | Case No. 8:20-cv-01431-PSG-KES |
|---|---|---|
| Plaintiff, | ) | **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | ) | |
| QYK BRANDS LLC d/b/a Glowyy, et al. | ) | *FILED CONCURRENTLY: (1) EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; (2) STATEMENT OF UNDISPUTED FACTS PURSUANT TO L.R. 56-1* |
| Defendants. | ) | |
| | ) | Magistrate: Hon. Karen E. Scott |
| | ) | Hearing Date: April 1, 2022 |
| | ) | Time: 1:30p.m. |
| | ) | Courtroom: 6A |
| | ) | Discovery Cutoff: December 1, 2021 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

)  Pretrial Conference: April 15, 2022
)  Trial Date: April 22, 2022

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that on April 1, 2022 or as soon thereafter as the matter may be heard in the above-entitled action before the Honorable Philip S. Gutierrez, United States Chief District Court Judge, at the United States District Court for the Central District of California, First Street Courthouse, 350 West 1st Street, Courtroom 6A, 6th Floor, Los Angeles, California 90012-4565, Plaintiff Federal Trade Commission ("FTC") hereby moves the Court to rule on this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, L.R. 56-1, and the Court's Standing Civil Order, and requests an order and monetary judgment, as filed concurrently herewith and proposed hereto, finding:

1.     Defendants operate and have operated as a common enterprise at all times material to the First Amended Complaint (ECF No. 73, "FAC").

2.     Defendants jointly and severally liable on Count I of the FAC for violating the Mail, Internet, Telephone Merchandise Order Sales Rule, 16 C.F.R. 435 ("MITOR").

3.     Defendants jointly and severally liable on Count II of the FAC for violating Section 5 of the FTC Act, 15 U.S.C. § 45.

4.     Defendants jointly and severally liable on Counts III-IV of the FAC for violating Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45 and 52.

And entering a judgment and permanent injunction as follows:

5.     Judgment in favor of the FTC on all Counts in the FAC, and monetary relief pursuant to Section 19, 15 U.S.C. § 57b, in the amount of $3,086,239.99.

6.     A permanent injunction against all Defendants that permanently restrains and enjoins Defendants from advertising, promoting, or offering for

3

sale, or assisting others in marketing, promoting, or offering for sale, Protective Goods and Services, defined as "any good or service designed, intended, or represented to detect, treat, prevent, mitigate, or cure COVID-19 or any other infection or disease, including, but not limited to Personal Protective Equipment, hand sanitizer, disinfecting wipes, facemasks, and thermometers (Section I).

   7.   A permanent injunction against all Defendants that restrains and enjoins them from (Section II-III) misrepresenting Shipping times without a reasonable basis for all goods and services; (Section IV) misrepresenting other material aspects of goods and services; (Sections V-IX) making deceptive health benefit claims, claims about cures and treatments, and claims that Covered Dietary Supplements are FDA-approved or supported by clinical tests.

There are no genuine disputes of material facts, therefore, good cause exists for the Court to grant this Motion.

   Plaintiff made a good faith effort to resolve this matter without Court intervention pursuant to Local Rule 7-3.  This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on January 24, 2022, with additional meetings on February 8, 2022 and February 11, 2022 concerning related matters.

   This Motion is based on this Notice of Motion, the Statement of Uncontroverted Facts, Declarations and supporting evidence, any supplemental memoranda that may be filed in connection with the Motion, the pleadings and papers on file in this action, and on such oral argument and other matters as the Court may properly consider at the hearing of this Motion.

Respectfully submitted,

Dated:  February 14, 2022

/s/Katherine Johnson
KATHERINE E. JOHNSON, *admitted pro hac vice*
KRISTY M. TILLMAN, *admitted pro hac vice*
CHRISTOPHER ERICKSON, *pro hac pending*
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC  20580
(202) 326-2185; (Johnson)
kjohnson3@ftc.gov
(202) 326-3025; (Tillman)
ktillman@ftc.gov
(202) 326-3671
cerickson@ftc.gov
**Attorneys for Plaintiff**
FEDERAL TRADE COMMISSION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **Table of Contents**

TABLE OF AUTHORITIES ........................................................................9

INTRODUCTION ...................................................................................13

STATEMENT OF UNDISPUTED FACTS .............................................3

I.    THE DEFENDANTS .........................................................................3

II.   THE CORPORATE DEFENDANTS OPERATE AS A COMMON
ENTERPRISE ..........................................................................................5

III. DEFENDANTS' DECEPTIVE BUSINESS PRACTICES ..............5

A.  Defendants Aggressively Advertised Hand Sanitizer "In Stock & Ships Today"
With Little Inventory. ..............................................................................6

B.  Defendants Continued to Claim Fast Shipping Throughout the Pandemic
Despite Not Being Able to Timely Fulfill Orders. ..................................9

C.  Defendants Further Deceived Consumers with False Revised Shipping Dates
and Wrongfully Refused to Give Customers Refunds. ...........................14

D.  Defendants' DJN Hand Sanitizer Sales. ............................................16

E.  Defendants Sold Basic Immune IGG as a Covid Preventative. .........17

IV. INDIVIDUAL PARTICIPATION BY CONTROL PERSONS. .......21

V.  CONSUMER INJURY. ....................................................................23

ARGUMENT ..........................................................................................25

I.    THE FTC IS ENTITLED TO SUMMARY JUDGMENT ON ALL COUNTS
25

A.  DEFENDANTS VIOLATED MITOR .................................................26

i.   DEFENDANTS LACKED A REASONABLE BASIS FOR THEIR
SHIPPING TIME CLAIMS.......................................................................26

1.   Defendants Represented Clearly and Conspicuously they Would Ship Hand
Sanitizer the Same Day.........................................................................26

2.   Defendants Never Represented a Shipment Time Longer than 10 days...........27

3.   Defendants Lacked a Reasonable Basis for All of their Shipment Claims.......27

4.   Defendants Failed to Timely Ship....................................................30

5.   Defendants Failed to Ship Goods Consumers Ordered...................................31

ii.   DEFENDANTS FAILED TO GIVE DELAY OPTION NOTICES AND
REFUNDS. ...............................................................................31

1.   The Delay Option Notice.................................................................32

2.   Defendants' March 11 Delay Option Notice Was Insufficient and Untimely..32

3.   Defendants Failed to Deem Orders Cancelled or Honor Consumers' Requests
for Refunds...............................................................................34

iii.   ALL OF DEFENDANTS' HAND SANITIZER SALES THROUGH DJN
ARE PRESUMED TO VIOLATE MITOR....................................................35

B.   DEFENDANTS VIOLATED THE FTC ACT...................................................35

i.   DEFENDANTS DISSEMINATED DECEPTIVE SHIPPING TIME AND
RELATED CLAIMS. .......................................................................35

ii.   DEFENDANTS' DECEPTIVE COVID-19 PREVENTION AND
TREATMENT CLAIMS VIOLATED THE FTC ACT.........................................37

C.   PLAINTIFF IS ENTITLED TO MONETARY AND INJUNCTIVE RELIEF
    39

i.    REFUNDS TO CONSUMERS FOR LATE, UNSHIPPED, MATERIALLY DIFFERENT AND DAMAGED ORDERS TO REDRESS THEIR INJURIES IS NECESSARY AND APPROPRIATE........................................................................40

ii.   THE PROPOSED INJUNCTIVE RELIEF IS NECESSARY TO PROTECT CONSUMERS. ........................................................................................43

iii.  THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR INJUNCTIVE AND MONETARY RELIEF. ......................................................................47

CONCLUSION ........................................................................................50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. __ (2021)..................................................43

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................26

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).......................................................25

*CFTC v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806 (C.D. Cal. 1980), *aff'd*, 680

    F.2d 573 (9th Cir. 1982) .....................................................................................46

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999)......................................52

*FTC v. Algoma Lumber Co.*, 291 U.S. 67 (1933)....................................................50

*FTC v. Braswell*, 2005 WL 4227194, at *8 (C.D. Cal. Sept. 27, 2005).................41

*FTC v. Cardiff*, 2021 WL 3616071, at *7 (C.D. Cal. June 29, 2021) ....................45

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965).............................................49

*FTC v. Com. Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) .................................. 43, 44

*FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300 (D. Wyo. 2016) ...53

*FTC v. Cyberspace.Com LLC*, 453 F.3d 1196 (9th Cir. 2006) ...............................38

*FTC v. Direct Mktg. Concepts, Inc.*, 569 F.Supp.2d 285 (D. Mass. 2008) .............28

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ............................30

*FTC v. DiscountMetalBrokers, Inc.*, 2017 WL 4442998, at *4 (C.D. Cal. Oct. 4,

    2017) ......................................................................................... 26, 28, 30, 37

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993)................................ 37, 42, 43, 44

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ......................................................... 37, 46

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982).......................................46

*FTC v. Health Formulas, Inc.*, 2015 WL 2130504, at *13 (D. Nev. May 6, 2015)41

*FTC v. Ideal Fin. Solutions, Inc.*, 2016 WL 756527, at *19 (D. Nev. Feb. 23, 2016)

    ..................................................................................................................49

*FTC v. Inv. Devs., Inc.*, C.A. No. 89-642, 1989 U.S. Dist. LEXIS 6502, at *28-29 (E.D. La. June 7, 1989) ................................................................................50

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ..........................52

*FTC v. John Beck Amazing Profits*, 865 F.Supp.2d 1052 (C.D. Cal. 2012) ... 28, 29, 51

*FTC v. Lights of Am., Inc.*, 2013 WL 5230681, at *50 (C.D. Cal. Sept. 17, 2013) 51

*FTC v. Magui Publishers, Inc.*, 1991 WL 90895, at *15-16 (C.D. Cal. Mar. 28, 1991) ...........................................................................................................47

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ................. 50, 51

*FTC v. Noland*, 2021 WL 5493443, at *4-5 (D. Az. Nov. 23, 2021) ......................44

*FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994 (D. Nev. 2019), *aff'd*, 827 F. App'x 653 (9th Cir. 2020) ....................................................................................46

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ........................ 37, 39, 41, 46

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997) .............. 50, 51

*FTC v. QT, Inc.*, 448 F.Supp.2d 908 (N.D. Ill. 2006) ................................ 30, 37, 39

*FTC v. Smith d/b/a SalesCo.*, 01-10962 NM (PJWx) (C.D. Cal. Dec. 27, 2001) ...31

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ..................................................37

*FTC v. Wellness Support Network, Inc.*, 2014 WL 644749, at *17 (N.D. Cal. Feb. 19, 2014) .............................................................................................. 37, 39, 53

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ........39

*In the Matter of Southwest Sunsites, Inc.*, 105 FTC 7, 1985 WL 668880, at *109 (1985) ...........................................................................................................38

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) .......................................................46

*Solar Sun Rings, Inc. v. Pools*, 2016 WL 6139615, at *2 (C.D. Cal. Jan. 13, 2016) .......................................................................................................................25

*Sterling Drug, Inc. v. FTC*, 741 F.2d 1146 (9th Cir. 1984) ....................................39

*Trujillo v. Cty. of Los Angeles*, 2019 WL 6622853, at *3 (C.D. Cal. Jan. 22, 2019)
.................................................................................................................................26

*United States v. MyLife.com, Inc.*, 2021 WL 4891776, at *13 (C.D. Cal. Oct. 19,
2021) ......................................................................................................................44

*United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)......................................45

**Statutes**

15 U.S.C. § 45 ...........................................................................................................13

15 U.S.C. § 45(a) .......................................................................................................36

15 U.S.C. § 52 ...........................................................................................................13

15 U.S.C. § 52(a)(2) ..................................................................................................41

15 U.S.C. § 53(b) .......................................................................................................42

15 U.S.C. § 55 ...........................................................................................................41

15 U.S.C. § 55(b)-(c) .................................................................................................41

15 U.S.C. § 57b(a) .....................................................................................................41

15 U.S.C. § 57b(b) ................................................................................................41, 42

**Other Authorities**

40 Fed. Reg. 51582, 51587-88 (1975) ......................................................................29

**Rules**

16 C.F.R. § 435.1(e) ..................................................................................................26

16 C.F.R. § 435.2 .......................................................................................................37

16 C.F.R. § 435.2(a)(1) ..............................................................................................26

16 C.F.R. § 435.2(a)(4) ........................................................................................ passim

16 C.F.R. § 435.2(b)(1) .......................................................................................32, 35

16 C.F.R. § 435.2(b)(1)(ii) ........................................................................................34

16 C.F.R. § 435.2(b)(1)(iii) ..................................................................................33, 34

16 C.F.R. § 435.2(c)(1) ..............................................................................................36

16 C.F.R. § 435.2(c)(1) ............................................................................35

16 C.F.R. § 435.2(c)(5) ......................................................................... 35, 36

16 C.F.R. § 435.2(d) ...................................................... 32, 35, 36, 43

Fed. R. Civ. P. 56(c).................................................................................25

Fed. R. Evid. 201(b)..................................................................................13

# INTRODUCTION[1]

There is no genuine dispute of material fact that Defendants violated MITOR and the FTC Act.[2]  Exploiting consumers' desperation for hand sanitizer as quickly as possible at the outset of the COVID-19 Pandemic,[3] Defendants[4] falsely promised they had it "In Stock & Ships Today" and "Ships Fast from CA Today."  The uncontroverted evidence shows Defendants charged consumers for thousands of bottles of hand sanitizer they did not have, forcing consumers to wait weeks—sometimes months—for hand sanitizer they promised to ship "Today."  While Defendants immediately charged consumers for 43,633 hand sanitizer

---

[1] This Memorandum of Points and Authorities is supported by Plaintiff's Statement of Undisputed Facts ("SUF"), concurrently filed with this Motion and Memorandum in Support of Summary Judgment.

[2] Mail, Internet, and Telephone Order Rule ("MITOR"), 16 C.F.R. Part 435 and Sections 5(a) and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45 and 52.

[3] On March 11, 2020, the World Health Organization's Director-General declared the disease caused by the novel coronavirus SARS-CoV-2 ("COVID-19") could be characterized as a pandemic ("COVID-19 Pandemic" or "Pandemic").  SUF ¶ 1.  The Court may take judicial notice of the WHO's declaration as a fact that is "not subject to reasonable dispute" and which "can be accurately and readily determined from sources whose accuracy cannot be questioned."  Fed. R. Evid. 201(b).

[4] On August 4, 2020, the FTC filed this case against four Defendants: QYK Brands LLC, d/b/a Glowyy.com ("QYK"); Rakesh Tammabattula, QYK's Founder and Chief Executive Officer ("CEO"); DRJSNATURAL LLC, ("Dr. J's Natural" or "DJN"); and Jacqueline Nguyen, CEO of Dr. J's Natural and officer of QYK alleging that they violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Mail, Internet, or Telephone Order Merchandise Rule ("MITOR"), 16 C.F.R. Part 435.  SUF ¶ 2.  Plaintiff filed its First Amended Complaint on May 19, 2021 adding two corporate defendants, Theo Pharmaceuticals, Inc. and EASII, Inc., and alleging all corporate defendants operated as a common enterprise.  SUF ¶ 3.

orders, they did not ship any hand sanitizer to more than 2,500 consumers, and shipped more than 93% of the remaining orders later than promised.  Further violating the law, Defendants failed to inform customers of their right to an immediate refund or to consent to a specific delay.  Instead, Defendants waited until frustrated customers called demanding refunds, and then compounded the harm by promising new false shipping dates or insisting consumers intercept their mail carrier and reject the shipment or return it to obtain a refund.  Even when Defendants did ship hand sanitizer, albeit belatedly or after consumers demanded refunds, numerous consumers received materially different brands, sizes, or volumes than they ordered, and at times empty or leaking bottles due to poor packaging.

The uncontroverted evidence also establishes that Defendants further violated the FTC Act with deceptive claims that their dietary supplement, Basic Immune IGG, was a COVID-19 preventative.  Appearing on YouTube and Vietnamese-language television stations, Defendant Nguyen aka Dr. J, the CEO, founder, and spokesperson of Dr. J's Natural, claimed, without any scientific support, that taking the powder would prevent transmission of, treat, or reduce the risk of contracting COVID-19, further falsely claiming the product was FDA-approved and backed by clinical trials demonstrating the truth of these claims.

To put Defendants' actions in context, all the violations described above occurred during the initial phase of the COVID-19 Pandemic.  This was a year before vaccines would become widely available, when original variant case numbers in the United States were rising exponentially, and the news was filled with frightening reports of coronavirus-related deaths and hospitalizations.

Defendants' admissions, corporate records, numerous consumer declarations, consumer complaints, and other evidence make clear that there is no

genuine dispute as to any material fact, Defendants' liability, or the amount of consumer injury.  Summary judgment is therefore appropriate.

## STATEMENT OF UNDISPUTED FACTS

### I.   THE DEFENDANTS

1.   **QYK Brands, LLC** is a California Limited Liability Company formed in 2017 with its principal place of business in Anaheim, California.[5]  QYK owns multiple brands and companies that sell skin care, health, beauty, personal care, and wellness products, including through its websites qyk.us, qyksonic.com, glowyy.com, and drjsnatural.com.[6]  Glowyy is QYK's online storefront operating through the website glowyy.com, which offers various brands of beauty, skin, personal care, and PPE products.  Glowyy launched in March 2020.[7]

2.   **Rakesh Tammabattula** is the CEO and founder of QYK and several other entities in the tech, beauty, wellness, and personal care industries, including the Theo Pharmacy online prescription fulfillment service.[8]  Mr. Tammabattula resides in the district.[9]

3.   **Dr. J's Natural, LLC** is a California Limited Liability Company, headquartered in Garden Grove, California, and formed in March 2020.[10]  Dr. J's Natural sells products through its website, drjsnatural.com.[11]  QYK promotes products from Dr. J's Natural through Glowyy.[12]

---

[5] SUF ¶ 4.  QYK and DJN were located at 10517 Garden Grove Blvd, Garden Grove, CA until approximately May 2020, when QYK moved to 3373 E. La Palma Blvd., Anaheim, CA.  In approximately November 2020, QYK and DJN moved to 12101 Western Ave., Anaheim, CA. SUF ¶ 6.

[6] SUF ¶ 10.

[7] SUF ¶ 12.

[8] SUF ¶ 13.

[9] SUF ¶ 14.

[10] SUF ¶ 16.

[11] SUF ¶ 17.

[12] SUF ¶ 18.

4.     **Jacqueline Thao Nguyen (aka "Dr. J")** is a "clinical compounding pharmacist" (license suspended),[13] who sells health and wellness products, including hand sanitizer, under the brand name "Dr. J's Natural."[14]  Dr. J is an owner of QYK (and has also represented herself as a principal of the company) and CEO of Dr. J's Natural.[15]  Dr. J and Mr. Tammabattula are husband and wife and reside in the district.[16]

5.     **Theo Pharmaceuticals, Inc.** is a California Corporation with its principal place of business at 10517 Garden Grove Blvd, Anaheim, California.[17]  Theo Pharmacy was founded by Dr. J in 2014, but corporate records show Defendant Tammabattula as the owner and controlling officer.[18]  Until in or around March 2020, Theo Pharmacy was an online pharmacy retailer.[19]

6.     **EASII, Inc. ("EASII")** is a Delaware Corporation with its principal place of business in Santa Ana, California.[20] Defendant Tammabattula is the CEO of EASII.[21]

---

[13] On October 8, 2018 (effective November 7, 2018), the State of California Board of Pharmacy entered into a Stipulated Settlement and Disciplinary Order with Dr. J suspending her from practice as a pharmacist for three (3) years, and thereafter placing her on probation for an additional five (5) years.  SUF ¶ 21.  As part of the Stipulation, Dr. J admitted to the charges, which included "Unprofessional Conduct Involving Acts Involving Dishonesty, Fraud, or Deceit," "Unlawful Holding and Offering for Sale of Adulterated Dangerous Drugs," and "Excessive Furnishing of Controlled Substances," among others.  SUF ¶ 22.  Dr. J voluntarily suspended her license in approximately November 2019.  SUF ¶ 22.
[14]  SUF ¶ 24.
[15] SUF ¶ 26.
[16] SUF ¶ 32.
[17] SUF ¶ 33.
[18] SUF ¶¶ 34-35.
[19] SUF ¶ 36.
[20] SUF ¶ 37.
[21] SUF ¶ 38.

4

## II.    THE CORPORATE DEFENDANTS OPERATE AS A COMMON ENTERPRISE

There is no dispute that Defendants Tammabattula and Dr. J operate QYK, DJN, Theo, and EASII ("Corporate Defendants") as a common enterprise.[22] Defendants admit Defendants Tammabattula and Dr. J have conducted the business practices described below through interrelated companies that share common ownership, officers, employees, and office locations, and agree that, because the Corporate Defendants have operated as a common enterprise, each is liable for the acts and practices alleged in the First Amended Complaint.[23]

## III.    DEFENDANTS' DECEPTIVE BUSINESS PRACTICES

In November 2019,[24] Defendants began developing www.glowyy.com ("Glowyy website") using the Shopify e-commerce platform.[25]  Defendants initially started the Glowyy website to sell beauty products.[26]  At the beginning of the Pandemic, however, Defendants changed their plans in order to capitalize on consumers' demand for hand sanitizer.[27]  Beginning on or around March 4, 2020, Defendants began offering Dr. J's Natural (and other branded) hand sanitizer through the Glowyy and DJN websites (DJN brand only).[28]  Additionally, they sold other (in their own words) "Pandemic Products" and "Current Essentials," including facemasks, shields, surface wipes, disinfectants, and other Personal Protective Equipment ("PPE").[29]

---

[22] SUF ¶¶ 40-42.
[23] SUF ¶¶ 40-42.
[24] SUF ¶ 43.
[25]  SUF ¶¶ 44-45.
[26] SUF ¶ 51.
[27] SUF ¶ 52.
[28] SUF ¶¶ 53, 57.
[29] SUF ¶ 54.

### A. Defendants Aggressively Advertised Hand Sanitizer "In Stock & Ships Today" With Little Inventory.

To kick off sales of hand sanitizer, Defendants began an aggressive online marketing campaign.[30] Specifically, on or around March 4, 2020, Defendants began advertising hand sanitizer with the claim "In Stock & Ships Today" through Google.[31] Moreover, they displayed the following ad in response to keyword searches for, *inter alia*, "human coronavirus," "buy hand sanitizer" and "hand sanitizer in stock":[32]



(the "March 4 Google AdWords' campaign"). Defendants simultaneously started several other online campaigns using tools provided by Shopify to advertise through Facebook and on Bing.[33] On March 6, 2020, for example, Defendants promoted the sale of hand sanitizer through non-traditional sales platforms such as Reddit via links to direct traffic to hand sanitizer on the Glowyy website.[34] Around the same time, they also promoted their hand sanitizer through Instagram and

---

[30] *See* SUF ¶¶ 58-76 (discussing the various hand sanitizer campaigns).

[31] SUF ¶ 59. Defendant Tammabattula testified at deposition that the Google AdWords' campaign started on the evening of March 3, but admitted in RFAs that he commenced the same campaign on March 4, 2020. *See id.*

[32] SUF ¶¶ 62-64.

[33] SUF ¶ 66.

[34] SUF ¶¶ 68, 71-75.

6

Twitter.[35]  Defendants ran the March 4 Google AdWords' campaign until at least

March 18, 2020.[36]  Defendants' efforts proved exceedingly fruitful.  Although

Defendants had never sold a single item through the Glowyy website previously,

consumers' bought thousands of bottles of hand sanitizer within the first few days

of Defendants' marketing campaign.[37]

Despite advertising they had hand sanitizer "In Stock & Ships Today",

Defendants had very little hand sanitizer (at most six bottles)[38] they could ship to

customers until March 9, 2020—5 days after making their first promises.  Between

March 4 (the beginning of the campaign) and March 9 (when Defendants received

their first delivery of hand sanitizer), consumers paid Defendants for 18,337 bottles

of hand sanitizer they did not have.[39]  Even after March 9, Defendants did not have

enough hand sanitizer to fulfill all those orders, having received only 1,384

bottles.[40]  Critically, of those, 310 bottles arrived damaged and unusable.[41]

---

[35] SUF ¶ 76.  Defendants also promoted the sale of hand sanitizer on
drjsnatural.com through Facebook and Instagram ads.  SUF ¶ 265.  DJN never
advertised through Google.  SUF ¶ 268.

[36] SUF ¶ 77.

[37] SUF ¶ 79.  Defendants sold and consumers purchased at least 147,953bottles of
hand sanitizer between March 4 and March 18, while the Google AdWords'
campaign was running.  SUF ¶ 80.

[38] Prior to launching the March 4 Google AdWords and other advertising
campaigns, Defendants had *at most* six bottles of hand sanitizer—three, 50ml (1.6
ounce) bottles and three, 100ml (3.3 ounce) bottles, ordered on February 21, 2020.
SUF ¶ 94.  Defendants claim they purchased 2,000 bottles of hand sanitizer for a
trade show in connection with efforts to promote the Dr. J' s Natural brand at a
white label expo in Las Vegas, taking place February 26, 2020.  SUF ¶ 92-93.
However, Defendants' records and the shipping records obtained from third party
shippers Federal Express Corporation and DHL show that Defendants received
only *six* bottles among various other beauty products.  SUF ¶ 94-95.

[39] SUF ¶¶ 82, 113.

[40] SUF ¶ 83.

[41] SUF ¶¶ 84, 111.  These bottles came from Syndy Pharma, comprising the only
hand sanitizer Defendants got from India.  SUF ¶ 112.

7

During the entire period in which Defendants admit they disseminated the
"In Stock & Ships Today" claim, *i.e.*, March 4-March 18, Defendants continued to
sell hand sanitizer they did not have.[42]  For instance, Defendants did not receive
any 8 oz hand sanitizer until at least March 19, 2020.[43]  By that date, however,
consumers had paid for over 8,000 bottles of Dr. J's Natural Brand 8 oz hand
sanitizer.  Similarly, Defendants sold kids' hand sanitizer beginning on March 4,
but received none until at least March 11.[44]  Even then, what did arrive was far less
than what consumers had already paid for.[45]

Contrary to their claims of ready availability, Defendants had little inventory
of hand sanitizer for much of March 2020,[46] and Defendants knew it.  In fact,
Defendants knew as early as March 4 they lacked sufficient inventory to fill orders,
and that obtaining additional hand sanitizer would be difficult.[47]  For example, in

---

[42] SUF ¶ 90 (hand sanitizer received between March 4 and March 19 was over
100,000 bottles less than what consumers bought); *see also* SUF 89 (Defendants
sold kids' and sanitizer beginning March 4 but none arrived until March 19); SUF
¶¶ 86-87; 118-119 (sold 9,343 bottles of 8 oz hand sanitizer between March 4-19,
but did not receive any until March 19); SUF ¶¶ 113-114 (consumers purchased
18,337 bottles between March 4 and 9, but Defendants received no inventory
during that time and only had six bottles to start).  Notably, the March 4 Google
AdWords' campaign ended on March 18 only because Google suspended the
Defendants' Google AdWords account.  SUF ¶¶ 189, 317.  However, as explained
*infra* at 11, 46, this did not stop Defendants from continuing to advertise that hand
sanitizer ships "Today", which it did using another Google AdWords account from
April 1 to approximately May 18, when that account, too was also suspended.
SUF ¶¶ 190-194.

[43] SUF ¶¶ 86-87; 118-119 (sold 9,343 bottles of 8 oz hand sanitizer between March
4-19, but did not receive any until March 19).

[44] SUF ¶¶ 89, 90 (-160 bottles [2.7 oz]).

[45] SUF ¶ 90 (showing negative inventory, *i.e.*, how many received versus sold, as
of March 19, 2020, as follows:  -160 bottles [2.7 oz]; -19,522 bottles [3.3 oz]; -
3487 bottles [8 oz], -99,148 bottles [10 oz]).

[46] SUF ¶¶ 91, 122.

[47] SUF ¶ 124. *See also* SUF ¶ 320.

early March, India banned the export of hand sanitizer and Defendants thus were unable to receive hand sanitizer from their only two suppliers: Syndy Pharma and Ayur, both in India.[48]  In response, Defendants scrambled to find new suppliers in China and elsewhere.[49]  Defendants received no hand sanitizer from domestic contract manufacturers until April (and what they did receive was vastly less than what they had promised).[50]  At least through mid-April 2020, Defendants failed to secure enough inventory to fulfill its outstanding orders—which at that point numbered in excess of 153,000 that consumers had paid for—yet continued to advertise same-day shipping through online ads.[51]

**B.    Defendants Continued to Claim Fast Shipping Throughout the Pandemic Despite Not Being Able to Timely Fulfill Orders.**

Unsurprisingly, with little inventory, Defendants' shipments to customers were not shipped "Today" as promised.[52]  There is no dispute Defendants were unable to ship their first weeks' orders timely:  Defendants did not "fulfill" any

---

[48] SUF ¶¶ 126-127.

[49] SUF ¶ 128 (China), ¶ 133 (domestic contract manufacturers); *see also* SUF ¶¶ 328-329 (enlisted help of brother to source sanitizer from domestic suppliers).

[50] SUF ¶¶ 140-146; SUF ¶ 441.

[51] SUF ¶ 149.

[52] SUF ¶¶ 197-198.  Shopify does not maintain information for shipments (only the tracking number), but it records a "fulfilled_at" date, which is the date Defendants purchase and print a shipping label. SUF ¶¶ 49;-50; ¶¶ 153-154, 412.  Thus, in order to determine the shipment date, *i.e.*, the date Defendants actually placed items into the hands of a mail carrier, the FTC obtained shipping records from the United States Postal Service ("USPS") and United Parcel Service ("UPS") using the tracking information associated with each customer order ("Mail Carrier Shipment Records").

9

orders before March 7,[53] and did not ship any orders before March 11, 2020.[54] Defendants acknowledged their significant delays in numerous communications with consumers, blaming, *inter alia*, the uncertain supply chain,[55] insufficient staff,[56] prioritizing sales to hospitals and charities (*i.e.*, bulk and wholesale customers),[57] and the sheer volume of orders[58] as reasons for their delay. Defendants also admit they faced additional issues impeding timely shipping. For example, they ordered bottles of hand sanitizer without labels (or with foreign labels that needed relabeling) when they initially had no labeling machine and labeled bottles by hand;[59] and Defendants' domestic suppliers were untested vendors that ultimately proved unreliable.[60]

Facing these delays and lack of inventory, Defendants repeatedly modified the "processing times"[61] on the Glowyy website. However, Defendants continued

---

[53] SUF ¶¶ 151, 115. Defendants admit that they did not always ship orders on the date they printed the label (*i.e.*, the "fulfilled_at" date). SUF ¶ 207. Which fact is obvious from the Mail Carrier Shipment Records.

[54] At that point, they only had 1,074 undamaged bottles in stock, SUF ¶ 111, but consumers had paid for more than 18,000 bottles of hand sanitizer, SUF ¶ 113, and were continuing to order in response to Defendants' unbroken string of advertising shipping "Today."

[55] SUF ¶ 156.

[56] SUF ¶ 157.

[57] SUF ¶ 158.

[58] SUF ¶ 159.

[59] SUF ¶¶ 161-162.

[60] SUF ¶¶ 163-164; SUF ¶ 147.

[61] Defendants' websites (both Glowyy and DJN) contained some variation of the following language: "Due to the overwhelming demand because of the outbreak we are experiencing long processing times. Please expect 5-7 days for the order to be processed. Customers selecting overnight shipping, please beware that we can ship overnight only when your order is ready to be processed, but the same day order is placed." SUF ¶ 168. Defendants concede that these "processing times" were intended to convey the amount of time it took to print the label and prepare

10

to promise fast shipment times that they could not, and did not, meet.[62] In fact, Defendants admit they never told consumers they would take more than 10 days to ship orders, yet Defendants took more than 10 days to mail 31,568 orders.[63]

Significantly, even while amending shipping dates on their website, Defendants neither paused nor stopped the March 4 Google AdWords' campaign and thus continued to advertise *even faster* shipping times—ships "Today"—via Google (which was the principal driver of customers to the Glowyy website).[64] Google suspended Defendants' AdWords account on March 18, 2020 for violating Google's advertising policies. Undeterred, Defendants continued similar, equally deceptive ads through another Google AdWords account, advertising hand sanitizer ships "Today" from April 1, 2020 until approximately May 18, 2020.

---

the package for shipment, *i.e.*, the time to place an order into the hands of a mail carrier. SUF ¶¶ 187, 264.

[62] For instance, the Defendants claimed the following: from 3/11/20 to 3/18/20, hand sanitizer Ships within 3 to 5 days (SUF ¶ 171); from 3/19/20 to 3/30/20, hand sanitizer Ships within 7 to 10 days; (SUF ¶ 172); on 4/1/20, hand sanitizer Ships within 3 to 5 days (SUF ¶ 173); on 4/13/20, hand sanitizer Ships within 5 to 7 days (SUF ¶ 174); on 4/19/20, hand sanitizer Ships within 3 days (SUF ¶ 175); from 5/1/20 to 5/7/20, hand sanitizer Ships within 3 to 5 days (SUF ¶ 176); on 5/15/20, hand sanitizer Ships within 3 to 7 days (SUF ¶ 177). "Ship," "Shipping" or any derivation thereof was defined in the Requests for Admissions ("RFAs") to mean the day or date Defendants physically placed ordered merchandise into the possession of a mail carrier. SUF ¶ 181. Defendants admitted in QYK and Defendant Tammabattula's RFAs that they made these claims. *See* SUF ¶¶ 171-177.

[63] *See* SUF ¶ 179. Defendants separately admit the allegation in Count II of the FAC alleging that they represented shipping times of one day or 7 days, and they admit that they did not ship within those times. SUF ¶ 180.

[64] SUF ¶ 188. Despite being aware of the significant delays, Defendants never stopped or paused their March 4 Google AdWords' campaign, which drove tens of thousands of customers to the website. SUF ¶ 184.

11

Defendants kept no records of the "processing times" they placed on the Glowyy website.[65]  However, Defendants admit they disseminated the ships "Today" advertisements via Google between March 4 and March 18, 2020; and again between April 1, 2020 and mid-May 2020;[66] they admit they never told consumers it would take more than 10 days to ship;[67] and admit in their answer to the FAC that they claimed one day or seven days to ship.[68]  Unsurprisingly, Defendants did not ship hand sanitizer to their customers within any of these promised timespans.  A detailed analysis based on Mail Carrier Shipment Records and Defendants' Shopify data shows that between March and August 2020 (when the FTC filed this case), consumers placed 43,633 orders for hand sanitizer and PPE, of which 39,724 were shipped late.[69]

---

[65] Defendants did not produce any such records.

[66] SUF ¶ 59 (admitting March 4 Google Campaign disseminated the ad "In Stock & Ships Today" through March 19) and ¶¶ 191-192 (Defendant Tammabattula admitting the campaign disseminated "Ships Fast From California Today", which started April 1, ended around mid-May).

[67] SUF ¶ 178.

[68] SUF ¶ 180.

[69] SUF ¶ 389-391.  Defendants Shopify database contained at least 43,749 orders for PPE or hand sanitizer items with payment information.  *See* SUF ¶ 388.  Of these, 3,837 orders did not have shipping information from Mail Carrier Shipment Records, but 1,335 had "fulfilled at" dates.  *See* SUF ¶ 392.  The remaining 2,502 orders had neither a "fulfilled at" date nor shipment date, SUF ¶ 392, and thus are presumed not to have shipped at all.

| Time Period | Shipping Time Claim | Total Orders Purchased | Total Shipped Late |
|---|---|---|---|
| 3/4/20 - 3/18/20 | 1 day | 22,305 | 20,902 |
| 3/19/20 - 3/31/20 | 10 days | 6,779 | 6,241 |
| 4/1/20 - 5/18/20 | 1 day | 13,931 | 12,575 |
| 5/19/20 – 8/31/20 | 10 days | 618 | 6 |
| Total | | 43,633 | 39,724 |

Importantly, almost 11,000 orders were shipped 30 days or more after the customer paid for the items.[70]  Over 93% of all orders in March and April were shipped after Defendants' promised shipping times.[71]  Moreover, in May, when sales dropped precipitously (from 42,000 orders in March and April to just 1,244 orders in May), Defendants still shipped more than 40% of orders late—in fact, in May Defendants were still shipping orders from March and early April.[72]

Defendants compounded the harm caused by their illegal false shipping claims with concerted efforts to prevent consumers from obtaining the refunds to which they were entitled.  These efforts include charging consumers up front, and giving them false "new" shipping dates, refusing their cancellation demands, lying about the inability to cancel once a shipping label was printed, and harassing consumers into paying, even after successful chargebacks.

---

[70] SUF ¶ 394 (10,560 orders shipped 30 days or more after "paid_at" date).  These shipments are untimely *per se* under MITOR.  *See infra* at 26 (30-day default).
[71] SUF ¶ 199.  Additionally, Defendants also failed to ship significant numbers of shipments within the "processing times" claimed on the website.  SUF ¶ 395.
[72] SUF ¶ 202.

13

**C.      Defendants Further Deceived Consumers with False Revised Shipping Dates and Wrongfully Refused to Give Customers Refunds.**

Immediately after consumers placed their orders, Defendants charged their credit cards or PayPal accounts.[73]  Shortly thereafter, Defendants generated a tracking number and shipping label, and sent customers an email with the number stating the item was "on its way."[74]  Consumers naturally understood the receipt of the email and tracking number to mean Defendants had shipped the product.[75]  Defendants were aware[76] customers believed this, but on only one date in March preemptively emailed waiting customers about any delay.[77]

Customers who had not received their items contacted the company because of the delays.[78]  Some of these consumers received no response;[79] others were told that there was a delay, but they would receive their orders soon (sometimes with a specific date range).[80]  When consumers still did not receive these inquiry-driven deliveries as promised, many contacted the Defendants again and were strung along with numerous false revised shipping dates.[81]  For example, in one typical exchange, a customer emailed the company to ask on March 14, 2020 about his order status, two days after placing the order.[82]  A Glowyy customer representative informed him the order would be shipped the "latter part of the week."[83]  The

---

[73] SUF ¶ 204.
[74] SUF ¶ 206.
[75] SUF ¶ 208.
[76] SUF ¶ 209.
[77] SUF ¶ 215.  *See infra* at 32-34 (discussion re Delay Option Notice).
[78] SUF ¶ 217.  Customers also contacted DJN to complain about delays.  SUF ¶ 273.
[79] SUF ¶ 217.
[80] SUF ¶ 218.
[81] SUF ¶ 219-220.
[82] SUF ¶ 221.
[83] SUF ¶ 221.

customer reached out again on March 20, 2020, to verify shipment and was told to "please allow 7-8 business days" and that "the order will be shipped next week."[84] When the customer complained that he had already been told once the package would ship "next week," the Glowyy rep explained the company was "a little behind on our fulfillment" due to a "overwhelming number of orders;" they "cannot anticipate the developments as they come;" that it was a "volatile situation;" and to "please bear with us."[85]  When pressed, the representative stated the order would be shipped on March 24th.  On March 25, 2020, Defendants generated a shipping label, prompting the customer to verify the items would be shipped soon.[86]  Defendants confirmed the "package is ready for dispatch at our facility."[87]  However, the package was not sent for another month.  During that time, the customer contacted the company several more times.  The Glowyy rep informed the customer, as they had numerous others, they were going send the items with their next batch of orders on April 13, 2020, now that they "finally secured a cargo plane with the necessities to fulfill all our delayed orders."[88]  The customer's order (placed on March 12, 2020) *was not shipped until April 26, 2020*.[89]  Defendants never informed this customer, as MITOR requires, of his right to cancel or obtain a refund.[90]  Indeed, Defendants specifically instructed customer representatives to avoid refunds and offer revised shipping dates, substitutions, and refunds of shipping charges instead.[91]

---

[84] SUF ¶ 221.
[85] SUF ¶ 221.
[86] SUF ¶ 221.
[87] SUF ¶ 221.
[88] SUF ¶¶ 222, 228.
[89] SUF ¶ 222.
[90] SUF ¶ 222.
[91] SUF ¶ 221.

Many frustrated customers demanded refunds.[92]  Outrageously, Defendants told those customers they could not issue a refund once they had created a shipping label—a cost-free exercise for Defendants with no relationship to an actual shipping date—instructing those customers to instead intercept the mail carrier, reject and return the package to sender to receive a refund.[93]  Unsurprisingly, customers who had tried to cancel were incredulous they had to wait for unshipped items to arrive in the mail, and then return them to get their money back.[94]  Defendants' policy not to authorize refunds once items were in "preshipment"[95] generated dozens of complaints (if not more).[96]

Further, ignoring customers' requests for cancellation and refunds, Defendants sent orders after consumers informed the company they no longer wanted them.[97]  When Defendants realized that some of these customers had been successful in obtaining chargebacks through their credit card companies, Defendants harassed them relentlessly for payment.[98]  Some customers complied with Defendants' illegal requests and paid again for hand sanitizer they clearly had already cancelled and did not want.[99]  Throughout, Defendants kept no records documenting the shipment date for orders placed.

## D.      Defendants' DJN Hand Sanitizer Sales.

On or around March 4, when Defendants began selling hand sanitizer through Glowyy, they also started similar campaigns to sell hand sanitizer through

---

[92] SUF ¶ 258.
[93] SUF ¶¶ 244-46, 249-253, 255-256.
[94] SUF ¶ 254.
[95] *See* SUF ¶ 255.
[96] SUF ¶ 257.
[97] SUF ¶ 259.
[98] SUF ¶ 260.
[99] SUF ¶ 261.

DJN.[100]  As with Glowyy, Defendants disseminated various processing times on the DJN website,[101] and disseminated various ads through Facebook, Instagram, and Twitter promoting the sale of hand sanitizer through DJN and claiming it was "In Stock."[102]  However, Defendants did not engage in a separate Google AdWords' campaign for DJN.[103]  As a result, Defendants sold substantially less hand sanitizer through DJN.[104]  Defendants, however, received numerous complaints from irate customers about delays,[105] broken and leaking bottles,[106] and materially different substitutions.[107]  Again, many customers requested refunds or cancellations, which the company did not always honor.[108]  As with Glowyy, Defendants used a third-party e-platform to manage the DJN website called Big Commerce.[109]  Similar to Shopify, Big Commerce maintains order data, but does not keep detailed tracking information showing shipment date.[110]  These records show consumers purchased $406,333.30 of hand sanitizer through DJN between March and August 2020.[111]

### E.     Defendants Sold Basic Immune IGG as a Covid Preventative.

In addition to hand sanitizer and other PPE, Defendants also offered a product called Basic Immune IGG.[112]  Basic Immune IGG contains

---

[100] SUF ¶ 262.

[101] SUF ¶¶ 263-264.

[102] SUF ¶¶ 265-266.  They also disseminated ads on Twitter that stated hand sanitizer ships "Today."  SUF ¶ 267.

[103] SUF ¶ 268.

[104] *See* SUF ¶ 269.

[105] SUF ¶¶ 270-271.

[106] SUF ¶¶ 272-273.

[107] SUF ¶ 275.

[108] SUF ¶ 276.

[109] SUF ¶ 277.

[110] SUF ¶ 278.

[111] SUF ¶ 279.

[112] SUF ¶¶ 280-281.

"ImmunoLin®," a serum-derived bovine immunoglobulin ("SBI") protein powder manufactured by Entera Health, Inc.[113]  Entera Health promotes the product primarily for healthy digestion and immune function.[114]  Entera Health authorizes the sale of ImmunoLin through doctors' offices and does not appear to sell the product directly to consumers.[115]

Contrary to Entera's advertising, in online videos, Defendants claimed Basic Immune IGG can prevent transmission of COVID-19; and Basic Immune IGG has been clinically tested and is FDA-approved for prevention of COVID-19 transmission.[116]  Defendants made these claims most pointedly in their Vietnamese language videos.  For example, on or about April 2, 2020, Dr. J appeared on a newscast on Saigon Entertainment Television (SET) and stated that Basic Immune IGG could "prevent" COVID-19 by boosting the immune system:[117]

> the immunoglobulin antibody therapy that I take with this powder, like how I drank and showed you earlier, is to increase my existing antibodies and make them stronger.  The product helps strengthen the army of soldiers already present in my body.  **Then, let's say if one coronavirus happens to infiltrate my body, I already have about five hundred thousand antibodies, thanks to this powder.  They would cling to and bite that coronavirus, push it out and kill it. . . .** And now if Mr. Do Dung or our dearest audience haven't taken this antibody powder yet, it means that if the coronavirus enters your body, Mr. Do Dung and you only have 5,000

---

[113] SUF ¶ 286.
[114] SUF ¶ 287.
[115] SUF ¶ 288.
[116] SUF ¶ 291.
[117] SUF ¶ 292.

antibodies while I have 500,000 of them, because I have been taking this antibody powder.[118]

She further claimed mixing Basic Immune IGG with drinking water could ward off COVID-19 infections, even if sitting next to an infected person:

> [L]et's say if I sit next to Mr. Do Dung or someone else or happen to touch something and get infected with Covid-19, at least I have already had more antibodies that can detect the invasion and cling to and attack the coronavirus.  It's like, the antibodies will say, "hey, bacteria are penetrating the body, let's come and fight it off."[119]

During this same "newscast," Dr. J also claims Basic Immune IGG has been FDA-approved and has undergone clinical trials proving the efficacy of Basic Immune IGG for treatment, prevention, and reducing the risk of COVID-19 infection.  For example, in response to the question "Is it guaranteed that we will stay safe [from COVID-19]?" Dr. J responds, "It's guaranteed, because there is FDA's verification and approval."[120]

Similarly, immediately after discussing the successful treatment of COVID-19 patients with plasma therapy—in which antibodies harvested from those recovering from COVID-19 are used to treat patients "at risk of death"—Dr. J went on to explain she was

> very happy, that at the same time, my company has released a product called Immune IgG.  Our parent company is the only company obtaining the registered trademark for this antibody product from the FDA [].  We have conducted clinical studies, involving the extraction and cultivation of

---

[118] SUF ¶ 294.

[119] SUF ¶ 295.

[120] SUF ¶ 296.

antibodies taken from cow blood, which is then made into this antibody powder."[121]

Two English-language videos on YouTube also touted Basic Immune IGG as a preventative and treatment for COVID-19 with similar claims.[122]  For instance, in a June 8, 2020 video in which Dr. J responds to questions regarding COVID-19 from consumers, she addresses the question, "What is the best preventative measure to take now?"[123]  Her response—use Dr. J's hand sanitizer and take Basic Immune IGG.  Basic Immune IGG will boost the immune system, "*so just in case you get infected with the virus, then your body will be able to fight back and destroy all the Coronavirus that is entering your body*."[124]

Likewise, in a June 11, 2020 English-language YouTube video titled "How Does Immune Igg Work," Dr. J claimed Basic Immune IGG was a "prevention" for COVID-19, and suggested it had been clinically tested and had a "patent" from the FDA for COVID-19 prevention and treatment.[125]  In that video, Dr. J further claimed Basic Immune IGG is specifically formulated to target COVID-19:  "out of all of the product on the market right now, whether it's Echinacea, zinc, vitamin C, probiotic, those are just a small part of the equation that will boost up your immune system.  But to be specific and to be laser-target [sic], immune IgG will boost up your antibody and your immunoglobulin for your body to help recognize viruses and bacteria, especially coronavirus."[126]

---

[121] SUF ¶ 297.
[122] SUF ¶ 298.
[123] SUF ¶¶ 299-300, 304.
[124] SUF ¶ 305.
[125] SUF ¶ 306.
[126] SUF ¶ 307.

Of course, Defendants had zero basis for these claims, and now admit as much.[127]

## IV.   INDIVIDUAL PARTICIPATION BY CONTROL PERSONS.

Defendant Tammabattula admits he had the authority to control, or "participated in the acts and practices of QYK, EASII, and Theo Pharmacy."[128] Critically, Defendant Tammabattula knew he could not ship hand sanitizer "Today" as claimed in his advertising. Defendant Tammabattula learned on March 3 or 4 that the first shipment of hand sanitizer expected from India would be delayed and he did not know when it would arrive.[129] Moreover, he knew he had only 6 bottles in inventory when he started advertising.[130] Rather than halt the false advertising campaign, Tammabattula continued making false claims even though he had no (or woefully insufficient) hand sanitizer in stock.

Further, Tammabattula's public statements demonstrate he knew he could not fulfill orders, let alone ship in the timeframes he promised.[131] For instance, in a March 26, 2020 article published online (and subsequently posted on qyk.us), Defendant Tammabattula said Defendants "saw the surge in searches for hand sanitizer [in early March]. That's when we started ramping up our production."[132]

---

[127] SUF ¶¶ 309, 312-313, 377-378; *see also infra* n.198 (admitting lacked substantiation in answer).

[128] SUF ¶¶ 314-15, 318-327. *See also* SUF 40-42 (admitting to common enterprise of Corporate Defendants).

[129] SUF ¶ 316.

[130] SUF ¶ 94.

[131] *See* SUF ¶¶ 330-352.

[132] SUF ¶¶ 334-335. Notably, the numerous advertisements and statements by Tammabattula and Dr. J conveyed another lie—that they were manufacturing the hand sanitizer in-house. SUF ¶ 375. In reality, they contracted with third parties to manufacture a generic formula of hand sanitizer approved by the FDA, or used hand sanitizer that was already being manufactured for distribution under "white labels," that is, for any company that will pay. SUF ¶ 376.

Yet, just a few days later, he was quoted in another news article stating the company only had enough raw ingredients for about two weeks' worth of hand sanitizer, and "timelines for production have been extended six to eight weeks" compared to the typical two or three weeks.[133]  Similarly, in an April 3, 2020 article, Mr. Tammabattula reiterated they did not have enough raw ingredients for hand sanitizer:  "From alcohol and polymer compounds to the plastic bottles and dispensing pumps.  They are sold out and back-ordered for about 8 weeks from all traditional sources."[134]

Numerous emails further demonstrate that Defendants knew of the difficulties in getting hand sanitizer through customs, with multiple shipments detained or not released at all.[135]  Defendant Tammabattula also knew they allowed customers to purchase hand sanitizer based only on hopeful expectation of receiving shipments, not the actual inventory they claimed.[136]  Moreover, he was aware of the hundreds of complaints pouring in every day about late and delayed hand sanitizer orders.[137]  Tellingly, he knew Shopify was concerned about the mounting number of unfulfilled orders piling up in the system.[138]  For example, on March 16 he told Shopify the company "will be able to fulfill 90% of the orders this week" even though that was completely baseless and proved wholly untrue.[139]

Dr. J was also aware of the companies' shipping problems.[140]  Dr. J likewise admits that she had the authority to control and participated in the activities of her

---

[133] SUF ¶ 336.
[134] SUF ¶ 338.
[135] SUF ¶ 351.
[136] SUF ¶ 352.
[137] SUF ¶ 353.  He was also aware that consumers complaint of receiving incorrect merchandise.  SUF ¶ 363.
[138] SUF ¶ 354.
[139] SUF ¶¶ 354-355.
[140] SUF ¶¶ 365-366; 368-374.

22

companies.[141]  Dr. J was directly involved in printing labels and labeling
shipments, and thus had direct knowledge of the significant shipping delays.[142]  In
a video appearing on YouTube April 2, 2020, she publicly admitted the numerous
complaints and concerns about the shipping delays, acknowledging Defendants
were experiencing delays and imploring consumers to "be patient . . . I know that I
will have over 100,000 bottles of hand sanitizer, the 300ml, that we can be able to
send out."[143]  In these statements, she admits that at least some consumers have
been waiting more than 7 days due to "uncertainty on the manufacturing side," and
that it has been "difficult to source the bottle or the pump."[144]

Despite knowing that Defendants would not be able to fulfill orders,
Defendants Tammabattula and Dr. J continued to falsely advertise that products
were in stock and would ship today or within days, and continued to take orders
based on these shipping claims through August, when the FTC filed this action.

Moreover, Dr. J made outrageous COVID-19 prevention and treatment
claims, targeting a Vietnamese-speaking audience, knowing these claims were
likely false and not backed by competent and reliable scientific evidence.
Importantly, Defendant Tammabattula admits he knew there was no scientific
evidence to support these claims, and Defendants both admit that Basic Immune
IGG is not FDA approved as a COVID-19 preventative.

## V.   CONSUMER INJURY.

Defendants have caused significant injury to consumers.  The FTC has
attached four declarations from consumers, as well as the declaration of its
investigator identifying more than 250 consumer complaints over the span of just a

---

[141] SUF ¶ 364; *see also* SUF ¶¶ 40-41 (admitting to common enterprise).
[142] SUF ¶ 367.
[143] SUF ¶ 369.
[144] SUF ¶ 371.

few months.[145]  As consumers explained in these declarations and complaints, they ordered the products at issue solely because they believed they were in stock and would arrive within days.[146]  They did not arrive as promised, and consumers were forced to chase down Defendants.[147]  Rather than offer consumers a refund to procure them elsewhere (or, at very least, make an informed decision about whether to continue to wait for promised hand sanitizer or buy from someone else), Defendants illegally refused to cancel their orders or refund their money.[148]  Thus, Defendants forced consumers to order the products from other merchants, try to obtain refunds through their credit card companies, or simply wait at Defendants' mercy.[149]  Additionally, numerous consumers reported either not receiving the products at all, or receiving unauthorized, materially different substitutions and broken or leaking bottles.[150]

Defendants processed at least 43,749 orders through Glowyy for hand sanitizer and PPE, 43,633 of which were placed between March and August 2020.[151]  The total gross amount attributable to those sales between March and August is $2,933,692.11.[152]  Defendants refunded orders totaling $253,786.42. The total net revenues from all hand sanitizer sales from DJN was $406,333.30.[153]

---

[145] SUF ¶ 381.

[146] SUF ¶ 382. Obtaining hand sanitizer as quickly as possible during the early weeks of the pandemic quarantine was paramount for many consumers.  SUF ¶ 379.

[147] SUF ¶ 383.

[148] *See supra* n; *see also* SUF ¶ 384.

[149] SUF ¶ 385.

[150] SUF ¶¶ 386-387; ¶ 422, ¶¶ 272-273.

[151] SUF ¶¶ 388-391.

[152] SUF ¶ 391.

[153] SUF ¶ 401.

1    Thus, the total amount of gross revenues less refunds for all sales of PPE and hand

2    sanitizer during the relevant period is at least $3,086,238.99.[154]

3         Moreover, hawking a digestion product as a COVID-19 preventative and

4    treatment with false claims that it is FDA-approved and clinically tested for this

5    purpose (and specifically targeting a non-English speaking community), caused

6    consumers to place hard-earned dollars in untested and unproven remedies, and

7    may have exposed them to life-threatening risk by making them believe they were

8    protected against COVID-19, when they were not.

9                            **ARGUMENT**

10   **I.    THE FTC IS ENTITLED TO SUMMARY JUDGMENT ON ALL**

11   **       COUNTS**

12        A motion for summary judgment must be granted when "the pleadings,

13   depositions, answers to interrogatories, and admissions on file, together with the

14   affidavits, if any, show that there is no genuine issue as to any material fact and

15   that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

16   56(c); *Solar Sun Rings, Inc. v. Pools*, No. EDCV142417PSGKKX, 2016 WL

17   6139615, at *2 (C.D. Cal. Jan. 13, 2016) (Gutierrez, C.J.); *see also Celotex Corp.*

18   *v. Catrett*, 477 U.S. 317, 322-23 (1986).

19        A party seeking summary judgment bears the initial burden of informing the

20   court of the basis for its motion and identifying those portions of the pleadings and

21   discovery responses that demonstrate the absence of a genuine issue of material

22   fact.  *Celotex*, 477 U.S. at 323; *Trujillo v. Cty. of Los Angeles*, No.

23   CV145431PSGMRWX, 2019 WL 6622853, at *3 (C.D. Cal. Jan. 22, 2019)

24   (Gutierrez, C.J.).  A disputed fact is material if it might affect the outcome of the

25   suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

26   (1986).  In deciding a motion for summary judgment, all justifiable inferences are

27   _____

28   [154]

                              25

to be drawn in favor of the nonmovant.  *Id.* at 255.  Under these standards, the FTC is entitled to summary judgment.

## A. DEFENDANTS VIOLATED MITOR

### i.   DEFENDANTS LACKED A REASONABLE BASIS FOR THEIR SHIPPING TIME CLAIMS

MITOR prohibits sellers from soliciting any sale of merchandise ordered through the mail, via the Internet, or by telephone "unless, at the time of the solicitation, the seller has a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer" "[w]ithin that time clearly and conspicuously stated in any such solicitation" or "[i]f no time is clearly and conspicuously stated," the seller must have a reasonable basis to expect shipment "within thirty (30) days after receipt of a properly completed order from the buyer."  16 C.F.R. § 435.2(a)(1); *see FTC v. DiscountMetalBrokers, Inc.*, No. 2:16–cv–2112–ODW(JC), 2017 WL 4442998, at *4 (C.D. Cal. Oct. 4, 2017). MITOR defines "Shipment" as the act by which the merchandise is physically placed in the possession of the carrier.  MITOR, § 435.1(e).  As detailed below, Defendants violated this standard thousands of times.

### 1.   Defendants Represented Clearly and Conspicuously they Would Ship Hand Sanitizer the Same Day.

Defendants admit they disseminated the claim "In Stock & Ships Today" beginning on or around March 4, 2020 through at least March 18, 2020.[155] Defendants also admit that beginning on April 1, 2020 through at least mid-May 2020, they disseminated the claim "Ships Fast From CA Today."[156]  Defendants disseminated these claims in response to keyword searches through two different

---

[155] SUF ¶ 59 62, 64. 65, 77.

[156] SUF ¶ 191-192.  Although Defendants did not give a specific date of when the second Google AdWords' campaign ended, there is evidence in the record that Google suspended the account around May 18, 2020.  SUF ¶¶ 193-194.

Google AdWords' campaigns, both of which were terminated for violating Google's terms.[157]  Clicking the links displayed with the ads would bring consumers to the Glowyy website, and specifically to the hand sanitizer webpage where Defendants offered hand sanitizer and other PPE for sale.[158]

## 2. Defendants Never Represented a Shipment Time Longer than 10 days.

Defendants repeatedly modified shipping time claims on their website.  For instance, as explained *supra* Section III.B, they claimed "processing times," *i.e.*, shipment times, of 3-5 days, 5-7, and 7-10 days throughout March and April.[159]  Defendants also advertised 1-2-day shipping times on the Glowyy website still in May and June.[160]  Defendants admit, however, they at no point represented a shipping time for hand sanitizer that exceeded 10 days.[161]  In any event, while making these changes on their website, Defendants' advertisements—whereby consumers found Defendants' website—continued to tout shipping "Today."

## 3. Defendants Lacked a Reasonable Basis for All of their Shipment Claims.

"Reasonable basis" is an objective standard.  "For an advertiser to have had a 'reasonable basis' for a representation, it must have had some recognizable substantiation for the representation prior to making it in an advertisement." *FTC v. John Beck Amazing Profits*, 865 F.Supp.2d 1052, 1067 (C.D. Cal. 2012) (*citing FTC v. Direct Mktg. Concepts, Inc.*, 569 F.Supp.2d 285, 298 (D. Mass. 2008)); *see also* https://www.ftc.gov/tips-advice/business-center/guidance/business-guide-ftcs-

---

[157] SUF ¶¶ 189, 194.

[158] SUF ¶ 403.

[159] SUF ¶ 168; *see also* SUF ¶¶ 171-177 (admitting to various shipment time claims on website).

[160] SUF ¶¶ 185 (May 18, 2020 "ALL ORDERS SHIP WITHIN 1-2 DAYS!!!!")-186 (June 8, 2020, same).

[161] SUF ¶ 178.

mail-internet-or-telephone-order ("reasonable basis means that the merchant has, at the time of making the representation, such information as would under the circumstances satisfy a reasonable and prudent businessperson, acting in good faith, that the representation is true.").

The "failure to maintain adequate shipping records creates a rebuttable presumption that [defendants] lacked a reasonable basis to believe they could ship goods within the guidelines provided by the . . . Rule." *DiscountMetalBrokers, Inc.*, 2017 WL 4442998, at *4; MITOR, § 435.2(a)(4).[162]  Defendants admit they did not maintain shipping records, and therefore do not have any records documenting the shipment date for orders placed between March 4, 2020 and when the FTC's filed its Complaint.[163]  Moreover, Defendants produced no records showing systems or procedures in place to ensure the timely shipment of orders.[164]  Indeed, Defendants admit that they did not actually know at the time whether

---

[162] MITOR, 435.2(a)(4) states:

> In any action brought by the Federal Trade Commission, alleging a violation of this part, the failure of a respondent-seller to have records or other documentary proof establishing its use of systems and procedures which assure the shipment of merchandise in the ordinary course of business within any applicable time set forth in this part will create a rebuttable presumption that the seller lacked a reasonable basis for any expectation of shipment within said applicable time.

[163] SUF ¶¶ 98, 405-409.
[164] SUF ¶ 98 (QYK did not maintain records sufficient to track shipment times); SUF ¶ 405 (QYK did not produce records, admitting no written policies and shipment time disputes handled on case-by-case basis).

28

orders had shipped.[165]  Thus, the law presumes Defendants lacked a reasonable basis for all of their shipping time claims.[166]  MITOR, § 435.2(a)(4).

Even if it were not presumed by law, the uncontroverted evidence independently proves Defendants lacked any reasonable basis for their shipping claims.  "Defendants have the burden of establishing what substantiation they relied on for their product claims" and the FTC has the burden of establishing that the purported substantiation is inadequate.  *John Beck Amazing Profits*, 865 F.Supp.2d at 1067 (*citing FTC v. QT, Inc.*, 448 F.Supp.2d 908, 959 (N.D. Ill. 2006), amended on reconsideration in part, 472 F. Supp. 2d 990 (N.D. Ill. 2007), and aff'd, 512 F.3d 858 (7th Cir. 2008)).  "Where the advertisers lack adequate substantiation evidence, they necessarily lack any reasonable basis for their claims" and those claims are deceptive as a matter of law.  *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010) (internal citation omitted); *see also* https://www.ftc.gov/tips-advice/business-center/guidance/business-guide-ftcs-mail-internet-or-telephone-order.

As demonstrated above, Defendants clearly had inadequate recordkeeping. Moreover, Defendants admit they knew consumers were having difficulty finding hand sanitizer and that anticipated demand was volatile and unpredictable.[167] Customs records, commercial invoices, and communications also show they had insufficient supply on hand, and they knew there were problems with the supply

---

[165] SUF ¶ 410.  Defendants printed shipping labels to place in stacks or empty boxes awaiting shipment and did not immediately ship the ordered items, but had no way of knowing whether these orders had actually been shipped. SUF ¶ 411. Defendants admit they shipped items consumers had cancelled and did not want because they could not intercept these orders before they were mailed.  *See* SUF ¶¶ 412-416.

[166] The presumption that Defendants maintain adequate records or be found in violation is not a technical *pro forma* requirement.  It is integral to ensuring compliance and protecting the public.  *See* 40 Fed. Reg. 51582, 51587-88 (1975).

[167] SUF ¶ 418.

chain, and shortages of raw materials, supplies, and packaging.[168]  Defendants admit they could not reliably tell when orders would be fulfilled.[169]  Yet they continued to make claims about fast shipment times both in online ads ("Today") and through the Glowyy website.  The records from Defendants' shippers tell the story.  First, there is no record for 2,502 consumers' payments to Defendants showing that anything was ever shipped.  For the remaining orders, over 93% of them were shipped later than the claimed shipping time.[170]  *DiscountMetalBrokers*, 2017 WL 4442998, at *4 (finding defendants' inability to ship on time, if at all, showed they lacked reasonable basis).

### 4.  Defendants Failed to Timely Ship.

The uncontroverted evidence shows that Defendants advertised shipping "Today" from March 4-March 18 and April 1-May 18.[171]  Yet, they admit they shipped nothing at all until March 11,[172] and the Mail Carrier Shipment Records show they *never* met that same-day shipping promise between March 4 and March 18 (and only met the "Today" shipping promise for 517 out of 12,976 orders during the period of April 1-May 18).[173]  Finally, analysis of relevant third-party records confirms that Defendants failed to ship even within the processing times claimed on the website, or within 10 days, as they admitted they promised consumers they would.[174]

---

[168] SUF ¶¶ 94, 111-119, 122, 124-149, 160, 330-352.
[169] SUF ¶ 419.
[170] SUF ¶¶ 392, 199-201.
[171] *See supra* n. 160-161.
[172] SUF ¶ 150.
[173] SUF ¶ 197-198.
[174] SUF ¶ 395.  Further, in their admissions, Defendants' also cop to a shipment time of 7 days, but admit that they failed to ship within that time.  SUF ¶ 180.

### 5. Defendants Failed to Ship Goods Consumers Ordered.

Defendants admit customers complained about not receiving the correct merchandise,[175] and about receiving broken and leaking bottles.[176]  Defendants agree if a customer receives a leaking, broken, or empty bottle, the customer did not receive what they ordered.[177]  Defendants cannot satisfy their obligation under MITOR to timely ship consumers' orders by fulfilling orders, even timely doing so, with materially different, broken, leaking, or empty bottles.  *See FTC v. Smith d/b/a SalesCo.*, 01-10962 NM (PJWx) (C.D. Cal. Dec. 27, 2001) (consent decree).  Further, Defendants did not maintain any shipping records including any identifying which consumers received substitutions or defective goods; therefore, MITOR presumes a violation.  MITOR, § 435.2(a)(4), (d).[178]

### ii. DEFENDANTS FAILED TO GIVE DELAY OPTION NOTICES AND REFUNDS.

Because they could not meet their shipping representations, Defendants were obligated (without prior demand) to timely notify customers they could either consent to a later shipping date or obtain an immediate refund.  MITOR, § 435.2(b)(1).  Defendants did not timely notify their customers of these rights, and

---

[175] SUF ¶¶ 363, 386.

[176] SUF ¶ 387.

[177] SUF ¶ 274.

[178] Section (d) provides:

> In any action brought by the Federal Trade Commission, alleging a violation of this part, the failure of a respondent-seller to have records or other documentary proof establishing its use of systems and procedures which assure compliance, in the ordinary course of business, with any requirement of paragraph (b) or (c) of this section will create a rebuttable presumption that the seller failed to comply with said requirement.

31

denied even those customers who contacted them the prompt refund to which they
were legally entitled.

### 1.  The Delay Option Notice.

When a seller cannot ship on time, MITOR, § 435.2(b)(1) requires that they
offer customers "without prior demand" cancellations of their order and a prompt
refund; or provide a definite revised shipping date and obtain the customer's
consent to delay ("Delay Option Notice").  The company must send the Delay
Option Notice to the consumer no later than the date promised in the shipping time
claim.  *Id.*  Further, if the Delay Option Notice provides a definite revised shipping
date that is 30 days or less from the original shipping date, the merchant must
expressly inform the consumer that unless the consumer cancels the order, the
consumer will be deemed to have consented to receiving the shipment by the new
shipping date stated in the Delay Option Notice.  *Id.* § 435.2(b)(1)(iii).

### 2.  Defendants' March 11 Delay Option Notice Was Insufficient and Untimely.

Defendants' records show that they sent a single mass email to some
customers on March 11, 2020 ("March 11 Delay Option Notice" [Bates No.
2706]).  Defendants' records do not identify the recipients of the email, so it is
impossible to tell which customers it was sent to.[179]  The email provided as
follows:

---

[179] SUF ¶ 213.

32



SUF ¶¶ 210-211.  This notice is wholly insufficient for multiple reasons.

First, the email does not provide "a definite revised shipping date."  *See* MITOR, § 435.2(b)(1)(ii); *see also id.* § 435.2(b)(1)(iii) (requiring the seller to expressly inform customers that unless they cancel the order, they will have been deemed to have consented to the new shipping date, if the revised date is less than 30 days).  Instead, the Notice provides a possible range of shipping dates (not a definite revised date) and one that was simply false.  The absence of this critical information made it impossible for consumers to make the informed cancellation decision the statute provides.  In any event, the March 11 Delay Option Notice, far from being clear and conspicuous as the law demands, actually lies about the fact that Defendants have sufficient inventory to fulfill current orders.[180]

---

[180] SUF ¶¶ 94, 108-119, 122-146.

Second, the Notice was untimely for every customer who received it because it was not sent before the original promised shipping date.  *Id.*, § 435.2(b)(1). Finally, because Defendants have no records demonstrating which customers received the Notice, they are presumed to not have complied with the Rule.  *Id.*, § 435.2(d).

### 3.  Defendants Failed to Deem Orders Cancelled or Honor Consumers' Requests for Refunds.

MITOR also requires sellers to honor the buyer's refund demand if made prior to shipment.  MITOR, § 435.2(c)(1).  Additionally, if the seller fails to offer the buyer the opportunity to consent or cancel, the seller must automatically cancel the order and provide a prompt refund.  MITOR, § 435.2(c)(5).  There is no genuine dispute that Defendants did not deem any orders cancelled.[181]

Not only did Defendants fail to offer or give prompt refunds to consumers who were entitled to them, they refused to provide refunds in the face of numerous and repeated consumer demands.[182]  For example, Defendants told complaining consumers they could not cancel an order that was in "pre-shipping."  Many consumers contacted the company requesting a refund but were told they needed to return the items to the sender first.[183]  Others were given revised shipping dates, even though Defendants lacked a reasonable basis for these dates.[184]  Thus, Defendants violated MITOR, §§ 435.2(c)(1) and (5).

---

[181] SUF ¶ 443.

[182] SUF ¶¶ 245-246, 249-257, 384.

[183] SUF ¶¶ 245-246, 249-257, 384.

[184] SUF ¶¶ 218-220, 222, 229-230.  *See generally infra* ARGUMENT, Section I.A.i.3 (discussing lack of reasonable basis for claims).

34

### iii. ALL OF DEFENDANTS' HAND SANITIZER SALES THROUGH DJN ARE PRESUMED TO VIOLATE MITOR.

Defendants admit to disseminating similar processing times on the DJN website as they did on the Glowyy website.[185]  Defendants' communications reveal that DJN also shipped hand sanitizer purchased from the DJN site well-after consumers reasonably anticipated shipment.[186]  Defendants' records do not maintain shipment dates, and they failed to provide complete DJN sales records for hand sanitizer until December 9, 2021, after the close of discovery.  Therefore, it was not possible to request the mail carrier shipment records from UPS and USPIS to determine whether Defendants complied with MITOR.[187]  MITOR thus presumes Defendants' violations, given the lack of adequate records.  MITOR, § 435.2(a)(4) and (d).

### B. DEFENDANTS VIOLATED THE FTC ACT

### i. DEFENDANTS DISSEMINATED DECEPTIVE SHIPPING TIME AND RELATED CLAIMS.

Defendants' conduct violated not only MITOR, but also Section 5 of the FTC Act.  Section 5 prohibits deceptive acts and practices in or affecting commerce.  15 U.S.C. § 45(a).  An act or practice is deceptive if:  (1) there was a representation; (2) that was likely to mislead consumers acting reasonably under the circumstances; and (3) the representation was material.  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (*quoting FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001)).  A misrepresentation may be either express or implied.  *FTC v. Figgie Int'l*, 994 F.2d 595, 604 (9th Cir. 1993); *see also see FTC v.*

---

[185] SUF ¶ 263.
[186] SUF ¶ 270-271.
[187] SUF ¶ 402.

*DiscountMetalBrokers, Inc.*, No. 2:16–cv–2112–ODW(JC), 2017 WL 4442998, at *3 (C.D. Cal. Oct. 4, 2017).  Express claims and deliberately made implied claims are presumed to be material, as are claims that go to the central characteristics of a product or service.  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *FTC v. Wellness Support Network, Inc.*, No. 10-cv-04879, 2014 WL 644749, at *17 (N.D. Cal. Feb. 19, 2014) ("Materiality is also presumed as to 'claims that significantly involve health, safety, or other issues that would concern reasonable consumers.'") (*quoting FTC v. QT, Inc.*, 448 F. Supp. 2d at 960).

Additionally, violations of certain rules promulgated by the FTC constitute *de facto* violations of the FTC Act.  As relevant here, violations of MITOR, 16 C.F.R. Part 435, *et seq*., constitute deceptive acts and practices in violation of the FTC Act.  16 C.F.R. § 435.2.

Here, Defendants represented in online marketing, on their website, and in other communications with consumers that they:  (1) would ship orders "Today"[188] or would ship within 7 days;[189] (2) had certain PPE and hand sanitizer in stock and ready to ship;[190] and (3) would ship the goods consumers ordered.[191]  Each of these representations was likely to, and in fact did, mislead consumers.  Defendants' inventory and shipping claims were false because they did not have inventory they claimed and did not ship within the promised timeframes.[192]  Moreover, as demonstrated above, Defendants lacked any reasonable basis for their shipping and in stock claims based on their severe inventory deficiencies, difficulties in obtaining supply, high demand, lack of adequate fulfillment services, and lack of

---

[188] SUF ¶ 59, 191.
[189] SUF ¶ 180.
[190] SUF ¶¶ 59, 120, 123, 320.
[191] SUF ¶¶ 59, 120, 123, 320.
[192] *See supra* n. 160, 161, 164, 166, 177, 178, 181-183.

recordkeeping.[193]  Moreover, Defendants often sent customers unauthorized and
materially different goods as substitutions.[194]  Further, Defendants did not pack
hand sanitizer appropriately, leading to broken and leaking bottles, a problem they
quickly became aware of and one that continues.[195]

Many consumers reported they would have chosen differently but for the
deceptive claims,[196] further demonstrating Defendants' representations were
material.  *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); *In
the Matter of Southwest Sunsites, Inc.*, 105 FTC 7, 1985 WL 668880, at *109
(1985).  Because "misrepresentations of material facts made for the purpose of
inducing consumers to purchase services [or products] constitute . . . deceptive acts
forbidden by [the FTC Act]," *FTC v. World Travel Vacation Brokers, Inc.*, 861
F.2d 1020, 1029 (7th Cir. 1988), Defendants violated the FTC Act.

## ii.  DEFENDANTS' DECEPTIVE COVID-19 PREVENTION AND TREATMENT CLAIMS VIOLATED THE FTC ACT

Defendants' claims that their product, Basic Immune IGG, could effectively
treat, prevent transmission of, or reduce the risk of contracting COVID-19 also
violated the FTC Act because they were material claims that lacked adequate
substantiation.[197]  Courts have routinely held claims that a product can treat or
prevent a disease must be substantiated by competent and reliable scientific

---

[193] *See supra* ARGUMENT, Section I.A.i.3.

[194] SUF ¶ 150.

[195] SUF ¶¶ 272-273.

[196] See SUF ¶ 382.

[197] As explained *supra*, a representation is likely to mislead consumers if it is either
false or the advertiser lacks a reasonable basis for asserting that the message was
true.  *Wellness Support Network, Inc.*, 2014 WL 644749, at *15.  "In determining
whether an advertiser has satisfied the reasonable basis requirement, the . . . court
must first determine what level of substantiation the advertiser is required to have
for his advertising claims.  Then, the adjudicator must determine whether the
advertiser possessed that level of substantiation."  *Pantron I*, 33 F.3d at 1096.

evidence, such as adequate and well-controlled human clinical trials.  *See, e.g.*, *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1156-57 (9th Cir. 1984); *QT*, 448 F. Supp. 2d at 961.  Defendants admitted they lacked knowledge of such substantiation for their claims.[198]  Moreover, Dr. Bruce VanBreemen, an expert in the "fields of pharmacology, medicinal chemistry, and pharmacognosy, and with a comprehensive knowledge in the safety and efficacy of dietary supplements," provided a sworn, uncontested declaration explaining that Basic Immune IGG lacks the necessary level of competent and reliable scientific evidence for its disease prevention and treatment claims, i.e., there are no randomized, double-blind, placebo-controlled, human clinical trials to support Defendants' claims.[199]

Defendants further told consumers that "clinical trials" supported their claims, and the FDA has approved their products for preventing and treating the COVID-19 virus.[200]  There is no material dispute that Basic Immune IGG is not FDA-approved for COVID-19 treatment or prevention—Defendants admit that fact.[201]  Additionally, based on Dr. VanBreemen's review of relevant FDA records, neither Basic Immune IGG nor Immunolin has been approved by the FDA for

---

[198] *See* SUF ¶¶ 309, 312-313; 377-378.  *See also* PX 16, Att. B, ECF No. 39 (Amended Answer to Complaint).  In response to the allegation that "there are no published adequate and well controlled clinical studies of Basic Immune IGG, Immunolin, or a serum-derived bovine immunoglobulin for use to effectively treat, prevent, or reduce the risk of contracting COVID-19," Defendants answered: "Deny knowledge or information sufficient of form a belief as to the truth of the allegations contained in paragraph 56 of the Complaint."  Defendants are required to have adequate substantiation at the time they make the claim.  Not knowing whether adequate studies exist is tantamount to admitting they lacked a substantiation.
[199] PX 7.  Defendants did not disclose any expert of its own, nor did they move to challenge Dr. VanBreemen's credentials, or the reliability and fit of his opinions.
[200] SUF ¶¶ 291, 296-297, 306.
[201] SUF ¶¶ 309, 312-313.

COVID-19 treatment or prevention.[202]  Defendants cannot, and do not, challenge this fact.  Thus, Defendants' COVID-19 establishment claims are also false.

Further, these claims violated Section 12 of the FTC Act, which prohibits the dissemination of any false advertisement "for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics."  15 U.S.C. § 52(a)(2).  Basic Immune IGG is a Food or Drug, as defined by the Act.  15 U.S.C. § 55(b)-(c); *see also FTC v. Health Formulas, Inc.*, No. 2:14-cv-01649-RFB-GWF, 2015 WL 2130504, at *13 (D. Nev. May 6, 2015) (dietary supplement is a food or drug within scope of Section 12).  The Act defines "false advertisement" as "an advertisement, other than labeling, which is misleading in a material respect."  *FTC v. Pantron I Corp.*, 33 F.3d at 1095 (*quoting* 15 U.S.C. § 55); *see also id*. at 1099 ("Indeed, a 'false advertisement' need not be 'false'; it need only be 'misleading in a material respect.'").  "In Section 12 cases involving objective product claims, the FTC can rely on a 'reasonable basis' theory."  *FTC v. Braswell*, No. CV 03-3700 DT (PJWX), 2005 WL 4227194, at *8 (C.D. Cal. Sept. 27, 2005) (citations omitted).  Here, as detailed above, Basic Immune IGG cannot meet this standard.  Accordingly, Defendants' claims are also false advertisements that violated Section 12.

## C. PLAINTIFF IS ENTITLED TO MONETARY AND INJUNCTIVE RELIEF

Under Section 19 of the FTC Act, when a party "violates any rule under [the FTC Act] respecting unfair or deceptive acts or practices," the Court may grant "such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from [Defendants'] rule violation." 15 U.S.C. § 57b(a), (b). "Such relief may include, but shall not be

---

[202] PX 7.

39

limited to, rescission or reformation of contracts, the refund or return of property,
the payment of damages, and public notification respecting the rule violation." *Id.*
"[T]here may be no redress without proof of injury caused by those practices. And
the relief must be necessary to redress the injury." *FTC v. Figgie Int'l, Inc.*, 994
F.2d at 605. Individual reliance by each purchasing customer is not needed. *Id.*
Further, a "presumption of actual reliance arises once the Commission has proved
that the defendant made material misrepresentations, that they were widely
disseminated, and that consumers purchased the defendant's product." *Id.*
(citations omitted). The burden then shifts to the defendant to prove the absence of
reliance. *Id.*

Separately, Section 13(b) of the FTC Act provides the FTC may obtain
permanent injunctions for violations of "any provision of law enforced by the
[FTC]." 15 U.S.C. § 53(b).

The FTC's proposed order, which includes monetary relief to refund
consumers injured by Defendants' MITOR violations, and injunctive relief to
preclude future FTC Act and MITOR violations, is both appropriate and necessary
under these standards.

> **i. REFUNDS TO CONSUMERS FOR LATE, UNSHIPPED,
> MATERIALLY DIFFERENT AND DAMAGED ORDERS
> TO REDRESS THEIR INJURIES IS NECESSARY AND
> APPROPRIATE.**

There is no dispute the law authorizes monetary relief as measured by
consumer losses rather than merely unjust gain. *Figgie*, 994 F.2d at 605 (affirming
that, at maximum, defendant would pay $49,950,000, the amount spent by
consumers, and holding "Section 19(b) does not limit its remedies to the amount of
the unjust enrichment"); *see also FTC v. Com. Planet, Inc.*, 815 F.3d 593, 603 (9th
Cir. 2016), *abrogated on other grounds by AMG Cap. Mgmt., LLC v. FTC*, 593

40

U.S. __ (2021) (Section 19 authorizes gross revenues as damages).  The
Commission is entitled to a presumption that *all* consumers who purchased
Defendants' product and have not received a refund relied on Defendants' material
misrepresentations that the sanitizer they desperately sought would be delivered
right away.[203]  *Figgie*, 994 F.2d at 605-6 (holding that widely disseminated claims
are entitled to a presumption of reliance and rejecting theory that Section 19
redress is available only when product is essentially worthless).  Indeed, even for
those few consumers who may have received items on time, Defendants' records
do not show whether these customers received the hand sanitizer they ordered, a
materially different substitution, or a broken, leaking, or empty bottle.  It is
Defendants' burden to show that they complied with the law.  MITOR,
§ 435.2(a)(4) and (d) (presumption of violation for missing records); *see also*
*Figgie*, 994 F.2d at 607 ("As between the innocent purchaser and the wrongdoer . .
. equity requires the wrongdoer to restore the victim to the status quo.").  Thus, the
FTC seeks judgment in the amount of the net revenue (gross revenue less refunds)
for all shipments between March 4 and August 4, 2020.  Specifically, advertising
that products were in stock and would ship "Today," and then failing to ship hand
sanitizer at all, or often for over a month, at the beginning of the Pandemic when
consumers wanted hand sanitizer quickly harmed consumers who relied on
Defendants' false promises.  Defendants compounded consumer harm by failing to
preemptively inform consumers of their legal right to cancel the transaction and

---

[203] That is, Defendants could be held liable for the harm caused by the shipping
time claims they disseminated without a reasonable basis, which were highly
material and on which consumers reasonably relied, regardless of whether the
shipments were timely or untimely.  *See Figgie*, 994 F.2d at 606 (recognizing the
injury to consumers is what consumers would have spent but for defendant's
dishonest practices, and finding there was no dispute that the defendant, who
"designed, authorized, and supervised" the dishonest sales was the proximate cause
of consumers' loss and may be held liable for damages it caused).

41

obtain a refund.  Worse yet, Defendants denied refunds by providing false revised shipping dates, and telling consumers that the non-event of "preshipment" meant no refund was possible.  Therefore, judgment in the amount of the refunds Defendants should have provided for these untimely shipments, but did not, is an appropriate remedy here.  *United States v. MyLife.com, Inc.*, No. CV 20-6692-JFW(PDX), 2021 WL 4891776, at \*13 (C.D. Cal. Oct. 19, 2021) (appropriate measure of consumer redress under Section 19 is net revenues attributable to the Rule violation) (*citing FTC v. Com. Planet, Inc.*, 815 F.3d at 603).

Further, Defendants failed to keep records demonstrating when they shipped goods or what goods they shipped.  MITOR thus presumes payments made for all unrefunded orders represent monetary injury.[204]  Based on Defendants' records and Mail Carrier Shipment Records, the total amount of net revenue for Defendants' sales of hand sanitizer and PPE for the period from March through August 2020 is at least $3,086,238.99.[205]

---

[204] A recently-decided case, *FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2021 WL 5493443, at \*4-5 (D. Az. Nov. 23, 2021), held that full refunds could result in a windfall for consumers where the delay was minimal.  *Noland* is distinguishable (and not binding on this Court).  Unlike that case, Defendants' customers waited weeks, if not months, for a product where timeliness was critical to the transaction.  Consumers did not merely want hand sanitizer, but wanted it quickly, and receiving it later than promised substantially diminished the value of the transaction.  Further, unlike in the record before the *Noland* court, there is ample evidence in the record here to find several additional compensable harms suffered by consumers, *see, e.g.*, SUF ¶¶ 258, 261, 379-402, and that consumers would have, and did, request refunds rather than wait for hand sanitizer, (which Defendants refused to give), SUF ¶¶ 384 (illegally refused to grant refunds); ¶ 414 (consumers told they had to "return to sender" to get refund), ¶ 231 (Defendants specifically instructed customer reps to not give refunds).

[205] The FTC's data analyst reviewed the Mail Carrier Shipment Records to determine which orders were shipped after the claimed shipping time, and then calculated the total of non-refunded sales for each violation.  PX 9 ¶¶ 19-30, Att. A.  This calculation likely understates the harm, as Defendants illegally forced

### ii.  THE PROPOSED INJUNCTIVE RELIEF IS NECESSARY TO PROTECT CONSUMERS.

Section 13(b) authorizes courts to permanently enjoin defendants from violating the FTC Act.  *FTC v. Cardiff*, No. ED CV 18-2104-DMG (PLAx), 2021 WL 3616071, at *7 (C.D. Cal. June 29, 2021) (holding "the FTC may still seek a permanent injunction against the Cardiffs under Section 13(b) without first initiating administrative proceedings").  Here a permanent injunction is necessary to protect consumers because Defendants clearly violated MITOR as well as the FTC Act and there is "some cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

A cognizable danger of recurrence occurs when there is "some reasonable likelihood of future violations," *CFTC v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982).  *See also FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) ("in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.") (*citing Pantron I Corp.*, 33 F.3d at 1102; *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110 (9th Cir. 1982)).  In determining the likelihood of future misconduct, the court examines the totality of the circumstances involved and a variety of factors.  *Co Petro Mktg. Grp.*, 502 F. Supp. at 818; *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 1013–14 (D. Nev. 2019), *aff'd*, 827 F. App'x 653 (9th Cir. 2020).  "Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm

consumers to pay for unordered merchandise.  *See supra* n.98-99; 39 U.S.C. § 3009.  Further, it is Defendants' burden to show this amount should be reduced. *See, e.g.*, *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 369 (2d Cir. 2011); *Figgie Int'l, Inc.*, 994 F.2d at 607.

consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations." *OMICS*, 374 F. Supp. 3d at 1014 (*citing Murphy*, 626 F.2d at 655; *FTC v. Magui Publishers, Inc.*, No. 89-3818, 1991 WL 90895, at *15-16 (C.D. Cal. Mar. 28, 1991)).

Here, the proposed injunctive relief enjoins Defendants from advertising or selling protective goods and services because Defendants acted egregiously and knowingly, causing substantial harm; have shown little remorse; and have a high risk of reoccurrence of future violations. As explained in detail, *supra*, in the STATEMENT OF UNDISPUTED FACTS, Sections IV. Individual Participation by Control Persons and V. Consumer Injury, Defendants took advantage of consumers' panic during the early days of the pre-vaccine COVID-19 Pandemic by vigorously and aggressively advertising hand sanitizer as in stock and available to ship when Defendants knew these claims were false and were fully aware they did not have the inventory they claimed. Further, they continued making specific delivery claims long after it was apparent they could not fulfill their current, much less incoming, orders. Defendants compounded this harm by illegally refusing to give refunds and creating illegal hurdles to obtain refunds, then hounding customers for payment after Defendants sent items customers had already said they did not want or no longer needed. Defendants' single Delay Option Notice further demonstrates Defendants knew of the obligation to notify customers of their legal rights but chose not to.

Defendants have shown no recognition for the harm they caused, insisting that the Pandemic was to blame, not their own lies. The fact that this Pandemic caused supply disruptions (and conversely the demand for their product) simply does not excuse their lying about shipment dates.

44

Importantly, Defendants are positioned to continue similar violations
through DJN, and Defendants continued to engage in problematic behavior after
the lawsuit.[206]  Defendants did little to establish procedures to prevent a
reoccurrence of similar harms.[207]  For instance, Defendants continue to sell
backordered items without notifying consumers the items are not in stock and still
seemingly take more than 30 days to ship items.[208]  Further, Defendants still do not
send the goods consumers' ordered, instead sending leaking and poorly packaged
materials.[209]

Finally, Defendants show a propensity to market deceptively.[210]  For
instance, during the pendency of this case, FTC staff received multiple complaints
from small business customers regarding materially deceptive claims about
Defendants' newest product—disinfecting wipes.[211]  Defendants previously
marketed dietary supplements with deceptive claims like "Many late-stage cancer
patients look to Dr. J's Natural supplements and cold pressed juices to help fight
cancer the all natural way" and "Our CBD collection is clinically proven to reduce
pain, anxiety, and over 200 other medical problems."[212]  Defendants also heavily
marketed hand sanitizer as "Made in the USA" (a claim which several customers

[206] Although Defendants claim they no longer sell retail products through Glowyy
(which they do), they continue to sell hand sanitizer and PPE through DJN, as well
as dietary supplements.  SUF ¶ 427.
[207] SUF ¶ 426.
[208] SUF ¶ 428.
[209] SUF ¶ 429.
[210] Defendants also show little regard for the law.  Defendants purposefully
concealed the true nature of the goods they were importing into the U.S. (hand
sanitizer) to circumvent export and safety restrictions for hazardous materials.
SUF ¶ 440.
[211] SUF ¶ 430; *see also* PX 15.
[212] SUF ¶ 431.  DJN has sold dietary supplements for many years with claims that
likely violated the law, including claims that consumers can lose weight quickly
and easily by taking "Simple Slim."  *Id.* (*citing* PX 2, Att. AA).

45

relied on[213]) but Defendants' records show they had very little domestically-produced hand sanitizer, and no way to identify which hand sanitizer was domestically sourced to ensure customers who purchased Made in the USA items received them.[214]  Additionally, and perhaps most egregiously, Defendants knew their Pandemic advertising was problematic.  Both the company's Facebook and Google AdWords accounts were suspended in March for violating advertising policies.[215]  However, instead of stopping the false advertising campaigns, Defendants hired freelancers to use their own established accounts to continue the deceptive advertising and used a different Google AdWords account to circumvent Google's suspension.[216]

The FTC's proposed order also includes compliance-monitoring measures that are common in FTC matters.  These provisions are narrowly tailored to help ensure Defendants' compliance with the requested permanent injunction.  These provisions are necessary to allow the Commission to effectively monitor Defendants' business activities and take appropriate enforcement action in the future, if necessary.  *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965); *FTC v. Ideal Fin. Solutions, Inc.*, No. 2:13-cv-00143-JAD-GWF, 2016 WL 756527, at *19 (D. Nev. Feb. 23, 2016) (granting injunction where FTC's requested conduct provisions bear a reasonable relationship to Defendants' unlawful practices, and the monitoring provisions are necessary to ensure compliance.)

---

[213] SUF ¶¶ 432-433, 442.

[214] SUF ¶ 425.  Defendants' total gross investment for domestic hand sanitizer was approximately $184,000, compared to over $1.5 Million dollars for hand sanitizer sourced through China. SUF ¶ 441.  Moreover, Defendants promoted hand sanitizer Made in the USA in early March 2020, SUF ¶ 442, but they received no domestically manufactured hand sanitizer until at least April, SUF ¶¶ 140.

[215] SUF ¶¶ 189, 193-194, 436-437; see also SUF ¶ 317 (Bing ads also suspended in March).

[216] SUF ¶¶ 190, 438-439.  These campaigns were shut down too.

46

### iii.   THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR INJUNCTIVE AND MONETARY RELIEF.

Individual defendants may be held liable for injunctive relief where the FTC demonstrates: (1) the corporation committed misrepresentations or omissions upon which a person might reasonably rely, resulting in consumer injury; and (2) the individual defendant participated directly in the unlawful acts or practices or had authority to control them.  *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997).

An individual defendant is liable for monetary relief if he or she also possessed actual or constructive knowledge of the unlawful acts.[217]  *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1170-71.  The knowledge element is satisfied if the individual was recklessly indifferent to the material misrepresentations or had an awareness of a high probability of fraud along with an intentional avoidance of the truth.  *Network Servs.*, 617 F.3d at 1138-39.  A showing that an individual has willfully ignored warning signs can meet this standard.  *Id.* at 1141 (finding reckless indifference for ignoring "numerous warning signs," including "multiple

---

[217] This case law is adopted from pre-AMG analysis under Section 13(b).  Unlike Section 19(a)(1) (monetary relief for violations of cease and desist orders, not relevant here), there is no scienter requirement under Section 19(a)(1) to show liability for relief for Rule violations.  At least one case has held that individual defendants can be held liable for monetary relief under Section 19(a)(1) without any showing of knowledge, holding instead that participation in the rule violations at issue is enough.  *FTC v. Inv. Devs., Inc.*, C.A. No. 89-642, 1989 U.S. Dist. LEXIS 6502, at *28-29 (E.D. La. June 7, 1989) ("Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), concerning rule violations, unlike Section 19(a)(2), does not include a knowledge requirement.  Accordingly, personal liability for consumer redress under Section 19(a)(1) will be imposed on those who participated in Franchise Rule violations or obtained the fruits of the violations.") (*citing FTC v. Algoma Lumber Co.*, 291 U.S. 67, 81 (1933)).Regardless, the knowledge elements are easily satisfied here.

customer complaints" and "suspicious financial practices").  For example, "awareness of consumer complaints is sufficient to establish" knowledge.  *FTC v. Lights of Am., Inc.*, No. SACV10-01333 JVS (MLGx), 2013 WL 5230681, at *50 (C.D. Cal. Sept. 17, 2013).  Here, the evidence shows both Rakesh Tammabattula and Dr. J ("Individual Defendants") are liable for both injunctive and monetary relief.

The first element for injunctive relief—corporate misrepresentations on which consumers reasonably relied resulting in consumer injury—is satisfied for the reasons described above.[218]

There is no dispute the second element is also satisfied.  First, both Individual Defendants admit they "formulated, directed, controlled, had the authority to control, or participated" in the acts and practices here.[219]  Further, "[s]tatus as a corporate officer is sufficient to establish individual liability." *Publ'g Clearing House*, 104 F.3d at 1170; *John Beck*, 865 F. Supp. 2d at 1080 (granting summary judgment for FTC); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1204 (C.D. Cal. 2000) ("[S]tatus as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control.").  Defendants Tammabattula and Dr. J are both corporate officers of QYK, and Dr. J is the CEO and spokesperson for DJN.[220]  Thus, the element for control and participation is indisputably satisfied.

Moreover, the Individual Defendants have the requisite knowledge.  *FTC v. Affordable Media*, 179 F.3d 1228, 1235 (9th Cir. 1999) (holding the "extent of an individual's involvement in a fraudulent scheme alone is enough to establish the requisite knowledge").  Defendant Tammabattula's numerous public statements

---

[218] *Supra* Sections I.A-B.
[219] SUF ¶¶ 314 (Tammabattula), 364 (Nguyen).
[220] SUF ¶¶ 13, 27-28-31; *see also* SUF ¶¶ 41-42.

48

throughout late March and April and Dr. J's public statements on YouTube in April and May demonstrate that they both knew, should have known, or were recklessly indifferent to, the high demand for, and commensurate shortages of, hand sanitizer, raw materials, and product packaging.  That evidence further shows both Tammabattula and Dr. J were aware numerous consumers complained to the company about not receiving hand sanitizer, yet Dr. J and her husband ignored these warning signs and continued to market hand sanitizer with claims that it was "In Stock" and would ship today or within days.[221]

Moreover, Dr. J knew or should have known that her claims about Basic Immune IGG's efficacy for COVID-19 were false.  Dr. J. is a "clinical compounding pharmacist."[222]  In making her claims, Dr. J specifically references her knowledge and understanding of the underlying science.[223]  Moreover, she appeared in numerous online videos describing the mechanism of action of the immune system and how and why the product is effective.[224]  However, as discussed above, there is no scientific support for her claims.[225]  Despite the obvious lack of scientific support, she repeatedly claimed consumers could keep safe from COVID-19 by using her product.  She did so either with actual knowledge the claims were false, or at the very least without regard to the truth or falsity of those claims.  *See Wellness Support Network*, 2014 WL 644749, at *18 (finding the knowledge requirement satisfied because defendant controlled the company, developed the product, and created the advertisements despite having no

---

[221] *See generally supra* Statement of Undisputed Facts Section IV, Individual Participation and Control.

[222] SUF ¶ 19.

[223] *See, e.g.*, PX 1, Att. F-2 (video "Covid-19 Insights from a Doctor"); *id.*, Att. H (transcript); *id.*, Att. F-3 (video "How Does Immune IGG Work?|Dr Js Natural Education"); *id.*, Attachment I (transcript).

[224] *Id.*; *see also id.*, Att. K (Prisma Translation of SETTV video).

[225] PX 7; *see also* SUF ¶¶ 309, 312-313, 377.

formal medical or scientific training, relying on his own internet research, and failing to conduct any scientific testing); *FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1313-14 (D. Wyo. 2016) (same).  Defendant Tammabattula admits that he knew they lacked sufficient support for these claims at the time they were made.[226]

## CONCLUSION

WHEREFORE, for all the foregoing reasons, the FTC respectfully requests entry of Summary Judgment against Defendants on all Counts of the FAC, including entry of monetary judgment in the amount of $3,086,239.99, and an injunction as included in the attached proposed judgment and order.

Respectfully submitted,

Dated:  February 14, 2022

/s/ Katherine Johnson
KATHERINE E. JOHNSON, *admitted pro hac vice*
KRISTY M. TILLMAN, *admitted pro hac vice*
CHRISTOPHER ERICKSON, *admitted pro hac*
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC  20580
(202) 326-2185; (Johnson)
kjohnson3@ftc.gov
(202) 326-3025; (Tillman)
ktillman@ftc.gov
(202) 326-3671
cerickson@ftc.gov
**Attorneys for Plaintiff**
FEDERAL TRADE COMMISSION

---

[226] SUF ¶ 377-378.

50