1  Scott Wellman, SBN: 82897
2  Chris Wellman SBN: 304700
   **WELLMAN & WARREN LLP**
3  24411 Ridge Route, Suite 200
4  Laguna Hills, CA 92653
   Tel:  (949) 580-3737
5  Fax: (949) 580-3738
6  swellman@w-wlaw.com
   cwellman@w-wlaw.com
7
8  Attorneys for Defendants

9

10           **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA**

12

13  FEDERAL TRADE COMMISSION,        Case No. 8:20-cv-01431-PSG-KES
14
15            Plaintiff,             **OPPOSITION TO THE FTC's**
                                     **MOTION FOR SUMMARY**
16  v.                               **JUDGMENT**

17  QYK BRANDS LLC d/b/a Glowyy; et   **Magistrate:  Hon. Karen E. Scott**
18  al,                              **District: Hon. Philip S. Gutierrez**
                                     **Hearing Date: April 8, 2022**
19                                   **Time: 1:30p.m.**
             Defendants             **Courtroom: 6A**
20
21                                   Discovery Cutoff:  December 1, 2021
22                                   Pretrial Conference:  May 13, 2022 at
                                     2:30 p.m.
23                                   Trial Date: May 13, 2022
24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION …………………..……….…………………… 1

II.     STATEMENT OF FACTS ……………………………………... 4

III.    REFUNDS ………………………………………………………. 12

IV.     CHANGE OF MARKETING MODEL …………………………… 13

V.      SALES OF HAND SANITIZER BY DR. J'S, LLC ………………………… 14

V1.     BASIC IMMUNE IGG SUPPLEMENT …………………………… 14

VII.    LEGAL ARGUMENT ……………………………………………… 15

A. Defendants had a Reasonable Basis for Making the Shipping Claims ….. 15

B. To the Extent There Were Late Shipments, they Were Due to Unforeseen Circumstances Outside of QYK's Control ………………………………… 18

C. The FTC's Claim that QYK Wrongly Refused Refunds is Incorrect …… 20

D. There is No Showing of any MITOR Violations by Dr. Js, LLC ……….. 21

E. When Read in Context, the Statements Made by Dr. Js During her Vietnamese TV Interviews are Not Misleading ……………………………… 22

F. There are Triable Issues of Fact as to any Damages Caused by Shipping Delays ……………………………………………………………………… 28

1. FTC v. Noland ……………………………………………….. 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2. Even if the Net Revenue Stream is the Proper Measure of Consumer Redress, there are Triable Issues of Fact as to the Amount of the Net Revenue Stream…………………………………………………………………… 38

G. There is No Monetary Relief Available for Any Health Claim Violations by Dr. Js as the FTC failed to Issue a Cease & Desist Letter and Pursue an Administrative Claim Prior to Filing this Lawsuit ………………………… 39

H. Injunctive Relief is Not Appropriate in this Case ……………………… 40

I. Even if the Court Believes that Injunctive Relief is Appropriate, the Breath of the Relief Asked by the FTC is Overbroad ………………………………… 44

1

2

3

4

5

# **TABLE OF AUTHORITIES**

6

## **Cases**

7

8 *AMG Capital Management, LLC v. FTC,* 141 S.Ct. 1341 (2021) ………………… 37

9 *FTC v. Braswell,* 2005 WL 4227194 (C.D. Cal., 2005)…………………………… 27

10 *FTC v. Com. Planet, Inc.,* 815 F.3d 603 ……………………………………………… 37

11

12 *FTC v. Direct Marketing Concepts, Inc.* 624 F.3d 1 (1st Cir. 2010)……………… 27

13 *FTC v. Evans Products Co.* 775 F.2d 1084, 1089 (9th Cir. 1985) ……………….. 3,40

14 *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 605 (9th Cir. 1982)……… 3, 30, 31, 33, 34, 36

15

16 *Fed. Trade Commn. v. John Beck Amazing Profits LLC, 888 F. Supp. 2d 1006, 1011*

17 *(C.D. Cal. 2012), aff'd sub nom. F.T.C. v. John Beck Amazing Profits, LLC, 644 Fed.*

18 *Appx. 709 (9th Cir. 2016)*……………………………………………………………... 44

19

20 *FTC v. Noland* 2021 WL 5493443 *4. ………………………… 3, 31, 32, 33, 34, 35, 36

21 *FTC v. Shire Viropharma, Inc.* 917 F.3d 147, 156 (2019; 3rd Cir.) ………………… 40

22 *FTC v. Silueta Distributors, Inc.* 1995 WL 215313 at *6 (1995, N.D. Ca.) ………..31

23

24 *Lamb-eston, Inc. v. McCain Foods, Ltdl,* 941 F.2d 970, 974 ……………………… 44

25 *United States v. MyLife.com, Inc., No CV 20-6692* 2021 WL 4891776 at *13 (C.D.

26 *Cal.)* ……………………………………………………………………………….. 37

27

28

*Washington Data Resources,* 856 F.Supp.2d 1247, 1280 (2012, USDC MD Florida)…………………………………………………………………………. 32

**STATUTES**

16 CFR Part 435 (§ 435.2(a)(i)) ………………………………………… 15,16

Section 19(b) of FTC Act. …………………………………..….. 29, 30, 31, 37, 38, 39

**OTHER AUTHORITIES**

https://www.ftc.gov/tips-advice/business-center/guidance/business-guide-ftcs-mail-internet-or-telephone-order ..................................................................... 18

https://www.supplychaindive.com/news/coronavirus-ups-fedex-suspend-service-guarantees/575280/ ………………………………………………………… 18

https://www.savethepostoffice.com/2020-mail-delays-stats-charts/ ……………….. 19

1

2

## I.   **INTRODUCTION**

3

4   This is a case that is peculiarly appropriate for the equitable jurisdiction of this

5   Court. It concerns a small company of about 4-5 employees that in the face of an

6   unprecedented, unforeseen pandemic, which literally destroyed the world supply

7   chain, did everything possible to provide what they considered a needed product to the

8   country. These employees braved the potential of contracting a terrible disease and

9   worked 16-18-hour days to provide the country with needed hand sanitizer. They

10  scoured the globe from India to China to domestic suppliers here to secure inventories

11  of the hand sanitizer. They did this when virtually all of the other retail hand sanitizer

12  merchants had shut down in the face of the COVID pandemic--- and they succeeded

13  in providing this needed product to the US consumer.  Instead of being saluted and

14  recognized for their bravery in the face of unforeseen and staggering odds, they are

15  being pursued as wrongdoers by an ungrateful government. This is their story.

16  The FTC's motion is based on false assumptions and fallacious interpretations of the

17  facts. Some of these are as following:

18

19

20      1.  Every consumer who ordered hand sanitizer received their hand sanitizer.[1]

21

22      2.  Every consumer who requested a refund received a refund. More than

23          $250,000 in refunds were paid.[2]

24

25

26  _____

27  [1] Dec. of Tammabattula ¶33

28  [2] Dec. of Tammabattula ¶40

3.  Many consumers were repeat customers (which is a clear sign of satisfaction with the product).[3]

4.  There is not one instance of any consumer who after receiving their hand sanitizer asked for a refund.[4]

5.  The FTC falsely states the shipping times represented by QYK.

6.  The FTC fails to acknowledge that the shipping time ads that it attacks (i.e. the Google ads) only accounted for about 11% of the sales made by QYK.[5] Instead, the FTC asks that 100% of QYK's revenue be disgorged.

7.  The shipping delays all occurred during March and April of 2020 when the pandemic hit the country with a vengeance. By May, more than 99% of all orders were timely shipped.  Even during the horrible months of March and April, the overwhelming majority of the products were timely shipped.[6]

8.  Any shipping delays were caused by events outside the control of the defendants.  These included the last minute, unforeseen confiscation of product by foreign governments, and the refusal of the U.S. Postal Service to pick-up product ready for shipment.[7]

---

[3] Dec. of Tammabattula ¶51

[4] Dec. of Tammabattula ¶51

[5] Dec. of Tammabattula ¶11

[6] Dec. of Tammabattula ¶30

[7] Dec. of Tammabattula ¶22

9. The records relied upon by the FTC to show late shipments is flawed as it relies on first scan dates by the U.S. Postal Service at a time when the USPS was not scanning picked-up product for days or weeks after the pick-up occurred. [8]

Apart from this, the FTC presents isolated instances from a few customers that complained when there were thousands upon thousands of satisfied customers.  By cherry picking in this way, the FTC creates a false impression of QYK and ignores the valuable contribution that QYK made to the American public.

Furthermore, the monetary relief requested by the FTC is not related to any "proof of injury caused" by the delays, nor is the relief "necessary to redress the injury" both of which the FTC bears the burden of proving. *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 605 (9th Cir. 1982); *FTC v. Noland* 2021 WL 5493443 *4.

Finally, there is no need for injunctive relief in this matter.  Injunctive relief is not a remedy to address past violations. If the past violation is not likely to recur, then an injunction is inappropriate. *FTC v. Evans Products Co.*  775 F.2d 1084, 1089 (9th Cir. 1985). From May 2020 onward, QYK had virtually complete compliance with represented shipping times. That is, after the unprecedented, unforeseen period when the pandemic first began, QKY experienced no shipping time issues.[9]  Moreover, in

---

[8] Dec. of Tammabattula ¶34

[9] Dec. of Tammabattula ¶30

August of 2020, QYK changed its model from being a supplier to retail consumers to a wholesale supplier to large businesses.[10]  This eliminated completely any possibility of late shipments.  From August of 2020 to the present, its total sales to retail consumers is a little more than $3,000.[11]  Since its entire business model has changed, there is no chance of any recurring shipping time issues.  For these reasons, injunctive relief is not merited in this case.

## II.   STATEMENT OF FACTS

QYK was formed by defendant Rakesh Tammabattula ("Rakesh") in November of 2017 to provide personal care and skin care products to the consumer. One of these products was hand sanitizer. QYK's model was primarily to sell directly to consumers through the internet.  Initially, most of QYK's products were sourced overseas in India and China.[12]

In February 2020, just before the Covid-19 pandemic began, the company had between 3-5 employees and worked out of a warehouse/office space in Garden Grove.[13] The brand name under which it sold its products on the internet was

---

[10] Dec. of Tammabattula ¶42

[11] Dec. of Tammabattula ¶43

[12] Dec. of Tammabattula ¶¶3-4

[13] *Id.* at ¶4

Glowyy.com.[14]   At the end of February 2020, QYK had about 2,000 bottles in its inventory.[15]

On March 4, 2020, QYK placed a Google Ad (which seems to be the basis for the FTC's entire case) that stated it had hand sanitizer in stock and ships today. This statement was based on two facts. First, QYK had 2,000 bottles in inventory which was more than sufficient to meet any anticipated demand based on past order history.[16] Second, QYK had a shipment coming from India of more than 10,000 bottles which Federal Express had confirmed in writing would be delivered to QYK on March 3.[17] These 10,000 bottles were fully labeled and ready to ship to consumers upon receipt by QYK.[18]

Despite Fed Ex's written assurance, the shipment did not arrive as promised on March 3.[19] When this occurred, QYK immediately started making inquiries. At first QYK was told that the shipment would be delivered the next day, then the day after. It finally arrived on March 9.[20]

_____

[14] *Id.* at ¶5

[15] *Id.* at ¶6

[16] *Id.* at ¶10

[17] Dec. of Tammabattula ¶¶6-8, 10

[18] Dec. of Tammabattula ¶7, Exhibit B

[19] The Court is asked to take judicial notice of the fact that during the early months of the pandemic (all the way through Christmas) the established shippers experienced significant delays in shipping and delivery product.

[20] Dec. of Tammabatula ¶7

On March 6, 2020, QYK ordered an additional 100,000 bottles of hand sanitizer from sources in India. On March 13,  without notice to QYK, this shipment was held up by the India government when it was about to be loaded at the airport for shipping pursuant to the emergency action by India. To this day, the Indian government has not released this shipment.[21]

On March 4, Rakesh placed an order with Sainno Care Pharmaceuticals ("Sainno Care") in Pennsylvania who represented that it could manufacture the sanitizer in one day as long as he had the alcohol and bottles available. On March 5, Rakesh ordered the alcohol from Eco-Link in Ohio for delivery the next day to Sainno Care  in Pennsylvania. At the same time (March 5), Rakesh had 10,000 empty bottles shipped overnight to the Sainno Care.  On March 5, Rakesh sent his brother, Balaji Tammabattula ("Balaji"), on the redeye flight to Pennsylvania to oversee the production. [22]

On March 6, Balaji inspected the Sainno Care facility and confirmed the order.[23] At that time, Rakesh also confirmed an additional order for 100,000 bottles of sanitizer from China as he did not want to take any chances of delays from Sainno Care.[24]

---

[21] *Id.* at ¶22

[22] *Id.* at ¶¶17,19

[23] *Id.* at ¶19

[24] *Id.* at ¶¶20,22

On March 7, Balaji instructed his team to increase production in India and to provide "real time" updates on the delays from Fed Ex.[25]

On March 8, Balaji and Rakesh's team in India confirmed that additional product was ready to ship and was immediately booked to be shipped by air freight.[26]

On March 9, the first Fed Ex shipment that was confirmed for delivery on March 3, arrived at QYK's headquarters.[27]

On March 13, the additional shipment from India arrived at LAX and was picked up by Balaji in the middle of the night and delivered to QYK's office for immediate shipping.[28]

After this, product began arriving on a continuous basis.[29]  This is summarized in the spreadsheet attached to the declaration of Rakesh Tammabattula.[30]  The statement by the FTC that "At lease through mid-April 2020, Defendants failed to secure enough inventory to fulfill its outstanding orders"(FTC Mot. 9/6-7) is false and given that the FTC has had the data showing this statement to be false for over a year, it is unknown why it made the statement.

---

[25] *Id.* at ¶21

[26] *Id.* at ¶22

[27] *Id.* at ¶23

[28] *Id.* at ¶24

[29] *Id.* at ¶14

[30] *Id.* at ¶14, Exhibit C

From March 4, QYK started to receive significantly larger orders than it could ever anticipate. This explains the efforts it went to secure additional product.[31] QYK utilized a third-party shipping platform named Shopify.[32]  When an order is made online, Shopify will book it in its system and issue a label for mailing to the consumer. Shopify will also send an email to the consumer informing him or her that the product was on the way. This message is part of the Shopify system and is not something QYK had any control over.[33]

The labels were printed out at the QYK office and were sorted into piles depending on the shipping method and the date of the order.[34] Several thousand labels were printed and sorted each day.[35] At this time, QYK had only 3-5 employees. These employees, Rakesh, and his wife Dr. Jaqueline Nguyen would work 16-18-hour days to print the labels, sort them, package the product, attached the label, and place them in bins for pick up by either the United States Postal Service or UPS.[36]  Each day, thousands of boxes of products were placed in the bins ready for pick up by the USPS.[37] To accommodate the demand, Rakesh began hiring temporary workers to

_____

[31] *Id.* at ¶26

[32] 8/16/21 RT Depo. Tr. 153:3-9

[33] Dec. of Tammabattula at ¶27

[34] 8/17/21 QYK Depo. Tr. 80:7-13

[35] 8/17/21 QYK Depo. Tr. 82:11-15

[36] 9/23/21 Paulo Depo. Tr. 90:22-91:6; Dec. of Tammabattula ¶28

[37] 8/17/21 QYK Depo. Tr. 82:11-15

assist in the boxing and shipping of the sanitizers.[38]  As stated by one former employee in response to whether there were ever any customer complaints:

> "We were still humans; we still make mistakes.  We tried our hardest, like we were working 16-hour days, hiring anybody that we could that felt comfortable or safe to even work.  Like we also worked during a pandemic, during our shutdown.
>
> So, for example, or goal was to always ship these out in a timely manner, even sooner than what we anticipated; but since we only had a few people rotating every morning and nighttime to ship these, of course, we're going to make human error." Depo of Paulo (90/22-91/6)

Issues with shipping times were also caused by the USPS which issues were completely out of the control of QYK. The USPS normally picks up daily. However, during the pandemic, the USPS was apparently shorthanded and operated under severe restrictions. At times when the bins were loaded with boxes ready to be pick up, the USPS would simply not show up.  In addition, the USPS records which are intended to show when pick-ups occurred were faulty.[39] In this regard, when the USPS picks up, it is supposed to scan each and every label to record a "first scan" date.  However, frequently when the USPS would show up at QYK to pick up the shipment it would

---

[38] 8/17/21 QYK Depo. Tr. 81:17-25

[39] Dec. of Tammabattula at ¶34

OPPOSITION TO THE FTC's MOTION FOR SUMMARY JUDGMENT

simply take it without scanning the boxes. It claimed that it did not have enough personnel to do the scans.[40]  It is unknown when the "first scan" was done, but in some cases it wasn't until the shipped box was actually in another state or city.[41] That is, the first scan may have taken place days or weeks after the product was actually picked up by the USPS. This was the state of affairs during the first weeks of the pandemic, and none of this was the fault of QYK.

Even with the unprecedented pandemic, all consumers received their product.[42]

To provide customer service, QYK utilized another third-party platform called Gorgias. When a customer inquiry came in, Gorgias would create a "chat" log, and a dedicated employee would respond.[43] As customer service calls increased, QYK would add additional customer service personnel. Later, to enhance the customer service, Rakesh hired an additional independent dedicated customer service team to work with the in-house customer service department.[44]

During the period from March 4 – May 31, 2020, QYK received 45,105 orders for hand sanitizer representing gross sales of $2,715,909.[45] Of these 45,105 orders,

---

[40] 9/23/21 Paulo Depo. Tr. 197:5-8

[41] Dec. of Tammabattula ¶34

[42] *Id.* at ¶33

[43] Declaration of Tammabattula at ¶35

[44] *Id.* at ¶36

[45] *Id.* at ¶¶12,13, Exhibit C

6,005 were generated from a Google Ad resulting in total sales from a Google Ad of $321,041.58.[46] This amounts to 11.8% of QYKs sales. When the refunds to the Google Ad customers are subtracted out, the total Google Ad sales were $301,664 which equates to 11.1% of all sales.[47]  The remaining sales were generated through almost 100 other sources. These included Bing, Yahoo!, Facebook, Instagram, direct website sales, Aol, Gq,  Tomsguide, Findsimilar, DuckDuckGo and many others.[48] None of these other sources advertised any shipping times or shipping claims.

This is vitally important in this case, as the only ad that contained the "In stock, ships today" claim or the "Ships Fast from CA Today" claim were the Google Ads—which amounted to only $321,041.58 of the sales.[49] The other ads made no shipping representations, and, as discussed below, when there are no claims made, then MITOR allows 30 days for the product to be delivered.[50]

When the sales are analyzed based on the source of the sales (e.g. Google Ads vs. Bing, Aol, Yahoo, Facebook etc.), the FTC's analysis is shown to be fundamentally flawed. What the FTC has done is to conflate the sales from all sources into one and then the FTC assumes that these were all generated from the Google Ad

---

[46] *Id.*

[47] *Id.* at ¶11

[48] *Id.* at ¶12

[49] *Id.* at ¶11, Exhibit C

[50] 16 C.F.R. 435.2

By creating a fallacy through incomplete data, the FTC attempts to confirm a particular position while ignoring the complete shipping data which would contradict its position. This is the classic definition of "cherry picking."

It is true that QYK would constantly reappraise the ever-changing situation caused by the pandemic, the government shut downs, and the international shipping closures and would modify its processing times. Each modification was based on a good faith estimate given the facts presented at the time of the change.

For instance, on March 11, 2020, QYK emailed all of the customers that had purchased a product to allow 3-5 days for processing and if this was not acceptable to the customer, then they could request a refund.[51]

## III.   REFUNDS

QYK employed a liberal refund policy. Anyone who requested a refund received one. The only delay to the refund payment was if the product was in transit, then the consumer would need to confirm that it had been sent back or rejected before the refund would be issued.[52]  QYK is unaware of anyone who requested a refund that did not receive one.[53]

---

[51] Declaration of Tammabattula at ¶38

[52] *Id.* at ¶¶39-41

[53] *Id.* at ¶40

A product in transit included a fully boxed, labeled product that was sitting in a USPS bin along with thousands of other packages waiting to be picked-up.[54] It was impossible to go through the bins to find a particular package belonging to a consumer. Therefore, QYK informed the consumer that once the package was received and confirmation was received that it was being sent back, the refund would issue. At no time did QYK ever refuse a refund once it confirmed the product was being returned.[55] A total of 2916 refunds were processed amounting to $266,357 in refunds.[56]

## IV.    CHANGE OF MARKETING MODEL

In August of 2020, QYK made a fundamental change in its marketing model. Instead of marketing directly to consumers through the internet, QYK decided to market only as a wholesaler to retail merchants.[57]  Since August of 2020 to the present, QYK has made only about $3,000 in direct sales to consumers.[58] More importantly, because retail merchants buy on a net 30 or net 60 basis, there can be no possibility of any late shipments. This is because these retailers do not pay for any product until sometime after they have received the product.[59]

---

[54] *Id.* at ¶41

[55] *Id.* at ¶40

[56] *Id.* at ¶40

[57] *Id.* at ¶42

[58] *Id.* at ¶43

[59] *Id.* at ¶44

## V.   SALES OF HAND SANITIZER BY DR. J'S, LLC

Dr. J's marketed hand sanitizer under its own brand (Dr. J's Naturals) only through FaceBook ads. These ads did not contain any shipping claims. Therefore, under MITOR, the product could be shipped anytime within 30 days.  Based on this, Dr. J's achieved complete shipping time compliance.

## VI.   BASIC IMMUNE IGG SUPPLEMENT

The Basic IGG Supplement was offered by Dr. J's Natural, LLC, a company owned and operated by Dr. Jacqueline Nguyen, the wife of Rakesh Tammabattula.[60] Dr. Nguyen holds a Doctor of Pharmacology degree and was trained as a clinical compounding pharmacist.[61]   The primary active ingredient of Basic IGG was ImmunoLin  a product produced by Entera health, Inc. which, according to Entera Heath's clinical studies, increases the body's natural defense by providing high levels of an antibody called IgG. As stated by EnteraHealth:

"ImmunoLin® is the next generation immune-protein providing concentrated immunoglobulins to support the body's natural immune defenses in the gut.

…

For years, immunoglobulins have been used to help support the body against infectious, idiopathic, and autoimmune diseases.  ImmunoLin® is the next

---

[60] Dec. of Nguyen ¶2

[61] Dec. of Nguyen ¶3

generation of functional protein that contains the highest level of IGG available per gram as a dietary supplement ingredient." [62]

Dr. J is Vietnamese and Basic IGG was marketed exclusively to the Vietnamese community through an interview of Dr. J on Vietnamese language TV.   The total amount of Basic IGG sold before it was discontinued was less than $14,000.[63]   That is, it was product that was offered for only a few months, generated almost no sales, and was discontinued in July of 2020.

Although the sales of this product were negligible, the FTC has ignored an important caveat made by Dr. J on this Vietnamese interview where she states at the outset of the interview the following:

> "Covid-19 is a super virus and at the moment, there is no western medicines that can be used to kill this virus, nor vaccines for people all around the world to get themselves immunized and protected from Covid-19." [64]

## VII.   LEGAL ARGUMENT

**A.     Defendants had a Reasonable Basis for Making the Shipping Claims.**

The FTC's first claim for relief is brought pursuant to the Mail, Internet, or Telephone Order Merchandise Rule known as "MITOR" (16 CFR  Part 435). MITOR

---

[62] Dec. of Nguyen.¶13, Exhibit B

[63] Dec. of Nguyen.¶15

[64] FTC Ex. PX8, Attachment A, Pgs.14-15

requires that a seller must have a "reasonable basis" to make a shipping claim in its solicitations.  (§ 435.2(a)(i)). If no shipping time is made in the solicitation, then the order must be shipped within 30 days of its order. (§ 435.2(a)(ii)).

The FTC makes a fundamental error in its analysis. It assumes that all of the orders were generated from the Google Ads. However, out of the 45,106 orders, only 6005 were generated from the Google Ads. This amounts to about 11% of the orders. In terms of dollars, out of the approximately $2.7 million in sales, only about $300 thousand were generated from the Google Ads. Moreover, there were four variants of Google Ads, and only one (1) of the Google Ad variants contained the "In Stock & Ships Today" language that the FTC seems to base its claim on. The other Google Ad variants had no shipping claims which, under MITOR,  allows for shipping to occur within 30 days.  When the variant of Google Ads that contained no shipping claim are subtracted out, the total number orders that were made based upon the Google Ad containing the "ships today" language were much lower.

It is unknown why the FTC makes this fundamental flaw of assuming all sales were from the Google Ads. The data shows that, in addition to the Google Ads, there were 99 other source ads that generated sales (e.g.  Bing, Yahoo!, Facebook, Instagram, direct website sales, AOL, GQ,  Tomsguide, Findsimilar, DuckDuckGo). None of these other sources (other than a Twitter  post which accounted for only 6 sales) contained any shipping claims.  By cherry picking the Google Ads and lumping them

in with all other sources, the FTC creates a false impression of the QYK shipping record. This is inappropriate.

At times, the glowyy.com website did contain a shipping claim. However, in almost all cases the product was shipped out within the time stated on the website.

With respect to the Google Ad variant that contained the "In Stock & Ships Today" language, QYK had a reasonable basis for making this claim. At the time QYK posted this Google Ad (March 4, 2020), it had 2,000 bottles of inventory on hand which was more than sufficient to meet the expected demand based on QYK's order history. In addition, Fed Ex had confirmed that on that day another 10,000 bottles (fully labeled and ready to be shipped) would be delivered. QYK could not have known during the early weeks of the pandemic, that shipments confirmed to be delivered would not in fact be delivered.

When the Fed Ex shipment was not received on March 4, QYK began inquiring into the order. The 10,000 bottle order was received on March 9.  An additional 13,000 bottles was received on March 13. In addition, on March 5, Rakesh had shipped alcohol and another 10,000 bottles to a manufacturer in Pennsylvania (Sainno Care) which guarantee a 24 hour turn around.  Moreover, on March 7, QYK increased production of the hand sanitizer in both India and China. On March 2, Rakesh had ordered additional sanitizer from India which was scheduled to ship on March 13. Unbeknownst to QYK, when the product was at the airport ready to be loaded, it was confiscated by the Indian government (presumably to be used in India).

The bottom line is that all of this is evidence to constitute "some recognizable substantiation for the" shipping claim that was made. https://www.ftc.gov/tips-advice/business-center/guidance/business-guide-ftcs-mail-internet-or-telephone-order. This is what is required to establish that QYK had a "reasonable basis" for making the shipping claim. At the very least, there is an issue of disputed fact as to whether a reasonable basis existed which disputed prevents summary judgment.

**B.      To the Extent There Were Late Shipments, they Were Due to Unforeseen Circumstances Outside of QYK's Control.**

The shipment issues that form the basis of this FTC action occurred during an unprecedented global pandemic that was unforeseen to anyone, including our own government.  As the FTC points out, the World Health Organization officially declared the global pandemic on March 11, 2020 (FTC Mot. P.13; fn 3). This pandemic destroyed the global supply chain and played havoc with traditional shippers such as Fed Ex and the USPS. These delays became so severe that on March 24, 2020 Fed Ex suspended its delivery guarantees and issued the following statement:

"The impact of COVID-19 is causing local, state and national governments around the world to issue work and travel restrictions on a daily basis which are impacting our ability to meet our high standards of service." (See, https://www.supplychaindive.com/news/coronavirus-ups-fedex-suspend-service-guarantees/575280/. "UPS, FEDEX SUSPEND SERVICE GUARANTEES CITING CORONAVIRUS IMPACT.")

-18-

The pandemic also affected the USPS. (See https://www.savethepostoffice.com/2020-mail-delays-stats-charts/. "The 2020 Mail Delays: Stats & Charts"). QYK's employees would work 16-18-hour days to prepare the packages for shipping. The packages would be waiting in postal bins to be picked up and on some days the USPS would fail to pick-up. When they were picked up, the Postal Service would fail to scan the packages which is necessary to create a "first scan." Sometimes these first scans did not occur for days or weeks until after the pick-up occurred which gave the impression that the sanitizer was shipped out long after it was actually shipped.

None of these problems created by the Global pandemic were caused by QYK and QYK had no control over these events.  Yet, the FTC still maintains that MITOR is some kind of strict liability rule that has no defense similar to Force Majeure or Impossibility of Performance (both of which are affirmative defenses in the defendants' Answer).  Admittedly, given the unique nature of the global pandemic, there are no cases discussing relief for a defendant faced with such unforeseen, unprecedented circumstances.  However, defendants believe that this Court should consider the unique circumstances of the pandemic in deciding this matter.

This is especially important in this case, as this case involves the equitable jurisdiction of this Court.  It is unfair to hold QYK liable when any violation was caused by events out of its control.  Moreover, QYK was one of the few companies, perhaps the only company, with employees who braved the pandemic and worked

endless hours to provide a product to the nation.  It would be inequitable to now punish them for this heroic effort.

**C.    The FTC's Claim that QYK Wrongly Refused Refunds is Incorrect.**

The FTC asserts that the defendants "wrongfully Refused to Give Customer Refunds (Mot. 14/1-2).  The evidence does not support this assertion. To QYK's knowledge every person who requested a refund received a refund. A total of $266,357 in refunds were paid out.

The FTC's claim that refunds were not paid appears to be based on a false interpretation of the facts regarding product that was in transit. If a product was in the hands of the USPS or other shipper, then QYK could not issue the refund until the product was received and confirmation could be made that it was being returned.  Once confirmation was made that it was being returned, a full return was made. Additionally, if a product had been fully packed, labeled, postage paid, and the package was sitting in the USPS bins with thousands of other packages it was virtually impossible to find this needle in the haystack.  Therefore, QYK would ask the customer to either reject the product when it was delivered or confirm that it was being returned when received. When this occurred, a full refund was paid.

The FTC has not produced one declaration of any customer who claims that they did not receive the refund if the product was returned. In this regard, the FTC has produced declarations from only four (4) consumers. One is from Randy Kalmeta (Ex: PX 5) who not only received and kept his product, but also received a refund.  A second

is from Kristin Askins (Ex: PX 6) who also received her product as well as a refund. A third is from Vivian Breier (Ex: PX 3) who also received her product and a refund. The fourth was from Ashley LeSage(Ex: PX 4) who received not only her order but also a duplicate order and never returned either.

The only evidence that the FTC relies upon that refunds were not paid are complaints made to a third-party platform called Centinal and calls to the QYK customer service platform, Gorgias. These are hearsay and generally inadmissible. Moreover, these complaints only concern a single point in time. They contain no evidence of subsequent actions such as when the product was received, or the refund actually paid. In short, they provide no support for the assertion that refunds were never properly paid.  As stated above, every customer who properly requested a refund (i.e. returned the product) did, in fact, receive a refund.

**D.      There is No Showing of any MITOR Violations by Dr. Js, LLC**

Dr. J's is a different company that QYK.  It is owned and operated by Jacqueline Nguyen. Dr. J's formulated and sold supplements and skin care products.  It is correct that Dr. J's also sold hand sanitizer.  Virtually all of Dr. J's sales of sanitizer were sourced from  Facebook ads which contained no shipping claims. Although Dr. J's also ran a Twitter Post directed to a few followers,  this accounted for no sales. The Twitter Post is the only media that contained any shipping claim and this was a  Post that provided a one day special to Dr. J's followers on March 10, 2020. A Post is different from an ad that is generally circulated, and the Post resulted in no sales.  With

respect to the Facebook ad, because no shipping claims were present, Dr. J's had up to

30 days to ship the product. Dr. J's complied with this requirement.

Despite this, the FTC seeks to include Dr. J's entire sales for two years (totaling

$406,333,30) as violative of MITOR.  This is wrong.

**E.      When Read in Context, the Statements Made by Dr. Js During her**

**Vietnamese TV Interviews are Not Misleading.**

Contrary to the FTC's assertion, the only defendant that sold the Basic IGG product

was Dr. J's. (See Mot 17,16-17 where FTC asserts that the "Defendants offered" the

product). During the few months that Basic IGG  was sold, very little of it was sold

and it resulted in a loss to the company. It was therefore discontinued. The Basic IGG

product was sold only to the Vietnamese community and was the subject of one (1)

interview with Jacquelin Nguyen which was on Vietnamese TV in the Vietnamese

language.

The FTC asserts that Ms. Nguyen improperly claimed that the Basic IGG product

prevented transmission of Covid-19. (Mot. 18/7-9). A review of the full transcript of

the interview reveals that the FTC has taken it out of context in an effort to bolster its

argument.

First, nowhere in the interview does Ms. Nguyen state that Basic IGG diagnosis,

treats, prevents or cures Covid-19. Indeed, she states the opposite:

"Covid-19 is a super virus and at the moment, there is no western medicines that can be used to kill this virus, nor vaccines for people all around the world to get themselves immunized and protected from Covid-19." (Ex: PX 8 at p. 2).

Second, when the entire transcript is read in context, it is clear that Ms. Nguyen was educating the audience on the use of antibodies to increase a person's natural immunity:

"Speaking of science, the first line of defense in the human body means that we have this treasure as a powerful pharmacy. That's why entry by viruses and bacteria to our bodies does not mean instant death. Therefore, the first line of defense is usually called antibodies.  If translated into Vietnamese, it is called "khang the". In English, it is called immunoglobulin and there are 5 different types of those in the human body. (Ex: PX 8 at 3)

The interviewer then asks Ms. Nguyen if there is something that "can boost human antibodies." Ms. Nguyen answers by explaining that every person has antibodies, but that younger people have stronger immune systems. (Ex: PX 8 at 5). She then states the additional following caveat:

"Essentially, we should follow the advice given by doctors and the advisers to the United States.  President Trump and everyone is calling for people to stay in their homes.  Doing so will save many lives now that coronavirus is raging.  It's because you may not even have the slightest idea whether your body had been infected, and hence you still go out and talk to other people."  (Ex. PX 8 5-6)

The interviewer then asks, "is there any way to help our body *resist* this type of virus." Note, the interviewer never asks is there any way to prevent,  cure or treat the virus. The only word he uses is to "resist" the virus.  In response, Mr. Nguyen states:

> "It's a must that you strengthen your immune system…And for now, in the midst of Covid-19, we have to say that, well, I have looked into immunoglobulins.  They **could** strengthen our antibodies." (Ex: PX at 7, emphasis added).

Importantly, Ms. Nguyen does not use the word "will" but states "could."  Ms. Nguyen then discusses how increased antibodies can help in resisting a virus.:

> "So, this antibody power will increase the three types of antibodies that are most populous in the human body, including IgC, IgM and IgA.  These are the three types of antibodies that the product helps improve.  At this moment, let's say if I sit next to Mr. Do Dung or someone else or happen to touch something and get infected with Covid-19, at least I have already had more antibodies that can detect the invasion and cling to and attack the coronavirus. It's like, the antibodies will say, "hey, bacteria are penetrating the body. Let's come and fight it off."  (Ex: PX 8 at 8)

When read in the proper context it is apparent that what Ms. Nguyen was referring to was increasing the body's antibodies through the Immunoglobin to **resist** viruses including COVID. At no time does she ever say that the Basic IGG prevents, treats or cures COVID nor does she (as the FTC assert) state that it prevents the

transmission of COVID. Indeed, the main ingredient of Basic IGG, called ImmunoLin® is described by its manufacturer, EnteraHealth as follows:

> "ImmunoLin is the next generation immune-protein, providing concentrated immunoglobulins to support the body's natural immune defenses in the gut. Made with specifically purified serum protein, ImmunoLin contains high concentrations of immunoglobulins and growth factors clinically proven to support immune health…" [65]

The clinical studies are then referenced for the reader to review.

The FTC also complains that Ms. Nguyen states that the product is "FDA registered." (Mot. 19/20-23).  However, what Ms. Nguyen was referring to was that the manufacturer (which she refers to as our parent company) of the "bovine immunoglobuline," the main ingredient of Basic IGG, has its "trademark" registered. In this regard, Ms. Nguyen states "our parent company is the only company obtaining the registered **trademark** of this antibody product from the FDA." (Mot 19/21-22; emphasis added).  She does make a mistake by confusing the agency that registers trademarks between the FDA and USPTO. But she was clearly referring to trademark registration which has nothing to do with curing or treating a disease.

Next, the FTC cites a passage from the interview where the FTC claims that Ms. Nguyen states "Is it guaranteed that we will stay safe [from COVID-19]?" Dr. J

---

[65] Dec. of Nguyen ¶13; Ex. B

responds, "It's guaranteed, because there is FDA's verification and approval." (Mot. 19/13-15). This, however, is not what the passage says. First, Ms. Nguyen never uses the phrase [from COVID-19]. This is an invention by the FTC to impart wrongdoing on her part. Second, the translation is faulty. A proper translation of the passage is as follows[66]:

> Nam: (male host)
>
> We tried our best to avoid and wash your hands often via singing the "Happy Birthday song" in addition, add on to take this bottle supplement for 1 month to guarantee something? Does it guarantee for better health?
>
> Nguyen: This bottle supplement is guarantee to make in FDA facility and it has all the certifications
>
> Nam (male host): Pharmacist Thu Thảo just take the supplement in front of us so I believe it is a good product. I should buy for family and friends and gifting to them to help them with bacteria and virus?

What Ms. Nguyen was conveying was that the product is safe to take as it is made by Entera Health which is a FDA certified as being safe. Indeed, Entera Health states the following regarding its ImmunoLin® product:

---

[66] Dec. of Nguyen ¶ 17

OPPOSITION TO THE FTC's MOTION FOR SUMMARY JUDGMENT

The safety of ImmunoLin® is supported through clinical trial monitoring of studies spanning more than 20 years and submission of a generally recognized as safe submission to the US Food and Drug Administration.[67]

The fact that the FTC adds words to the translation that are not present, and the translation itself is incorrect, results in an incorrect assumption as to what was being said.

Lastly, the FTC asserts that Ms. Nguyen falsely represents that the Basic IGG has been clinically tested. (Mot 20/12-14). However, a review of the transcript shows that Ms. Nguyen was referring to "clinical studies involving the extraction and cultivation of antibodies taken from cow blood, which is then made into this antibody powder." This was referring to the studies that ImmunoLin® increases antibodies in the body, not that the product prevented or cured Covid. These clinical studies do exist and were provided to the FTC. They can, in fact, be found on the Entera Health website. Nowhere does Mr. Nguyen state or imply that there are clinical studies regarding the use of ImmuloLin to prevent, treat, or cure Covid, and for the FTC to assert otherwise is misleading.

This is not a case like *FTC v. Direct Marketing Concepts, Inc.* 624 F.3d 1 (1st Cir. 2010), cited by the FTC, where the defendant's "health claims were bold and straightforward" that the supplement product "cures cancer, autoimmune diseases, and

---

[67] Dec. of Nguyen  ¶18

pain by rendering acidic bodes more alkaline." *Id* at 12. Nor is this a case like *FTC v. Braswell,* 2005 WL 4227194 (C.D. Cal., 2005), also cited by the FTC, where the defendant's ads claimed, "on its cover page that "Scientist Find Amazing Remedy for: Asthma, Bronchitis, Emphysema and Smoking Damage." *Id.* at 5.

Here, Ms. Nguyen never states anywhere in her interview that the Basic IGG prevents, treats, or cures COVID. In fact, she states the opposite when she says "Covid-19 is a super virus and at the moment, there is no western medicines that can be used to kill this virus." Moreover, any statements made by Ms. Nguyen were buried within an interview and were not part of a cover of an advertisement.

In determining whether the statements by Ms. Nguyen during her interview were deceptive, the statements must first be determined to be "objective product claims." Here, however, there are no claims that the product cures, treats, or prevents COVID. At most, the discussion goes to the fact that increased antibodies helps the body to resist viruses which is common knowledge.

The fact that very little of the product was sold is a strong indication that the observer never took the statements as an objective indication that the Basic IGG cures or prevents COVID. Clearly, if the observer thought it did, then hundreds of thousands, if not millions, of dollars of the product would have been in demand and sold. In short, the FTC cannot show that the predicate needed to make a deceptive health claim is present. At the very least, there is a triable issue of fact as to whether the statements

made by Ms. Nguyen, in the context of which she made them, constitute actionable, objective health claims.

### F.      There are Triable Issues of Fact as to any Damages Caused by Shipping Delays.

The FTC admits that the only monetary relief it seeks for the alleged MITOR violations are "refunds" pursuant to Section 19(b) of the FTC Act. (Mot. 40/18) [As stated by the FTC: "the FTC seeks only equitable monetary relief in the form of refunds under Section 19." (FTC's Mot to Strike Jury, Dkt. 189; 1/3-4)].  The FTC also admits that the purpose of refunds is to "restore the status quo." (Dkt. 189; 3/15-16). And the FTC further admits that this means the remedy it seeks "serves to reinstate the parties to their positions prior to the challenged conduct." (Dkt. 189; 4/14-16).

After having made these admissions, the FTC for some reasons has asserted in its motion that it seeks a disgorgement equal to all of the revenues received by QYK for the sale of hand sanitizer. This measure of monetary relief is not permitted under Section 19(b) for several reasons.

First, there is not one consumer that did not receive his or her hand sanitizer. Perhaps it was a day late, a few days late, or in some rare cases, even a few weeks late. However, they all received their product. There is not one incident of a consumer who after receiving their hand sanitizer asked for a refund. This is because they must have used it. If the FTC seeks to "reinstate the parties to their positions prior to the challenged conduct," then the hand sanitizer must be returned in order for QYK to

issue a refund. Otherwise, a situation would arise where the consumer keeps (and uses) the product and also gets a refund.  This is not reinstating the parties to their prior positions. Instead, this would result in a windfall to the consumer by placing him or her in a better position by having a valuable product plus the money paid for it.  This inequitable.

Second, requiring QYK to pay back the money for the sanitizer, and allow the consumer to keep the product should be barred because it is punitive in nature, which is expressly prohibited by Section 19(b). *FTC v. Figge Intern., Inc.,* 994 F.2d 595, 607 (9th Cir. 1993).   In *Figge,* the court found the defendant made deceptive advertisements regarding the efficacy of the heat detectors it sold. The court then devised a remedy by establishing a fund to give the consumers the opportunity to receive a refund if they chose to return their heat detector:

> "Those consumers who decide, after advertising which corrects the deceptions by which Figge sold them the heat detectors, that nevertheless the heat detectors serve their needs, may then make the informed choice to keep their heat detectors instead of returning them for refunds." *Id.* at 606

The FTC in *Figgie* then asserted that, if any money was left over as a result of consumers not returning their product, the money should be turned over to the FTC. The Ninth Circuit rejected this as being punitive and prohibited by Section 19(b):

> "We do find this portion in effect to be punitive.  We can see no basis for allowing the Commission to keep money in excess of what it reasonably spends

to find purchasers of the heat detectors, advertise to them the availability of the money and the importance of using smoke rather than heat detectors at appropriate locations, and process their claims and reimburse them. The FTC argues that it should be allowed to keep the money because it is in the nature of disgorgement, but the statute authorizes only 'redress…to consumers,' and specifically prohibits the imposition of 'exemplary or punitive damages.' *Id.* at 607

Here, disgorging QYK's entire revenue when the consumer is allowed to keep the product is punitive and cannot not be permitted under Section 19(b). *Figgie* 994 F.2d at 606 ["If disgorgement of Figgie's receipts would exceed redress to consumers, then . . . the excess would be for the purposes of punishing Figgie, not making redress to the consumers who bought the heat detectors."]; see also *FTC v. Silueta Distributors, Inc.* 1995 WL 215313 at *6 (1995, N.D. Ca.) ["any monetary remedy authorized under Section 19(b) that accomplishes more than redress acts as prohibitive punitive damages"]. This is precisely why the court in *Figgie* required the consumers to return the product. Otherwise, by allowing consumers to keep the product and be compensated the full value of their heat detector would constitute a "windfall" to the consumer. *Figgie* 994 F.2d at 606 [stating that by requiring the consumer to return the product "creates no windfall for Figgie's customers."]; see also *Federal Trade Commission v. Noland* 2021 WL 5493443, 4-7 (D. Ariz. 2021) (acknowledging that *Figgie* "took pains to avoid" the "very windfall" the FTC is trying to seek in this case.)

-31-

1

1.    **FTC v. Noland.**

2

3         "Concerned solely with the plaintiff's injury, Section 19(b) confers no authority

4    to award monetary relief that exceeds redress to consumers." *Washington Data*

5    *Resources,* 856 F.Supp.2d 1247, 1280 (2012, USDC MD Florida).

6

7         *Noland* uses this principle and may be of assistance to this Court. *Noland* is a

8    recent case that is strikingly similar to our facts.  Like this case, *Noland* concerned a

9    violation of MITOR.[68] The court granted the FTC's summary adjudication on liability

10   but denied it on its request for monetary relief.  As in this case, the FTC argued that

11   consumers redress equaled defendant's full sales irrespective of any injury to the

12   consumer. The court rejected this, as there was no evidence this was the actual damage

13   suffered by consumers:

14

15

16        "The problem with the FTC's damages methodology is that it goes beyond

17        redressing injury to consumers and provides a potential windfall to consumers.

18        Under the FTC's proposed approach, if a consumer ordered and paid for $5,000

19        of products from [the defendant], the shipping deadline expired without

20        notification of the consumer's right to a refund, [the defendant] shipped the

21        product the very next day after the deadline expired, and the consumer was

22        satisfied with the products upon receipt and immediately consumed them, the

23

24

25

26

27   [68] Defendant is unaware of any published case dealing with the MITOR statute except for *Noland*.
     Indeed, it does not even appear the FTC has cited a single case dealing with MITOR except for
28   *Noland* in their summary judgment motion.

consumer would nevertheless be entitle to a $5,000 damage award…It is difficult to see how such an outcome could be viewed as 'necessary to redress injury' to the affected consumer… Put another way, there is simply no 'proof of injury" in that scenario.' [Citation omitted]" *Id.* at *4

The court noted that "the FTC does not argue that [the defendant] *never* subsequently fulfilled these orders. Instead, the FTC's theory is that, at the moment any shipment became overdue (and [the defendant] failed to provide the notice of the buyer's right to seek a refund or consent to a shipping delay), the consumer immediately suffered harm equal to the purchase price of the unshipped product, irrespective of whether the consumer later received the product from [the defendant]." *Noland* 2021 WL 5493443 at *3 (emphasis in original). The court rejected this position:

"The FTC is not entitled to summary judgment on its request for an award of $630,377 in damages arising from the Merchandise Rule violations. Although the Court does not foreclose the possibility that consumers suffered some form of cognizable harm from the violations, the all-or-nothing methodology presented in the FTC's moving papers is flawed because it fails to account for the inherent value of the product that consumers ultimately received, even if the product was shipped late." *Id.* at *3.

Here also, every consumer received the hand sanitizer it ordered.

In reaching its conclusion, the *Noland* court relied on *Figgie* and found "that that there may be no redress without proof of injury ... [a]nd the relief must be necessary to redress the injury." *Id. *4 citing FTC v. Figgie,* supra*, at 605*. In other words, the FTC must prove that consumers were: (1) damaged because of any delay in shipment; and (2) quantify the amount of such damage.

Like this case, the FTC in *Noland* also argued that injury for all consumers is presumed. Thus, according to the FTC, it should be relieved of its burden of proof as the plaintiff. However, this argument was rejected by the court:

> "As an initial matter, there is no merit to the FTC's contention that the Individual Defendants 'must bear the burden of proving which late orders were eventually sent.' (Doc. 365 at 12 n.7.) The FTC is the plaintiff in this action and has chosen to affirmatively move for summary judgment on the issue of damages. '[W]hen the moving party [at summary judgment] has the burden of proof on an issue,' that party 'must affirmatively put forth evidence that would satisfy its proof burden at trial. If the moving party fails to identify and document facts that would support a finding for that party at trial, then the motion must fail.' *See* 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 162 (2021)." *Noland* 2021 WL 5493443, 4.

The court went on to say that it was the FTC's burden, as plaintiff, to prove how the consumers were damaged by any delay:

"Moreover, even assuming (without deciding) that the FTC might be able to secure a full-purchase-price damage award under Section 57b on behalf of a particular consumer who was so dismayed by a shipping delay that he would have opted for a full refund had he been given proper notice of his refund rights under the Merchandise Rule, the FTC has made no effort to identify any such consumers in its motion. Instead, the FTC asks the Court to assume that every consumer who received a late shipment was dissatisfied and would have requested an immediate refund if aware that such refunds were available. This approach is improper—for each consumer on whose behalf a damage award is sought, the FTC must prove why that consumer was harmed and identify the amount of money that is 'necessary to redress' that consumer's injury. Although the Court doesn't discount the FTC's concerns about the burdensomeness of this approach, which the FTC believes would undermine its ability to pursue 'large consumer redress actions' (Doc. 398 at 8 n.5), the Court is not at liberty to rewrite 57b based on such concerns. The bottom line is that the statute only authorizes damage awards as 'necessary to redress injury' and the FTC has not established that an award of $630,377 is necessary to redress the consumer injuries flowing from SBH's Merchandise Rule violations." *Id.* at 5.

The *Noland* court went on to state that, "[a]lthough it is possible such a consumer might suffer other forms of harm from a late shipment—such as lost resale

1  opportunities or a decrease in the market price of the product between the anticipated

2  and actual shipping dates—the FTC [must prove] such forms of harm. *Id.* at 4.[69]

3

4      Here, as in *Noland,* every consumer received the product (hand sanitizer)

5  ordered.   Even if, because of the unforeseen pandemic, some of the products were

6  delivered later than desired—they were all delivered. Any consumer that asked for a

7

8  refund received one. (USF 3).  There is no evidence of widespread dissatisfaction with

9  the hand sanitizer or that it was not happily used. Indeed, there were hundreds of repeat

10  customers which are an indication of customer satisfaction.

11

12      As discussed in *Noland,* simply using the net revenue as the measure of damages

13  ignores the inherent value of the product that was received, and most likely used:

14      "[T]he fundamental problem with the FTC's damages methodology is that it

15      fails to account for the inherent value of the products and services received by

16

17      consumers, thereby creating a windfall." *Noland* 2021 WL 5493443 at 7.

18      As stated above, by allowing damages in the full amount of the product's

19

20  purchase price (i.e. revenue), while at the same time allowing the consumer to keep

21  and use the products, is the very same "windfall" the courts in *Noland* and *Figgie*

22

23

---

24  [69] The *Noland* court also acknowledged *Figgie's* holding that reliance may be presumed when a
misrepresentation regarding the quality of a product is widely disseminated to consumers. However,
25  the court distinguished *Figgie* because, unlike *Figgie,* the Individual Defendants never made
misrepresentations about the "nature of the underlying product or service . . ." *Noland* 2021 WL
26  5493443, 7. Instead, the Individual Defendant failed to meet shipping dates, which was totally
unrelated to the quality of the product. The *Noland* court held that, because consumers may have
27  been satisfied with the product, regardless of the date the product was received, the FTC was required
to show which consumers were dissatisfied with the product on the basis that it was shipped late. *Id.*
28  at 7-8. This principle should also be applied here.

found to be improper.  Such a remedy would be punitive and is expressly prohibited under §19(b).

Although the FTC claims that "Many consumers reported they would have chosen differently but for the deceptive [shipping] claims," (Mot. 37/5-6), the FTC has failed to produce a single declaration from any consumer who claims that he or she would not have purchased the sanitizer if the "ships today" language was not contained in the Google Ad. Nor has the FTC produced a single declaration of any consumer who claims he or she never received the product.  Instead, the FTC relies on a summary by an FTC staff member of 11 consumers who filed a complaint with a third-party platform. (Ex: PX 1; ¶ 56).  Apart from the fact that this is double hearsay and therefore non-admissible, a total of 11 complaints out of 45,000 orders does not constitute "Many consumers."

The FTC cites *United States v. MyLife.com, Inc., No CV 20-6692* 2021 WL 4891776 at *13 (C.D. Cal.) for the proposition that the proper measure of damages is the defendants' net revenue. However, the court in *MyLife.com, Inc.* relied on *FTC v. Com. Planet, Inc.,* 815 F.3d 603 in adopting this measurement, and *Com. Planet* was was a 13(b) case, not a 19(b) case. The holding in *FTC v. Com.Planet, Inc.* was abrogated by the Supreme Court in *AMG Capital Management, LLC v. FTC,* 141 S.Ct. 1341 (2021) [holding that Sec. 13(b) does not allow for any monetary relief]. Thus, *MyLife.com, Inc.* is not only misplaced, but also no longer good law.

The Court should rule that: 1) the correct measure of damages under §19(b) is limited to actual "consumer redress"; 2) that this consumer redress depends on the actual damages, if any, suffered by the consumers after taking into account the inherent value of the hand sanitizer which they all received; 3)  that these damages must be proved on a case by case basis by the FTC, as it is the plaintiff in this action; and 4) that a blanket finding of net revenue, without proper proof, as damages is not appropriate. At the very least, there are questions of fact of what, if any damages, were suffered by consumers from any delays.

## 2. Even if the Net Revenue Stream is the Proper Measure of Consumer Redress, there are Triable Issues of Fact as to the Amount of the Net Revenue Stream.

As discussed above, more than 90% of the sales of hand sanitizer were generated from ads (solicitations) that did not contain shipping claims. For these sales, QYK (as well as Dr. J's) complied with the 30-day shipping requirement. However, the FTC has conflated together all of the sales of both QYK and Dr. J's, as it is asking for a refund of 100% of the revenue stream from both companies. It should be self-evident that if a sale was generated from an ad that was compliant with MITOR, then those sales should be excluded from the refund calculation. This creates a triable issue of fact of which sales should be excluded and the proper amount of the refund amount thereby precluding summary judgment on this issue.

**G.    There is No Monetary Relief Available for Any Health Claim Violations by Dr. Js as the FTC failed to Issue a Cease & Desist Letter and Pursue an Administrative Claim Prior to Filing this Lawsuit.**

The FTC also seeks monetary relief under Sec. 19 for the alleged deceptive health claim made by Dr. J's regarding the Basic IGG supplement.  However, the FTC's claim is based directly on the FTC Act and not on any rule.  As such, before the FTC may bring an action seeking monetary relief it must first issued a cease & desist order and that order must become final (through an administrative hearing) which the FTC failed to do. This is made clear by the express language of Sec. 19:

"If any person, partnership, or corporation engaged in any unfair or deceptive act or practice (within the meaning of section 45(a)(1) of this title) with respect to which the Commission has issued a final cease and desist order …then the Commission may commence a civil action…If the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent, the court may grant relief under subsection (b)." *FTC Act* Sec. 19(a)(2).

This distinction between an action brought under a rule versus the act itself is the subject of a motion in limine by the defendants.  It is also defendants' understanding that the FTC does not dispute the fact that it is not entitled to any monetary relief

relating to the Basic IGG claims. In any event, the FTC is  not entitled to any monetary relief relating to its Basic IGG claims.

**H.     Injunctive Relief is Not Appropriate in this Case.**

Injunctive relief is not a remedy to address past violations. If the past violation is not likely to recur, then an injunction is inappropriate. *FTC v. Evans Products Co.*  775 F.2d 1084, 1089 (9th Cir. 1985).  Indeed, the FTC Act sets forth the standard that an injunction should not issue unless the FTC shows that the defendant "is violating, or is about to violate" the law. *Sec. 13(b)(1).*  See also *FTC v. Shire Viropharma, Inc.* 917 F.3d   147,   156   (2019;  3rd  Cir.)  ["We   conclude   that   this   language   is unambiguous…Simply put, Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant "is" committing or 'is about to" commit another violation.].

The FTC disagrees with this standard and it argues that that the standard should be the less onerous of a reasonable "likelihood" or "cognizable danger" of recurrence. (Mot. 43/ 9-12).**[70]** Regardless of what standard is use, however, injunctive relief is not appropriate as there is no chance of any further MITOR violations.

First, the only period of potential violative conduct was limited to the early months of the pandemic. By May, 2018 QYK achieved 100% shipping compliance.

---

**[70]** The court in *FTC v. Shire Viropharma* found that the standard suggested by the FTC was borrowed "from the common law standard for an award of injunctive relief," but was inappropriate in this context given the express, unambiguous language of the Sec. 13(b). *Id.* at 157.

Second, in the summer of 2020, QYK fundamentally changed its business model from marketing primary to consumers through the internet to selling to retail businesses on a wholesale basis.  Indeed, from August 2020 to the present QYK's consumer sales have only been about $3,000.  With sales to wholesale, retail sellers money is generally not paid until after the product is received, so there is no possibility of any MITOR violations.  Moreover, MITOR was intended to apply to consumer sales, not wholesale purchases from entities that are retail sellers.

Given the demonstration of complete compliance once the unprecedented destruction of the pandemic was taken into consideration and given that the QYK marketing plan has fundamentally changed making violations virtually impossible, there can be no showing of a future violation, and therefore an injunction would be inappropriate.  At the very least, there are material issues of fact regarding the potential of any future violations precluding summary judgment on this issue.

Apart from hyperbole, the FTC presents little evidence that any defendant is committing or about to commit any violation, or that there is any likelihood of a violation. For instance, the FTC states that defendants "*seemingly* take more than 30 days to ship items." (Mot. 45/4-6, emphasis added). It is unknown what "seemingly" means. However, the evidence the FTC cites has nothing to do with QYK. Instead, it concerns isolated instances of customer service issues with Dr. Js  These concerned only 4 orders out of 1100 made to Dr. J's, all of which were readily resolved. For the

FTC to argue that this shows that Dr. J's is about to commit a violation of the law is absurd.

The FTC then tries to bolster its assertion that "Defendants show a propensity to market deceptively" by pointing to a carrier form for importing goods. (Mot 45/9). First, this has nothing to do with MITOR violations, nor does it have anything to do with any purported violation of the FTC Act itself. This concerned private shipper requirements.

The FTC then points to a declaration from a business broker who purchased empty cannisters from QYK for his manufacturing clients who claims that a portion of the cannisters had defects in them. This business broker is named Jerry Ji Guo. (Mot. 45/10-12). Given that this was not an internet purchase, was not a consumer purchase, and was not a hand sanitizer purchase, it has nothing to do with MITOR violations. Moreover, the FTC apparently did not check on the credibility of its declarant, Mr. Guo.  At the same time that the alleged acts occurred, Mr. Guo was convicted and imprisoned for embezzling $5 million. His declaration, which the defendants dispute, should be given little weight, if any.  Moreover, the defendants never received any complaints of defective cannisters from Mr. Guo, and, in fact, Mr. Guo continued to order cannisters after the supposed defects occurred. This makes no sense and only shows the lack of merit of Mr. Guo's declaration.

Finally, the FTC pivots by asserting that the defendants improperly made "Made in America" claims. QYK did produce product in America as well as sourcing it from

overseas. If a customer desired a Made in America product, then the customer received this product. In the few instances where an ad (e.g. Dr. J's Facebook ad) represented that a product was made in America, then any products sources from that ad were fulfilled with product made in America. The FTC's claims on this issue are illusory and have no merit.

Even if the Court considers the factor of likelihood cited by the FTC, it is apparent that this is not an appropriate case for an injunction. According to the FTC, these factors are "the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations." (Mot. 43/22-44/3).

Here, the defendants were faced with an unforeseen and unprecedented global pandemic. They did everything they could to meet the issues presented. They were a small company with an order history that they believed allowed them to source and supply the ordered products. The violations of the shipping times, if any, were isolated and only occurred during the first weeks of the pandemic and given the defendants' current business model there is no possibility of recurrent violations. Moreover, every consumer received the sanitizer or a refund. There has been no showing how a consumer was damaged by receiving hand sanitizer a few days (or even a few weeks)

late. The fact that the overwhelming majority of consumers were happy is shown by the fact that there were hundreds of repeat customers.

## I.     Even if the Court Believes that Injunctive Relief is Appropriate, the Breath of the Relief Asked by the FTC is Overbroad.

In its motion, the FTC asks for an injunction that "enjoins Defendants from advertising or selling protective goods and services." That is, the FTC wants to ban the defendants from an entire industry—the Personal Protective Equipment and Services industry. This is overkill and given that any issues occurred during a very brief period when the world was turned upside down from an unforeseen global pandemic, such a draconian injunction is not merited.

"An injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled." *Fed. Trade Commn. v. John Beck Amazing Profits LLC, 888 F. Supp. 2d 1006, 1011 (C.D. Cal. 2012), aff'd sub nom. F.T.C. v. John Beck Amazing Profits, LLC, 644 Fed. Appx. 709 (9th Cir. 2016)(unpublished)*; (See also *Lamb-eston, Inc. v. McCain Foods, Ltdl,* 941 F.2d 970, 974 ["injunctive relief …must be tailored to remedy the specific harm alleged."])

Here, the complaint about QYK is alleged violations of MITOR. There is no dispute that every consumer received the product, and every consumer that requested a refund received a refund. The only issue is the delay in shipment. There is no history of unlawful practices by the defendants, and once the initial weeks of the pandemic passed, all product, for the most part, was timely delivered. This is not a case of a

recalcitrant defendant who has a long history of engaging in unlawful practices. This is a case of defendants who were faced with an unforeseen, unprecedented event and did everything in their power to cope with it and serve the American public—even to the extent of working 16-18 days during a time that other businesses had been ordered to close down. An injunction that prohibits the defendants from engaging in their chosen filed is unmerited in light of the circumstances of this matter. It would also have devastating effects on the company which now follows a wholesale, business to business model which has nothing to do with MITOR. If the Court believes that an injunction is merited, then at the very most it should be limited to complying with MITOR in the future.

DATED: March 18, 2022                    **WELLMAN & WARREN**


                              By:    */s/ Scott Wellman* ___
                                     SCOTT WELLMAN
                                     Attorneys for Defendants

# CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, under the laws of the United States of America that on this date, I caused to be electronically filed the foregoing document, and this Certificate of ECF Filing & Service, with the Clerk of the Court using the CM/ECF system, who will send notification of such filing to the following party:

**<u>Attorneys for Plaintiff and Defendants</u>**

KATHERINE E. JOHNSON kjohnson3@ftc.gov;
CHRISTOPHER ERICKSON cerickson@ftc.gov
DELILAH VINZON dvinzon@ftc.gov

Attorneys for Federal Trade Commission

DATED this 18th day of March 2022, at  Laguna Hills, California.

*/s/ Scott Wellman*___
Scott Wellman