1  Scott Wellman, SBN: 82897
2  Chris Wellman SBN: 304700
   **WELLMAN & WARREN LLP**
3  24411 Ridge Route, Suite 200
4  Laguna Hills, CA 92653
   Tel:  (949) 580-3737
5  Fax: (949) 580-3738
6  swellman@w-wlaw.com
   cwellman@w-wlaw.com
7
8  Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> QYK BRANDS LLC d/b/a Glowyy; et al, <br><br> Defendants | Case No. 8:20-cv-01431-PSG-KES <br><br> **OPPOSITION TO THE FTC's MOTION FOR SUMMARY JUDGMENT** <br><br> **Magistrate:  Hon. Karen E. Scott** <br> **District: Hon. Philip S. Gutierrez** <br> **Hearing Date: April 8, 2022** <br> **Time: 1:30p.m.** <br> **Courtroom: 6A** <br><br> Discovery Cutoff:  December 1, 2021 <br> Pretrial Conference:  May 13, 2022 at 2:30 p.m. <br> Trial Date: May 13, 2022 |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ………………………………………………………………… 1

II.  DISCUSSION ……………………………………………………………………... 2

    A. The FTC Misunderstands the Purpose of Defendants' Motion, which is to Seek a Determination on Whether Consumers are Allowed to Keep their Products if they Opt for a Refund ………………………………………………………….. 2

    B. The FTC's Analysis of Caselaw is Misplaced …………………….. 6

    C. The FTC Cannot Escape the Fact that it Seeks Disgorgement Even Though It Labels its Remedy as a Refund ………………………………………….. 9

    D. Consumer Complaints …………………………………………………. 10

III. CONCLUSION …………………………………………………………………… 12

# TABLE OF AUTHORITIES

**Cases**

*AMG Capital Management, LLC v. FTC, 141 S.Ct. 1341, 1349 (2021)* ……………..3

*Federal Trade Commission v. AMG Services, Inc.* 2017 WL 1704411, 11 (D. Nev. 2017) …………………………………………………………………………..… 10

*FTC v. Bronson Partners*, LLC, 674 F.Supp.2d 373 (D.Conn. 2009) …………. 7, 8, 9

*F.T.C. v. Commerce Planet, Inc.* 878 F.Supp.2d 1048, 1088 (C.D. Cal. 2012) ……. 10

*FTC v. Figgie 994 F.2d 595 (9th Cir. 1993)* ………………. 1, 3, 4, 5, 6, 7, 8, 9, 10, 12

*FTC v. Kuyendall*, 371 F.3d 745 (10 Cir. 2002) (en banc) ………………………….. 7, 8

*FTC v. Noland, 2021 WL 5493443 (D. Ariz. 2021)* ………………. 1, 3, 4, 6, 7, 9, 12

*Liu v. SEC,* 140 S.Ct. 1936 (2020) ……………………………………………..… 9

**STATUTES**

Section 19(b) of FTC Act ………………..………………………… 1, 2, 3, 7, 8, 10, 12

Section 13(b) of FTC Act …………………………………………………………. 2, 7

**OTHER AUTHORITIES**

https://www.ftc.gov/business-guidance/resources/business-guide-ftcs-mail-internet-or-telephone-order-merchandise-rule ……………………………………………… 5

https://www.apple.com/shop/help/returns_refund ................................................. 12

https://www.amazon.com/gp/help/customer/display.html?nodeId=GKM69DUUYKQWKWX7 ................................................................................................................. 12

https://www.walmart.com/help/article/refunds/a86a0400e237444cb9a5f3c3ce500d1b ………………………………………………………………………………… 12

https://help.target.com/help/targetguesthelparticledetail?articleId=ka95d000000oOGIAA2&articleTitle=What%27s+the+return+policy%3F&clickSearchVar=Search+Results&searchQuery=return+policy ................................................................................. 12

## I. INTRODUCTION

The FTC's response to the Defendants' motion for summary adjudication is peculiar. The FTC admits that the sole monetary remedy it is seeking is to "restore the status quo" (DKT. No. 189, pg. 3, line 1) by "reinstat[ing] the parties to their positions prior to the challenged conduct." (DKT. No. 189, pg. 4, lines 15-16). The FTC also admits that this reinstatement it seeks is in the form of refunds. (DKT. No. 189, pg. 1, lines 3-4). However, it then pivots by asserting that the consumers are permitted to keep and use the valuable product they received plus obtain the full price paid merely because it may have arrived late. This would put the consumer in a better position than they were prior to the challenged conduct and would exceed the actual "consumer redress" that limits a remedy under Sec. 19(b). Indeed, it would result in a windfall for the consumer… More important, this would work as a punitive measure against defendants by disgorging all their revenue from selling the product, but at the same time making them incur the cost of the product and all the overhead associated with distributing the product. As the FTC knows, Section 19(b) expressly prohibits such granting of punitive or exemplary remedies.

The FTC also asks this Court to simply ignore the holding in *FTC v. Noland*, 2021 WL 5493443 (D. Ariz. 2021), a case with facts very similar to ours, because the FTC feels it is "simply wrong." (DKT. No. 186, pg. 14, lines 9-10). And it asks this Court to ignore the clear language of another case, *FTC v. Figgie* 994 F.2d 595 (9th Cir. 1993). It is understandable why the FTC wants to ignore the holding of *Noland*,

as it contradicts the FTC's interpretation of Section 19(b). The FTC may think it is part of the Judicial Branch, but it is not—it is an agency of the Executive Branch. To say that a case is wrong because the FTC believes it is wrong (*i.e.* Ipse Dixit) is cavalier at best, but it is up to the courts and not the FTC to interpret the law.

## II. DISCUSSION

**A. The FTC Misunderstands the Purpose of Defendants' Motion, which is to Seek a Determination on Whether Consumers are Allowed to Keep their Products if they Opt for a Refund.**

The FTC misunderstands the purpose of Defendants' Rule 56 motion. In this regard, the FTC devotes the first several pages of its argument by asserting that "Defendants concede they violated both provisions [of MITOR]." (DKT. No. 196, pg. 3, lines 24-25). This is untrue, as the Defendants have not conceded liability.[1] It is also irrelevant for this motion because the purpose of this motion is to assist the Court "on the proper measure of damages *assuming* that the Federal Trade Commission is able to show liability." (DKT. No. 169, pg. 1, lines 1-2, emphasis added).

In determining the proper measure of damages, the parties agree that monetary relief is available only under Section 19(b). The parties also agree that the Court has the discretion to order "refunds" under Section 19(b). The parties also agree that Section 19(b) "comes with certain important limitations that are absent in §13(b)."

---

[1] Defendants defense to liability is discussed in its opposition to the FTC's motion for partial summary judgment which is found at DKT. 198.

*AMG Capital Management, LLC v. FTC,* 141 S.Ct. 1341, 1349 (2021). And the parties agree that the remedy chosen must be limited to only "redress[ing] injury to consumers," as any relief in excess of this constitutes the imposition of exemplary or punitive damages which is prohibited by §19(b). Finally, the parties agree "that there may be no redress without proof of injury caused by the [offending] practices. And the relief must be necessary to redress the injury." *FTC v. Figgie,* 994 F.2d 595, 605 (9th Cir., 1993).

The dispute is whether a refund allows the consumer to keep the product plus the money paid for it. It is the FTC's contention that it does. It is the Defendants' contention that a refund, which allows the consumer to keep the product, use the product, and still receive all the money paid for it constitutes an impermissible windfall amounting to a punitive remedy not allowed under §19(b). The Defendants further contend that their position is supported by *FTC v. Figgie Int'l. Inc.,* 994 F.2d 595 (9th Cir. 1993), as well as the only published case on the proper measure of damages under MITOR, *FTC v. Noland,* 2021 WL 54993443 (D. Ariz. 2021). In other words, this motion boils down to the proper definition of "refund" in the context of §19(b).

An example is illustrative of the FTC's improper position. Assume one sells a home for a million dollars cash and the seller receives the money and transfers the home to the buyer. The buyer then discovers some defects in the home. Does the buyer then get to keep the home and receive a return of the full million dollars paid? Of course not. This would be a windfall for the buyer and would place him or her in a

position better than before the transactions. This would be more than simply redressing his or her injury from the defects found. It is common sense that the buyer does not get the house plus the money.

Despite this commonsense conclusion, the FTC states that "*Figgie* does not preclude, and in fact supports, the FTC's requested relief of full refunds without product returns. Moreover, *Figgie* does not make the return of products mandatory." (DKT. No. 196, pg. 13, lines 9-13). In making this assertion, the FTC ignores the clear dictates of *Figgie*:

> "[T]he Ninth Circuit held in Figgie that the only way a consumer could receive a monetary award equal to the full purchase price of the heat detector was to return the product to the manufacturer.  Here, the FTC has made no similar allowance—it seeks to secure a monetary award that would allow each consumer to recoup the full purchase price while retaining the underlying goods and services.  This is the very windfall that Figgie took pains to avoid. See also *CFPB v. Nationwide Biweekly Admin., Inc.*, 2017 WL 3948396, *12 (N.D. Cal. 2017) (rejecting regulatory agency's damages methodology, where agency sought a refund of all setup fees paid by consumers with no offset for the value of the service provided, and emphasizing "that even in *Figgie*, the restitutionary award was structured in a way that those customers who elected to maintain the benefits of the products they had purchase (however minimal) would  not receive the windfall of both a benefit and a refund"); *In re Sanctuary Belize Litig.*, 2019 WL 5267774, *3 n.4 (D. Md. 2019) (explaining that the FTC's restitution methodology would not result in a "windfall" to consumers because "consumers who are repaid the prices they paid for the lots would be obliged to relinquish the lots to defendant" and citing *Figgie* as a decision supporting this approach.)" *Noland*, supra, *7.

In fact, contrary to what the FTC states in its Opposition, the court in *Figgie* went through great lengths to fashion a remedy to avoid the type of windfall the FTC

is requesting, specifically, by allowing the consumer to decide whether they wanted a refund, in which case they would need to return the heat detector, or to "make the informed choice to keep their heat detectors instead of returning them for refunds." *Figgie*, supra, at 606. However, they could not do both—get a refund and keep the product.[2]

Furthermore, it's worth noting that the FTC ignores its own guidelines in the position it takes. In its published Business Guide to the FTC's Mail, Internet, or Telephone Order Merchandise Rule (https://www.ftc.gov/business-guidance/resources/business-guide-ftcs-mail-internet-or-telephone-order-merchandise-rule), the FTC states the following under "How Much You Must Refund":

> If you cannot ship any of the merchandise ordered by the customer, you must refund the entire amount the customer "tendered," including any shipping, handling, insurance, or other costs. If you ship some, but not all, of the merchandise ordered, you must refund the difference between the total amount paid and the amount the customer would have paid, according to your ordering instructions, for the shipped items only.

In other words, if some of the merchandise has been shipped, then the amount to be refunded is only the price of the goods that have not been shipped. This

---

[2] As stated in *Figgie*, "*[t]he district court's order creates no windfall for Figgie's customers*. Refunds are available to those buyers 'who can make a valid claim for such redress.' . . . Those consumers who decide, after advertising which corrects the deceptions by which Figgie sold them the heat detectors, that nevertheless the heat detectors serve their needs, may then make the informed choice to keep their heat detectors instead of **returning them for refunds**." (emphasis added) *Figgie* 994 F.2d at 606.

recognizes the commonsense conclusion that if the consumer has received some product, and keeps it, then no refund for this amount is to be made. That is, the consumer cannot both keep the product and receive a refund of the amount paid, and the FTC's own guidelines acknowledge this.

**B. The FTC's Analysis of Caselaw is Misplaced**

In its Opposition, the FTC attempts to distinguish *Noland* while at the same providing its own cases to support its position. Defendants will address the FTC's arguments in order.

First, the FTC's attempt to distinguish *Noland* is erroneous. For instance, the FTC states that *Noland* is distinguished from this case because the shipping delay in *Noland* was only "minimal". (DKT. No. 196, pg. 15-16, lines 21-1). However, in *Noland*, "all of the unfilled orders" (i.e. the shipping delay) "were at least six weeks old." *Noland*, supra, at 2. Six weeks is, in fact, substantially longer than any delay in this case. Thus, contrary to what the FTC contends, the shipping delay in *Noland* was not "minimal," but in fact was much larger than the alleged shipping delays here.

Second, the FTC relies on *Figgie* to argue that it need not satisfy its burden of proof regarding reliance if it can show there were misrepresentations that were widely disseminated to consumers. (DKT. No. 196, pg. 8, lines 12-15). However, as articulated by the court in *Noland*, the burden shifting occurs only when the seller makes "affirmative misrepresentations about the nature and quality of its product." (*Noland* at *7). Indeed, in *Figgie*, the court analogized the misrepresentations to a

merchant who sells rhinestones but misrepresents them as diamonds. *Figgie* at 604. Here, there are no misrepresentations as to "the nature and quality of its product". Instead, we have potential shipping delays rusting from a global pandemic that put a halt on all businesses.

More importantly, and this should be dispositive of the FTC's burden shifting argument, the court in *Figgie* did not enter judgment for the full amount of the defendant's sales revenues and did not require the defendant to purchase back all the heat detectors sold. Instead, it required the defendant to set up a fund equal to its net profits (not net revenues), and then allow the consumer to decide whether they wanted to keep the product or return it for a refund. The FTC's request for a judgment equal to all revenue is simply not supported by *Figgie*.

Third, the FTC's reliance on *FTC v. Kuyendall*, 371 F.3d 745 (10 Cir. 2002) (en banc) and *FTC v. Bronson Partners*, LLC, 674 F.Supp.2d 373 (D.Conn. 2009) is misplaced. To begin, both cases concerned relief under Section 13(b) of the FTC Act, which contains none of the limitations that exist under Section 19(b). To reiterate, any remedy under Section 19(b) **must be limited to consumer redress and cannot be punitive**. Because *Bronson Partners* and *Kuyendall* fashioned their remedies without applying the limitations contained in Section 19(b), their holdings are rendered inapplicable.

Furthermore, unlike *Noland* and *Figgie*, neither of these cases are in the Ninth Circuit, and thus are not binding.

Also, to the extent *Kuyendall* is applicable, it concerned what the proper remedy should be for defendants that were in contempt of court for continuous violations of the court's preliminary injunction. The court concluded that "when the FTC has proven a pattern or practice of contemptuous conduct at the liability stage by clear and convincing evidence, a presumption arises that allows the district court to use all revenue attributable to the contemptuous conduct—the gross receipts from consumers—as a baseline for assessing sanctions." *Kuyendall* at 766. Here, there is no assertion of a pattern or practice of contemptuous conduct in violation of any order of the court. More importantly, a sanction (the relief granted in *Kuyendall*) is clearly punitive, which, as agreed by all parties, is not permissible under Rule 19(b). Because the *Kuyendall* court's analysis was tailored to punish the defendant for continuous contemptuous conduct, it cannot be applied in this case.

To the extent *Bronson Partners* has any applicability to this action, that case concerned a scheme to sell Diet Tea that would cause a "miracle weight loss." *Id.* at 386. There, the court declined to give any value for the tea because it provided no weight loss aide. In reaching its decision, the court made the same analogy to a rhinestone merchant claiming that he was selling diamonds (i.e. misrepresentation as to the nature and quality of the product), which was discussed by the *Figgie* court in determining whether any value should be given to the product in the hands of the consumer:

"In *Figgie,* customers had purchased rhinestones sold as diamonds, and the court

held that the defendants could not reduce their restitution order by the value of the rhinestones. Here, the buyers were purchasing Diet Tea for the purpose of miracle weight loss. Even though the tea may have provided some intrinsic value itself, it was sold for weight loss purposes not for refreshment purposes and I will not deduct any value the consumer received."[3] Ibid.

In this matter, however, it is undisputed that the hand sanitizer was of high quality, had value, and was enjoyed by thousands of satisfied customers. The issue here had nothing to do with the nature or the quality of the product. Rather, it has only to do with potential delays in receiving the product. As stated by the court in *Noland*, "[t]he fundamental problem with the FTC's damages methodology is that it fails to account for the inherent value of the product and services receive by consumer, thereby creating a windfall. *Figgie*, if anything, amplifies this concern." *Noland*, at *7.

### C. The FTC Cannot Escape the Fact that it Seeks Disgorgement Even Though It Labels its Remedy as a Refund.

Finally, the FTC devotes several pages attacking Defendants for their assertion that what the FTC is really asking for is disgorgement. (DKT. No. 196, pgs. 5-7, lines 10-8). By asking the Court for a judgment equal to QYK's full net revenue, the FTC is attempting to deprive QYK of what the FTC believes is unjust enrichment. This is the classic definition of disgorgement. There is no way to avoid this characterization.

However, because in the recent case of *Liu v. SEC*, 140 S.Ct. 1936 (2020), where

---

[3] When reading *Bronson Partners*, it appears the court confused the facts of the *Figgie* case with a hypothetical the *Figgie* court used to determine whether an offset should be awarded in lieu of a refund. Regardless of this error, *Bronson Partners* has no application because it involved fashioning a remedy under 13(b) and not 19(b).

the Supreme Court found that disgorgement is limited to a defendant's net profits (as oppose to net revenue), the FTC has no choice but to argue that it is not asking for disgorgement. Instead, it pivots now by saying it is asking, not for disgorgement, but for a "refund," – but now it is a "refund" without the return of the product (which is the net revenue and the same as disgorgement). This wordplay is inappropriate.

Moreover, according to *Figgie*, disgorgement is not permissible under Section 19(b) because it "exceed[s] redress of consumers" and would "be for the purpose of punishing" the defendant, "not making redress to the consumers . . ." *Figgie* 994 F.2d at 607; see also *F.T.C. v. Commerce Planet, Inc.* 878 F.Supp.2d 1048, 1088 (C.D. Cal. 2012) ("The purpose of disgorgement is not to redress consumer injuries but to deprive wrongdoers of ill-gotten gains."); see also *Federal Trade Commission v. AMG Services, Inc.* 2017 WL 1704411, 11 (D. Nev. 2017) (also stating that disgorgement is not intended to redress consumers).

Here, the remedy the FTC seeks goes beyond redressing consumers, and in fact places the consumer in a better position because they both get a full refund while at the same time are allowed to keep Defendants' products. Accordingly, the remedy (which the FTC terms as a "refund") actually "exceed[s] redress to consumers." As a result, the Court should find that such remedy is "for the purpose of punishing" Defendants, and therefore cannot be granted under Section 19(b).

**D. Consumer Complaints**

In the last few pages of its Opposition, the FTC presents seven statements that

its terms as complaints from consumers (DKT. 196, Pg. 16, line 9- Pg. 19, line 10). These statements are taken from QYK's customer service platform, Gorgias. A review of these statements show that they are incomplete and, frankly, again fall in the category of cherry picking. When the full dialogue with the customer service reps are reviewed, a different story arises.

In this regard, four of the seven customers received a refund, one, in fact, received his or her product plus a refund, and two received their product and never returned it even though they were told that a full refund would be issued once the product was returned. (See Declaration of Tammabattula).

As an example, the first statement is from a customer named Maja Jorgensen. The FTC includes a statement by Ms. Jorgensen on April 3 that "I want a full refund. I am done, done, done with this order…." (DKT. 196, Pg. 16, line 9). However, what the FTC does not include is the customer services rep's response tot Mr. Jorgensen on April 6, which is the following:

"Hello, your refund has been initiated."

It is unknown why the FTC failed to inform the Court that the refund had been paid.

A review of the Gorgias customer service platform shows that there were also complimentary statements to QYK. Yet, the FTC fails to include any of these. For instance, one customer states, "I love your company." Another customer states, "Thank you for your great product." (Dec. of Tammabattula). And another customer

states the following:

> "Congratulations! I received my product (plus!). I cannot begin to give you enough accolades for handling your customer (me!) as well as you did. I think you guys are great and I will keep you in my contacts for future stuff. Again, Congratulations on a job well done in spite of everything. (Dec. of Tammabattula)

The point is that the Defendants admit that there were challenges during this unprecedented, global pandemic when the entire world literally shut down. However, they did everything in their power to address these challenges and were able to brave the pandemic and deliver a valuable product. To single them out and persecute them is unfair.

### III. CONCLUSION

In sum, the Court should find that a refund requires the return of product.[4] Otherwise, it would constitute a windfall to the consumer and place them in a much better position than they would have been had they never purchased the hand sanitizer. According to *Noland* and *Figgie*, such a remedy is impermissible under Section 19(b), and would only be intended to punish Defendants.

---

[4] It's worth noting that most, if not all, commercial distributors such as Amazon, Target, Walmart, and Apple all require the merchandize to be returned to obtain a refund. There is no reason why Defendants should be treated differently, except for the purpose of punishing them.

https://www.apple.com/shop/help/returns_refund;
https://www.amazon.com/gp/help/customer/display.html?nodeId=GKM69DUUYKQWKWX7;
https://www.walmart.com/help/article/refunds/a86a0400e237444cb9a5f3c3ce500d1b;
https://help.target.com/help/targetguesthelparticledetail?articleId=ka95d000000oOGIAA2&articleTitle=What%27s+the+return+policy%3F&clickSearchVar=Search+Results&searchQuery=return+policy

DATED: March 25, 2022          **WELLMAN & WARREN**

                                By:   */s/ Scott Wellman*
                                      SCOTT WELLMAN
                                      Attorneys for Defendants

-13-
REPLY TO OPPOSITION OF FTC's TO MOTION FOR PARTIAL SUMMARY JUDGMENT

# CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, under the laws of the United States of America that on this date, I caused to be electronically filed the foregoing document, and this Certificate of ECF Filing & Service, with the Clerk of the Court using the CM/ECF system, who will send notification of such filing to the following party:

**Attorneys for Plaintiff and Defendants**

KATHERINE E. JOHNSON kjohnson3@ftc.gov;
CHRISTOPHER ERICKSON cerickson@ftc.gov
DELILAH VINZON dvinzon@ftc.gov

   Attorneys for Federal Trade Commission

DATED this 25th day of March 2022, at Laguna Hills, California.

　　　　　　　　　　　　*/s/ Scott Wellman*
　　　　　　　　　　　　Scott Wellman