# Attachment B

No. 22-55446

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

FEDERAL TRADE COMMISSION,

*Plaintiff- Appellee,*

v.

QYK BRANDS LLC, BDA GLOWYY, ET AL

*Defendant- Appellants.*

On Appeal from the United States District Court
for the Central District of California
No. 8:20-cv-01431-PSG-KES
Hon. Philip S. Gutierrez

_____

## APPELLANTS' OPENING BRIEF

_____

Scott Wellman
Wellman & Warren, LLP
24411 Ridge Route Drive, Ste 200
Laguna Hills, CA 92653
949-580-3737
*swellman@w-wlaw.com*

*Attorneys for Appellants*
QYK BRANDS LLC d/b/a Glowyy,
DRJSNATURAL LLC,  EASII, INC.,
THEO PHARMACEUTICALS, INC. ,
RAKESH TAMMABATTULA,
JACQUELINE THAO NGUYEN

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellants QYK Brands LLC, Dr.J's Natural LLC, EASII INC, and Theo Pharmaceuticals, Inc. are privately held corporations. No parent corporation or publicly held corporation owns 10% or more of QYK Brands LLC, Dr.J's Natural LLC, EASII INC, and Theo Pharmaceuticals, Inc.'s stock.

Date:  July 6, 2022

Wellman & Warren, LLP

*/s/ Scott Wellman*

*Attorneys for Appellants*
QYK BRANDS LLC d/b/a Glowyy,
DRJSNATURAL LLC,  EASII, INC.,
THEO PHARMACEUTICALS, INC. ,
RAKESH TAMMABATTULA,
JACQUELINE THAO NGUYEN

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ..................................................................v

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ......................................................3

ISSUES PRESENTED..........................................................................3

STATEMENT OF THE CASE ..............................................................5

      a. Change of Marketing Model ..................................................10

      b. The Basic Immune IGG Supplement .......................................13

SUMMARY OF THE ARGUMENT .....................................................17

      I. Definition of Refund .............................................................17

      II. Representations Regarding Basic IGG .....................................19

      III. Appropriateness of an Injunction ........................................19

      IV. Scope of the Injunction.........................................................19

STANDARD OF REVIEW ...................................................................21

ARGUMENT .......................................................................................21

      I.      The Refund Issue..……………………………………………..21

               A.     In Ordering a Full Refund, the District Court Errored by Not Requiring Either a Return of the Product or Providing Credit for the Value of the Hand Sanitizer Used ……………….......21

               B.     The Presumption of Reliance/Injury Issue…………………...26

1. The District Court Improperly Applied a Presumption of Both Reliance and Injury by Ignoring the Evidence and Assumed that All Consumers Were Injured in an Amount Equal to the Full Value of the Hand Sanitizer Whether it Was a Day Late or a Few Weeks Late…………………26

C.      The District Court Erred in Ordering Disgorgement of 100% of Appellants' Revenue, Even Though the Undisputed Evidence was that Only About 11% of the Sales were Derived from the Google Ad that Contained the "In Stock, Ships Today" Language…………………………………….……………..28

D.      The Conflict with *FTC v. Noland*……………………………29

1. *FTC v. Noland* Rejects the District Court's All-or-Nothing Approach to Presume Consumer Injury………………..29

2. *FTC v. Noland* Required Proof of Injury for Consumer Redress and It Should be Required Here……………………….32

3. The District Court Improperly Distinguished *Noland* from this Case………………………………………………………34

E.      The District Court Ignored the Evidence Presented to Rebut the Presumption of Reliance ……………………………………..37

II.     Representations Concerning Basic Immune IGG…………………...39

III.    The Injunction Issues……………………………………………..43

A.      The District Court Abuse its Discretion in Ordering an Injunction, as the Appellants' Changed Their Business Model, so that there is No Possibility of Violating MITOR in the Future ………………………………………………………..43

B.      Even if the District Court had the Discretion to Enjoin the Appellants from Violating MITOR or Section 5(a) in the Future, the District Court Abused its Discretion by Ordering a Permanent Ban from the PPE Industry as to ALL Appellants…………………………………………………46

IV.    The Pandemic Issue…………………………………………………51

CONCLUSION ..........................................................................................54

STATEMENT OF RELATED CASE ....................................................55

CERTIFICATE OF COMPLIANCE....................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Califano v. Yamasaki*,
 442 U.S. 682, 702 (1979) .................................................................. 47

*FTC v. Evans Products Co.*,
 775 F.2d 1084, 1089 (9th Cir. 1985).....................................................43

*FTC v. Figgie Intern., Inc*,
 994 F.2d 595, 607 (9th Cir. 1993)............................... 24, 25, 30, 35,36

*F.T.C. v. Grant Connect LLC*,
 763 F.3d 1094, 1097 (9th Cir. 2014)......................................................48

*Fed. Trade Commn. v. John Beck Amazing Profits LLC*,
 888 F. Supp. 2d 1006 (C.D. Cal. 2012)........................ 46, 47,48,50,51

*FTC v. Noland*,
 2021 WL 5493443 (2021, USDC Ariz) ........1, 18, 23-25, 27, 29-35,37

*FTC v. Shire Viropharma, Inc.*,
 917 F.3d 147, 156 (2019; 3rd Cir.).........................................................43

*FTC v. Silueta Distributors, Inc.*,
 1995 WL 215313 (1995, N.D. Ca.)............................................. 23, 24

*FTC v. Washington Data Resources*,
 856 F.Supp.2d 1247, 1280 (2012, USDC MD Florida)............... 22, 23

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
 941 F.2d 970, 974 (9th Cir. 1991)................................................. 46, 47

*Litton Industries, Inc. v. F.T.C.*,
 676 F.2d 364, 367, 372........................................................................48

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
 809 F.2d 626, 630-31 (9th Cir. 1987) ...................................................41

*United States v. Zaken Corp*,
 57 F.Supp.3d 1233 (C.D. Cal. 2014)........................................... 45, 46

## Statutes

15 U.S.C. §45(a) (Section 5(a) of the FTC Act) ........................ 13-15, 39, 46

15 U.S.C. §57b (Section 19(b) of the FTC Act) .............................1-2, 22-23

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. § 1331 ...................................................................................3

28 U.S.C. § 1337(a) ..............................................................................3

28 U.S.C. § 1345 ...................................................................................3

## Regulations

16 C.F.R. Part 435, Mail, Internet, or Telephone Order Merchandise Rule
    (MITOR) ...................1, 13, 17-18, 21-22, 26, 29, 34, 36, 43-44, 46-49

## Rules

FRAP 4 .................................................................................................3

FRE 64 ...............................................................................................41

## Other Authorities

Daily Caller Podcast, https://youtu.be/ulsq18k8whM .................................45

2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule
56, at 162 (2021) …………………………………………………… 33

"The 2020 Mail Delays: Stats & Charts," Steve Hutkins,
https://www.savethepostoffice.com/2020-mail-delays-stats-charts/ ............51

# INTRODUCTION

This appeal concerns two different, conflicting decisions by sister United States District Courts in the Ninth Circuit that must be reconciled.[1] The contrary decisions concern the novel question of what should be the proper definition of a "refund" contained in Section 19(b) of the FTC Act. In this matter, the lower court found that a refund did not require the consumer to return the merchandise or to provide value for the merchandise received and used. The court in the sister district disagreed and found that providing the consumer a full refund plus the product purchased was a "windfall" that exceeded consumer "redress" and was not permitted under Section 19(b). This appeal, therefore, seeks a ruling as to the proper definition of a refund.

In making its ruling, the District Court improperly ignored numerous issues of material facts, and, for some unknown reason, lumped together all of Appellants' hand sanitizer sales as violative of the Mail, Internet, or Telephone Order Merchandise rule ("MITOR"), even though only about 11% of the sales resulted from the ad that contained the violative shipping claim. The court then ordered the Appellants to pay 100% of the their revenue into a redress fund. This

---

[1] The two conflicting cases are this case and *FTC v. Noland,* 2021 WL 5493443 (2021, USDC Ariz.)

1

not only makes no sense but is punitive which is specifically prohibited by Section 19(b) of the FTC Act.

The appeal further concerns whether injunctive relief is merited in this case given that almost two years ago the Appellants' fundamentally changed its business model, thereby making it impossible for them to violate MITOR. To the extent injunctive relief was appropriate, this appeal concerns the breadth of such relief. The FTC not only sought and received an injunction prohibiting the Appellants from violating the FTC Act or MITOR, but also, imposed a conduct injunction permanently banning the Appellants from ever engaging in the Personal Protective Equipment ("PPE") industry again. This overbroad permanent ban was imposed even though (1) the events occurred during the first couple months of the pandemic and were quickly corrected, and (2) the late shipments never occurred again once corrected. This was an isolated and one-time problem with mitigating circumstances, and the Appellee never asked for a permanent ban in its complaint, its amended complaint or in the preliminary injunction.

All these issues involve important issues of material fact which the District Court summarily dismissed. In the context of a summary judgment such failure to consider the facts is error.

## JURISDICTIONAL STATEMENT

The District Court exercised jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345. This case involves federal claims. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1291. The final order of the District Court was entered on April 22, 2022. 1-ER-18–43 . This Appeal was timely filed on April 29, 2022 pursuant to FRAP 4. *See* 6-ER-900.

## ISSUES PRESENTED

I.    What is the proper definition of "refund" as used in the FTC Act §19(b) (15 USC §57b)?

    a.    Whether a consumer who received a valuable product in violation of the Mail, Internet, or Telephone Order Merchandise Rule ("MITOR")(16 *CFR* Part 435) is entitled to a full refund without returning the product or providing a credit for its value?

II.    Whether the District Court erred in presuming that all consumers were injured when only a fraction of the consumer orders were generated from the ads with violative shipping claims?

III.    Whether the unforeseen and unprecedented effects of the Covid-19 pandemic relieve a merchant from late shipment violations of MITOR?

IV.   Whether the District Court erred in ordering disgorgement of 100% of Defendant's net revenue when only a fraction of the product shipments violated MITOR?

V.   Whether injunctive relief is appropriate when two years ago the Appellants changed its entire business model to make it impossible to violate MITOR and has not had a MITOR violation since the change?

VI.   Whether the District Court abused its discretion in granting the permanent lifetime ban of all Appellants from the PPE industry?

VII.   Whether the District Court erred in rejecting consideration of Ms. Nguyen's translation of her own statement?

VIII.   Whether the District Court errored in finding scienter based on excerpts taken out of context from a pod cast interview?

## STATEMENT OF THE CASE

At the beginning of 2020, QYK Brands, Inc. ("QYK") was a small company of about 4-5 employees. It sold hand sanitizer as well as some skin care products.[2] At that time, all sales were direct consumer sales made through its website, Glowyy.com.[3] QYK was not a manufacturer of the products but rather a re-shipper of finished goods it obtained from other sources. Most of QYK's products were sourced overseas in India and China.[4]

In February 2020, just before the Covid-19 pandemic began, the company worked out of a warehouse/office space in Garden Grove, California.[5] At the end of February 2020, QYK had about 2,000 bottles of hand sanitizer in its inventory.[6]

On March 4, 2020, QYK placed a Google Ad stating it had hand sanitizer "in stock and ships today."[7] The Google Ad was one of 100 other Ad sources placed by QYK. Other ads included Yahoo!, Facebook, Instagram, Bing, AOL, DuckDuckGo.[8] *None* of the other Ads contained the "in stock and ships today" language or any shipping time claims. The Google Ad was the source of about 11% of QYK's sales of hand sanitizer.[9] During the period from March 4–May 31,

---

[2] 4-ER-386
[3] 4-ER-386
[4] 4-ER-386
[5] 4-ER-386
[6] 4-ER-386
[7] 4-ER-387–88
[8] 4-ER-388
[9] 4-ER-387

2020, QYK received 45,105 orders for hand sanitizer representing gross sales of $2,715,909.[10] Of this amount, $301,664 were generated from the Google Ad.[11] This amounted to 11.1% of QYK's sales.[12] The remaining sales were generated through the other sources.

The statement in the Google Ad was based on two facts. First, QYK had 2,000 bottles in inventory which was more than sufficient to meet any anticipated demand based on past order history.[13] Second, QYK had a shipment coming from India of more than 10,000 bottles which Federal Express had confirmed in writing would be delivered to QYK on March 3rd.[14] These 10,000 bottles were fully labeled and ready to ship to consumers upon receipt by QYK.[15] Despite Fed Ex's written assurance, the shipment did not arrive on March 3rd.[16]

When this occurred, QYK immediately started making inquiries. At first QYK was told that the shipment would be delivered the next day, then the day after. It finally arrived on March 9th.[17]

---

[10] 4-ER-411–16
[11] 4-ER-394
[12] 4-ER-394
[13] 4-ER-387
[14] 4-ER-386–87
[15] 4-ER-386–87; 4-ER-402–05
[16] The Court is asked to take judicial notice of the fact that during the early months of the pandemic (all the way through December 2020) the established shippers experienced significant delays in shipping and delivery product.
[17] 4-ER-387

6

Because of this delay, on March 11, 2020, QYK emailed all of the customers that had purchased a product to allow 3-5 days for processing and if this was not acceptable to the customer, then they could request a refund.[18]

On March 18, 2020, Google removed the ad.[19]

QYK utilized a third-party shipping platform named Shopify.[20]  When an order was made online, Shopify would book it in its system and issue a label for mailing to the consumer. Shopify would also send an email to the consumer informing them that the product was on the way. This message was part of the Shopify system and was not something QYK had any control over.[21]

The labels were printed out at the QYK office and were sorted into piles depending on the shipping method and the date of the order.[22] Several thousand labels were printed and sorted each day.[23] The QYK employees would work 16-18 hour days to print the labels, sort them, package the product, attached the label, and place them in bins for pick up by either the United States Postal Service (USPS) or UPS.[24] Each day, thousands of boxes of products were placed in the bins ready for pick up by the USPS.[25]

---

[18] 4-ER-394
[19] 4-ER-387
[20] 4-ER-388
[21] 4-ER-391
[22] 5-ER-707
[23] 5-ER-708
[24] 4-ER-391–92
[25] 4-ER-392

As stated by one former employee in response to whether there were ever any customer complaints:

> "We were still humans; we still make mistakes. We tried our hardest, like we were working 16-hour days, hiring anybody that we could that felt comfortable or safe to even work. Like we also worked during a pandemic, during our shutdown.
>
> So, for example, our goal was to always ship these out in a timely manner, even sooner than what we anticipated; but since we only had a few people rotating every morning and nighttime to ship these, of course, we're going to make human error."[26]

There is no doubt that that there were some delays in shipping product. However, all hand sanitizer product that was ordered was, in fact, received by the consumers.[27]

During the first weeks of the pandemic, QYK scoured the globe to find available hand sanitizer. This included orders for 2,000 bottles placed on March 2, 2020; 3,024 bottles placed on March 3, 2020; 9,000 bottles placed on March 6, 2020; 59,352 bottles placed on March 9, 2020; 5856 bottles placed on March 12, 2020; 292,462 bottles placed on March 20, 2020; 201,285 bottles placed on March

---

[26] 5-ER-702–03
[27] 3-ER-354; 4-ER-393

24, 2020; 60,000 bottles placed on March 26, 2020; 8,146 bottles placed on March 30, 2020; 879; 920 bottles placed on April 2, 2020.[28] These hand sanitizer's were expected to be delivered in 3-4 days. However, the bottles were not always delivered as promised. For example, the delivery date for some 35,070 bottles from China ordered prior to March 8th was confirmed to be delivered on March 10 but did not arrive until March 13th.[29]

By mid-May, 2020 (2 months into the pandemic) all orders were timely shipped, and since that time there has been no issue with late shipments.[30]

The issues with shipping were further compounded by the USPS which was experiencing its own staffing problems with the pandemic. QYK would have thousands of orders each day placed in bins for pick-up by the USPS. At times the USPS would not show up to pick up the packages.[31] These were, no doubt, chaotic times. In addition, because of staffing issues, when the USPS did pick up the packages it would often fail to scan the packages. Sometimes these packages were not scanned until they reach a designation in other states. The failure to create an accurate "first-scan" resulted in creating false late shipping times, as the first scan is supposed to be when the USPS first picks up the package.[32]

---

[28] 4-ER-388–89
[29] 4-ER-389
[30] 4-ER-392
[31] 4-ER-392
[32] 4-ER-393–394; 3-ER-353

## a. Change of Marketing Model

In the summer of 2020, QYK made a fundamental change in its marketing model. Instead of marketing directly to consumers through the internet, QYK decided to market only as a wholesaler to retail merchants and as a fulfiller of government contracts.[33] 99.9% of all of QYK's sales are either governmental contracts or wholesales to business. Since August of 2020 to present, QYK has made only about $3,000 in direct sales to consumers.[34] The change was done as Mr. Tammabattula saw the need for domestic manufacturing in order to eliminate dependence on the global supply chain and its vagaries both politically and economically.[35] More importantly, because retail merchant and government contracts are paid on a net 30 or net 60 basis, there can be no possibility of any MITOR violations. This is because the shipping delay under MITOR starts when the customer pays for the merchandise. With business-to-business wholesales and government fulfillment contracts, the customer does not pay for any product until sometime after they have received the product.[36]

To implement this change in the business model, QYK, in mid-2020, invested more than $6 million in manufacturing equipment.[37] QYK also took

---

[33] 4-ER-395; 5-ER-889–90
[34] 4-ER-396
[35] 4-ER-395
[36] 4-ER-396
[37] 6-ER-894

extraordinary efforts, such as chartering a jet to fly the huge pieces of machinery here necessary for the production.[38] Below are three photos of the QYK factory. The first is before the change was made ( July 2020). The last two are how it looked after the change and the investment.



Space reserved last month for the imported mask machinery at the QYK Brands factory in Anaheim, Calif.  Bryan Denton for The New York Times

---

[38] 6-ER-894



The chief executive of QYK Brands, Rakesh Tammabattula, with his wife, Dr. Jacqueline Nguyen. Bryan Denton for The New York Times



Sample masks on the Chinese equipment before it was installed in Anaheim. Bryan Denton for The New York Times

QYK is now one of only five companies in the U.S. with the capacity to

manufacture the masks and surgical gowns needed by the public.[39]

**b. The Basic Immune IGG Supplement**

In addition to alleging violations of MITOR, the FTC alleged a violation of

Section 5(a) of the FTC Act (15 U.S.C. §45(a)(1)). Specifically, the FTC alleged

that deceptive representations were made when marketing a supplement called

Basic Immune IGG ("Basic IGG"). Basic IGG was sold by Dr. J's Naturals, a

company owned by Jacqueline Nguyen who is Mr. Tammabattula's wife.[40]  Dr. J's

Naturals worked out of the same office/warehouse space as QYK. Ms. Nguyen,

through her company, Dr. J's Naturals, was the only Defendant that sold Basic

IGG. Basic IGG was sold for only a few months, from April 2020-July 2020

before it was discontinued.[41] A total of fourteen thousand dollars ($14,000) in

product was sold. It was marketed exclusively to the Vietnamese community.[42]

Appellant Jacqueline Nguyen is of Vietnamese descent. Sometime in late June or

early July of 2020, Ms. Nguyen gave an interview in Vietnamese on Vietnamese

TV regarding this product. It is certain statements made during this interview that

that the District Court found violated Section 5(a).[43]

---

[39] 5-ER-890
[40] 5-ER-673
[41] 5-ER-676
[42] 2-ER-105
[43] 1-ER-16

Jacqueline Nguyen holds a Doctor of Pharmacology degree.[44] She worked as a license clinical pharmacist since 1998. Basic IGG was a product manufactured by Entera Health, Inc. and contained an ingredient called ImmuноLin® which according to Entera Health's clinical studies, increases the body's natural defense by providing high levels of an antibody called IgG.[45] In 2018, Ms. Nguyen's pharmacy license was suspended (not terminated) for events occurring in February of 2014.[46] This incident was not related to anything with the FTC.

The FTC claimed that during her Vietnamese interview, Ms. Nguyen and the interviewer had the following exchange:

> INTERVIEWER: And we should still wash our hands for two Happy Birthday song's time, and use this product for a month as well. Is it guaranteed that we will stay safe [from Covid]? Guaranteed?

> And that Ms. Nguyen's response was:

> NGUYEN: It's guaranteed, because there is FDA's verification and approval.

This is the passage that the District Court used to summarily conclude that Ms. Nguyen violated Section 5(a) of the FTC Act.[47]

---

[44] 5-ER-674
[45] 5-ER-675–76
[46] 3-ER-150–51
[47] 1-ER-11

Ms. Nguyen's translation of her own statement was different. First, she never used the word "COVID" as this was added by the FTC. Second, her translation is as follows:

Nam: (male INTERVIEWER)

We tried our best to avoid and wash your hands often via singing the "Happy Birthday song" in addition, add on to take this bottle supplement for 1 month to guarantee something? Does it guarantee for better health?

Nguyen: This bottle supplement is guaranteed to make in FDA facility and it has all the certifications.[48]

According to Ms. Nguyen she was conveying that "the product is safe to take as it is made by Entera Health" which is an FDA certified facility.[49]

In reaching its summary conclusion, the District Court rejected Ms. Nguyen's translation of this "same passage [as] not enough to create a genuine factual dispute."[50]

On August 4, 2020, the FTC filed it complaint asserting violations of MITOR regarding the sale of hand sanitizer. The FTC also filed claims for violation of Section 5(a) of the FTC Act regarding the shipping claims as well as the representations made by Ms. Nguyen regarding Basic Immune IGG. The FTC

---

[48] 5-ER-677–78
[49] 5-ER-677–78
[50] 1-ER-11

asked for monetary relief under Section 19(b) of the FTC Act for the violations of MITOR and for injunctive relief under Section 13(b) of the FTC Act. On August 24, 2020, the parties stipulated to a preliminary injunction. On January 12, 2021, the FTC filed its first amended complaint. The FTC filed its motion for summary judgment on February 15, 2022 and the Appellants filed their motion for partial summary judgment on February 16, 2022. The District Court granted the FTC's motion for summary judgment and denied the Appellants' motion for partial summary judgment.

On April 22, 2022, the District Court issued its final order. The final order included both monetary relief and a permanent injunction. The monetary relief required the Appellants to pay into a redress fund a 100% of their net revenue. Any consumer was then entitled to a refund without returning the product or receiving a credit for the value of the hand sanitizer used. The permanent injunction included prohibitions against violating MITOR or making misrepresentations regarding health claims as well as monitoring provisions. The permanent injunction also permanently banned all Appellants from participation in the Personal Protective Equipment Industry. This appeal followed.

## SUMMARY OF THE ARGUMENT

**I. Definition of Refund:** The only monetary relief available to the FTC is pursuant to the MITOR violations (Claim 1). That is, no monetary relief is available for violations of Sec. 5 of the FTC Act (Claims 2, 3 and 4) as the FTC elected not to first initiate an administrative action which is a prerequisite for such relief. $15 USC 57(a)(2)$

The FTC admits that the only monetary relief it is seeking for the MITOR violations are "refunds" under Sec. 19(b) of the FTC Act. Sec. 19(b) relief is limited to proper redress of consumer injury and expressly excludes punitive or exemplary damages. Only a small fraction of the consumer orders were generated from the "in stock, ships today" ad. However, the District Court ordered that 100% of the Appellants' revenue be disgorged and paid into a redress fund. The District Court then ordered that every consumer is entitled to a full refund without returning the product or providing a credit for the value of the product.

Simply ordering the Appellants to disgorge their entire revenue without an analysis of whether a consumer ever saw the offending ad or was injured by the Ad exceeds consumer redress. For example, if the consumer received the hand sanitizer one day late, used it and was satisfied with it, how can the FTC argue that the consumer needs redress? This is a question of fact that should preclude summary judgment. Instead, the District Court improperly applied a presumption

17

that all consumers relied on the Google Ad (even though there is rebutal evidence that only 11% ever saw it), and that all consumers were injured by the late arrival equal to the full purchase price of the sanitizer. This is an improper application of the presumption which permitted the FTC to completely skip having to show injury even though it is the plaintiff that has the burden of proof of showing injury.

Even if the presumption allows the FTC to show both reliance and injury, the District Court errored in ignoring the factual evidence that rebutted the presumption. This evidence included indisputable records showing that only a small fraction of the orders were generated by the Google Ad that contained the "ships today" language.  In other words, Appellants presented evidence to rebut the presumption that all consumers relied and were injured by the shipping claim; however, the District Court ignored it.

In addition, allowing the consumer to keep and use the product and still receive a full refund provides a windfall to consumer, exceeds proper redress, and is punitive.

Like this case, *FTC v. Noland,* 2021 WL 5493443 (2021, USDC Ariz.) was a MITOR action. The court in *Noland* rejected the argument (which the District Court accepted) that the moment any shipment became overdue the consumer immediately suffered harm equal to the full purchase price of the product. Instead, in *Noland* the court found that there may be no redress without proof of injury

which was a question of fact precluding summary judgment. This must be reconciled with *this* District Court's decision.

**II. <u>Representations Regarding Basic IGG:</u>** In finding that Ms. Nguyen's statement during her Vietnamese interview violated Sec. 5(a) of the FTC Act, the District Court accepted verbatim the FTC's translation of the Vietnamese interview and rejected Ms. Nguyen's translation of her own statement. Although one translation versus another may be given more weight based on bias or other factors, a court is not permitted to make credibility determinations or weigh conflicting evidence at the summary judgment stage. This is a triable issue of fact and the District Court erred in summarily rejecting Ms. Nguyen's translation of her own statement.

**III. <u>Appropriateness of an Injunction:</u>** The District Court issued an injunction even though the Appellants fundamentally changed their business model two years ago making it impossible to violate MITOR. Indeed, since mid-May of 2020 there have been no violations of MITOR, and there can be no violations in the future. Injunctions are prospective and it is not proper to issue an injunction when there is no likelihood of future violations.

**IV. <u>Scope of the Injunction:</u>** The scope of the injunction is extremely broad and includes a permanent bar of *all* Appellants from ever engaging in the PPE industry. This relief was not plead in the complaint or amended complaint, nor was it

contained in the preliminary injunction issued by the District Court. An injunction must be narrowly tailored to remedy the specific harm claimed. The injunction already contains prohibitions against violating MITOR or making misrepresentations in violation of Sec. 5(a). This was a first-time violation that was quickly remedied within several weeks. The Appellants' have modified their business model to prevent such violations in the future. The violations occurred during an unforeseen, unprecedented pandemic. Given these circumstances it is an abuse of discretion for the District Court to issue such an over encompassing injunction. The Appellants' primary business is fulfillment of government contracts. Such agencies as the Veteran's Administration and the Department of Energy depend on their PPE products for their constituents. A permanent ban would not only harm the Appellants, but it would also harm the public interest that is served by these agencies.

Only one of the Appellants, Ms. Nguyen, had a previous blemish on her record. This was a suspension of her pharmacy license for events that took place in 2014. The suspension had nothing to do with violations of the FTC Act. This one stain on her record should not merit a permanent lifetime ban from the entire PPE industry. Even if this is sufficient to merit a permanent ban against Ms. Nguyen, it should not be used to permanently ban all the remaining Appellants, and to do so is an abuse of discretion.

## STANDARD OF REVIEW

The question of how "refund" should be interpreted under Section 19(b) of the FTC Act is reviewed de novo. *See Collins v. Gee West Seattle LLC*, 631 F.3d 1001, 1004 (9th Cir. 2011) ("We apply a de novo standard of review to questions of statutory interpretation.") The granting of summary judgement based on genuine issues of material fact regarding interpretation of a Vietnamese interview is reviewed de novo. *Adams v. Burlington Northern R. Co.*, 80 F.3d 1377, 1380 (9th Cir. 1996). The trial court's decision to grant any injunctive relief is reviewed for abuse of discretion. *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004). The scope of the overbroad permanent injunction on the PPE industry is reviewed for abuse of discretion. *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012).

## ARGUMENT

## I. <u>The Refund Issue</u>

## A. <u>In Ordering a Full Refund, the District Court Errored by Not Requiring Either a Return of the Product or Providing Credit for the Value of the Hand Sanitizer Used</u>

The FTC admits that the only monetary relief it is entitled to is for violation of the MITOR rule  under the First Claim for Relief. In other words, the FTC admits that it is not entitled to any monetary relief for the Second, Third, and

Fourth Claims for Relief because these concerned violations of Sec. 5(a) of the FTC Act. To receive monetary relief for these other claims under Section 19, the FTC has to fulfill the prerequisite requiring the FTC to first file an administrative action, which it elected not to do.[51] The FTC further admits that the only monetary relief it sought for violation of MITOR was "refunds" under Section 19(b) of the FTC Act."[52]

The FTC further admits that refunds are an equitable remedy that is intended to "restore the status quo, and ordering the return of that which rightfully belongs" to another.[53] The FTC also admits that it is a "restitutionary" remedy that "serves to reinstate the parties to their positions *prior to the challenged conduct*.".[54] (*emphasis added*)

"Concerned solely with the Appellee's injury, Section 19(b) confers no authority to award monetary relief that exceeds redress to consumers." *FTC v. Washington Data Resources,* 856 F.Supp.2d 1247, 1280 (2012, USDC MD Florida).

In determining the proper measure of damages under Section 19(b), the courts have recognized that §19(b) "comes with certain important limitations." *Id.*

---

[51] 15 U.S.C. § 57b(a)(2)
[52] 3-ER-376
[53] 3-ER-378
[54] 3-ER-379

at 1349. Section 19(b)'s goal is to determine the amount of money that is

"necessary to redress consumer injury." *FTC v. Noland* 2021 WL 5493443 (2021,

USDC Ariz.); see also *FTC v. Washington Data Resources,* 856 F.Supp.2d 1247,

1280 (2012, USDC MD Florida) (§19(b) allows "such relief as the court finds

necessary to redress injury to consumers ... resulting from the rule violation or the

unfair or deceptive act or practice, as the case may be."). Moreover, Section 19(b)

specifically prohibits the "imposition of any exemplary or punitive damages."

As stated by the court in *FTC v. Silueta Distributors, Inc.* 1995 WL 215313

(N.D. Cal. 1995):

> "The court in an action [granting relief under Section 19(b)] shall have
>
> jurisdiction to grant such relief as the court finds *necessary to redress injury*
>
> *to consumers* or other persons, partnerships, and corporations resulting from
>
> the rule violation or the unfair or deceptive act or practice, as the case may
>
> be… except that nothing in this subsection is intended to authorize the
>
> imposition of any exemplary or punitive damages. 15 U.S.C. §57b(b)
>
> (emphasis added).
>
> As found by the Ninth Circuit in *Figgie,* the above-emphasized portions of
>
> Section 19(b) indicate that (1) Congress intended to limit the remedies
>
> available under Section 19(b) to those that provide redress to consumers, and
>
> (2) *any monetary remedy authorized under Section 19(b) that accomplishes*

*more than redress acts as prohibitive punitive damages*. 994 F.2d at 607."
*Silueta Distributors, Inc.* 1995 WL 215313, 6. (*emphasis added*)

If the FTC seeks to "reinstate the parties to their positions prior to the challenged conduct," then the hand sanitizer must be returned for QYK to issue a refund. Otherwise, a situation would arise where the consumer keeps (and uses) the product and also gets a refund. This situation is not reinstating the parties to their prior positions. Instead, this situation would result in a windfall to the consumer by placing them in a better position by having a valuable product plus the money paid for it. This is inequitable.

Alternatively, if the District Court decided that the consumer could keep the hand sanitizer, then it was incumbent on the court to determine the value of the sanitizer and reduce any refund by said amount. Otherwise, the consumer would realize a windfall, which is not proper redress of the injury as required by Section 19(b).

Requiring QYK to pay back the money for the sanitizer, and allow the consumer to keep the product is punitive to QYK – which is expressly prohibited by Section 19(b). *FTC v. Figgie Intern., Inc.,* 994 F.2d 595, 607 (9th Cir. 1993. For example, if one product is sold for $10 and its cost is $5, then the company would be paying $15 (i.e. the full price refund plus the cost of the product) and the consumer would be receiving $15 (i.e. the full price refund plus the product which

cost $5).This is a windfall for the consumer as it exceeds "consumer redress" which is all that is allowed under Section 19(b). *FTC v. Noland.* at *4  ("[G]ranting a full refund to a satisfied consumer who received a one-day-late shipment would result in a windfall and thus go beyond § 57(b)(b)'s narrow focus on redressing injury." )

In *Figgie,* the court found the defendant made deceptive advertisements regarding the efficacy of the heat detectors it sold. The court then devised a remedy by establishing a fund to give the consumers the opportunity to receive a refund if they chose to return their heat detector. The Ninth Circuit found that the manner in which the remedy was devised by the district court was equitable, as it avoided a "windfall" to the consumer:

> "The district court's order creates no windfall for Figgie's customers. Refunds are available to those buyers who can make a valid claim for such redress…Those consumers who decide, after advertising which corrects the deceptions by which Figgie sold them the heat detectors, that nevertheless the heat detectors serve their needs, may then make the informed choice *to keep their heat detectors instead of returning them for refunds*." *Id.* at 606 (*emphasis added*).

As stated by the court in *Figgie,* the consumer can either return the product for a full refund or keep it – but not both. *Figgie's* holding is in direct contradiction

with the District Court's order that the consumer can keep the hand sanitizer and
receive a full refund. The District Court's order  would not "reinstate the parties in
the same position as prior to the challenged conduct," but would place the
consumer in a better position.

## B. The Presumption of Reliance/Injury Issue.

**1. The District Court Improperly Applied a Presumption of Both
Reliance and Injury by Ignoring the Evidence and Assumed that All
Consumers Were Injured in an Amount Equal to the Full Value of the Hand
Sanitizer Whether it Was a Day Late or a Few Weeks Late.**

The District Court ordered that all the Appellants' revenue from the sale of
hand sanitizers be disgorged and paid into a redress fund without analyzing
whether a consumer was injured by a hand sanitizer that may have arrived late.
Instead, the District Court found that "because the FTC's theory of MITOR
liability here turns on Appellants' pre-purchase, materially misleading shipping
promises, the presumption of actual reliance standard can apply here."[55]  The
District Court then stated that because the "Appellants widely disseminated
misleading claims that they had sanitizer in stock and ready to ship…the FTC is
entitled to a presumption of actual reliance in this case." *Id.*

---

[55] 1-ER-13

In making its order, the District Court failed to take into account that only 11% of the total sales were generated by the misleading Google Ad.  Moreover, the District Court failed to distinguish between a presumption of reliance and a presumption of injury and conflated the two together. Reliance does not mean injury and the two elements are different. In this regard, the District Court performed no analysis of whether any consumer was injured from receiving a late hand sanitizer. Whether the sanitizer arrived timely or a day late, a few days late, or a few weeks late, the District Court assumed that *all* consumers were injured in an amount equal to the full price of the sanitizer. The District Court's  all-or-nothing  approach is improper.

The facts in this case showed  a wide disparity between customers who received timely shipment to some that may have been a few weeks late. The District Court presumed that all of the consumers were injured when the facts are that as little as 11% of the sales were generated by the offending ad that said, "in inventory and ships today." By conflating all of the sales together and assuming that all consumers were damaged, the District Court ignored the evidence and generalized the extent of the injury. At the very least, the disparity of any injury creates a triable issue of fact precluding summary judgment. As discussed below, the *Noland* court held that the extent, if any, of a consumer's injury was a question of fact precluding summary judgment.

## C. **The District Court Erred in Ordering Disgorgement of 100% of Appellants' Revenue, Even Though the Undisputed Evidence was that Only About 11% of the Sales Were Derived from the Google Ad that Contained the "In Stock, Ships Today" Language.**

The District Court acknowledged that "the FTC's only evidence of one-day shipping promises comes from Appellants' Google AdWords advertisements, which accounts for only 10 to 11% of Appellants' total hand sanitizer sales."[56] However, the District Court then, without explanation, conflates all of the Appellants' sales and concludes they were all violative and ordered disgorgement of 100% of Appellants revenue.

Of the 45,106 orders from March-May, only 6005 were generated from the Google Ad. In terms of dollars, of the approximately $2.7 million in sales, only about $300,000 were generated from the Google Ad. In addition to the Google Ad, there were 100 other ad sources that generated sales (e.g. Bing, Yahoo!, Facebook, Instagram, direct website sales, AOL, GQ, Tomsguide, Findsimilar, DuckDuckGo). None of the other sources (other than a Twitter post which accounted for only 6 sales) contained any shipping claims.[57]

---

[56] 1-ER-4
[57] 4-ER-388

It was improper for the District Court to order disgorgement of 100% of the Appellants' sales, when the ad complained about ("in stock, ships today") only accounted for a small fraction of the sales. The District Court sought to dismiss this issue by stating that the Google Ad was widely disseminated so that the presumption of reliance applies.[58] However, the Google ads could not have been widely disseminated because it only generated 11% of the sales. The remaining 89% of sales is attributed to the other ads that did not contain the shipping promises. Yet, FTC produced no evidence that 89% of the customers saw the Google Ad. At the very least, there was a disputed issue of fact as to who saw the ad and what the proper amount of disgorgement should be. Anything else is punitive and not permitted by Sec. 19(b).

**D. The Conflict With *FTC v. Noland***

**1. *FTC v. Noland* Rejects the District Court's All-or-Nothing Approach to Presume Consumer Injury.**

The District Court's " all or nothing" approach was rejected by the court in *FTC v. Noland* 2021 WL 5493443 (D. Ariz., 2021). Like this case, *Noland* concerned violations of MITOR. The *Noland* court granted summary judgment on liability but, unlike here, denied it on the issue of damages.

---

[58] 1-ER-12

29

As stated by the court in *Noland:*

"The problem with the FTC's damages methodology is that it goes beyond redressing injury to consumers and provides a potential windfall to consumers. Under the FTC's proposed approach, if a consumer ordered and paid for $5,000 of products from [the defendant], the shipping deadline expired without notification of the consumer's right to a refund, [the defendant] shipped the product the very next day after the deadline expired, and the consumer was satisfied with the products upon receipt and immediately consumed them, the consumer would nevertheless be entitle to a $5,000 damage award…It is difficult to see  how such an outcome could be viewed as 'necessary to redress injury' to the affected consumer… Put another way, there is simply no 'proof of injury" in that scenario.' *Figgie Int'l,* 994 F.2d at 605." *Id.* at *4

The *Noland* court rejected the FTC's all or nothing argument that  "at the moment any shipment became overdue (and [the defendant] failed to provide the notice of the buyer's right to seek a refund or consent to a shipping delay), the consumer immediately suffered harm equal to the purchase price of the unshipped product, irrespective of whether the consumer later received the product from [the defendant]." *Noland* 2021 WL 5493443 at *3.

30

The *Noland* court reasoned that "[a]lthough the Court does not foreclose the possibility that consumers suffered some form of cognizable harm from the violations, *the all-or-nothing* methodology presented in the FTC's moving papers is flawed because it fails to account for the inherent value of the product that consumers ultimately received, even if the product was shipped late." *Id.* at *3. (*emphasis added*).

Here, the District Court assumed that at the moment the shipment became overdue that all the customers were dissatisfied and wanted a refund. For one, every customer received the hand sanitizer ordered and the FTC provided no declaration of any customer who never received the product. Second, the FTC provided no evidence of any consumer who received a hand sanitizer that wanted a refund. Third, the FTC provided no declaration from any consumer who claims that they would not have purchased the sanitizer if the "ships today" language was not contained in the Google Ad. Therefore, the District Court's all-or-nothing injury approach, when considering the lack of proof of injury, is "flawed". *Id.* at *4. ("[G]ranting a full refund to a satisfied consumer who received a …late shipment would result in a windfall and thus go beyond § 57(b)(b)'s narrow focus on redressing injury.").

31

**2.** ***FTC v. Noland*** **Required Proof of Injury for Consumer Redress and it**
**Should be Required Here.**

In reaching its conclusion, the *Noland* court relied on *Figgie* and found "that
there may be no redress without proof of injury ... [a]nd the relief must be
necessary to redress the injury." *Id. *4 citing FTC v. Figge,* supra*, at 605*. In other
words, the FTC must prove that consumers were: (1) damaged because of any
delay in shipment; and (2) quantify the amount of such damage.

Like this case, the FTC in *Noland* argued that injury for all consumers is
assumed, and the District Court adopted this position by presuming every
consumer was damaged in an amount equal to the full value of the sanitizer. Thus,
according to the FTC in *Noland*, it should be relieved of its burden of proof even
though it is the Plaintiff. However, Noland court rejected this argument by stating
that:

> "As an initial matter, there is no merit to the FTC's contention that the
> Individual Defendants' 'must bear the burden of proving which late orders
> were eventually sent.' (Doc. 365 at 12 n.7.) The FTC is the Plaintiff in this
> action and has chosen to affirmatively move for summary judgment on the
> issue of damages. '[W]hen the moving party [at summary judgment] has the
> burden of proof on an issue,' that party 'must affirmatively put forth
> evidence that would satisfy its proof burden at trial. If the moving party fails

to identify and document facts that would support a finding for that party at trial, then the motion must fail.' *See* 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 162 (2021)."

*Noland* 2021 WL 5493443,* 4.

Here, every consumer received the hand sanitizer ordered. Even if some of the products were delivered later than desired due to the unforeseen pandemic—they were all delivered. Any consumer that asked for a refund received one.[59] There is no evidence of dissatisfaction with the hand sanitizer or that it was not happily used. Indeed, there were hundreds of repeat customers which are an indication of customer satisfaction.[60] Therefore, granting of summary judgement was improper as to the issue of damages because proof of injury could not be established.

Furthermore, the *Noland* court emphasized that using the net revenue as the measure of damages ignores the inherent value of the product that was received, and most likely used. *Noland* 2021 WL 5493443 at 7 ("[T]he fundamental problem with the FTC's damages methodology is that it fails to account for the inherent value of the products and services received by consumers, thereby creating a windfall.".) By disgorging the Appellants' entire revenue and allowing the

---

[59] 3-ER-354
[60] 4-ER-398

33

consumer a full refund and continued use the of products, the District Court allowed the very same "windfall" the courts in *Noland* and *Figgie* found to be improper. Such a remedy would be punitive and is expressly prohibited under §19(b).

### 3.  The District Court Improperly Distinguished *Noland* from this Case

In its order, the District Court sought to distinguish *Noland* on the basis that "the FTC has established a MITOR violation for conduct that occurred *before* any contract was consummated."[61] However, the distinction between the MITOR violation being *before* the contract is made versus *after* the contract is made is meaningless for purposes of determining the injury to the consumer. In either scenario, the product was delayed and the question is whether receiving the product late (even 1-day late) can result in a presumption that the consumer has been damaged by the full purchase price of the product. The *Noland* court answered this "no" whereas the District Court in this case answered "yes."

The District Court's analysis assumed the damage to one who received a product a few hours late to be the same as a consumer who received it 30 days late. The District Court's analysis makes no sense. The District Court confuses "reliance" with "injury" and conflates the two together. However, injury to one who received the product 1-day late is different than injury to one who received the

---

[61] 1-ER-13

product 30 days late. This is the reason for the *Noland* court finding a triable issue of fact as to the injuries sustained and that the FTC's "all or nothing approach" was inappropriate. Indeed, given that the consumer used the product, there is no evidence of damage at all. In other words, there must be some showing of damage; otherwise, the FTC, who is the plaintiff, will be able to completely escape its burden of showing damage merely by showing that an ad (which was seen by only a fraction of the purchasers) contained false information.

The District Court's distinction that the violation was before the contract versus after the contract appears to follow a fraud in the inducement theory. In this regard, the District Court referred to the " 'dishonest rhinestone merchant' in *Figgie* who sold customers diamonds that were in fact rhinestones." [62] It noted that the *Figgie* court did not require a refund equal to the value of the rhinestones. However, this ignores the fact that the *Figgie* court required the customer to return the product if it was to receive a refund. As in any rescission for fraud, the parties are to be returned to their position before the transaction occurred—it should be no different here-- and it was not different in *Figgie*. Moreover, selling worthless rhinestones and pawning them off as diamonds is much different from selling valuable hand sanitizer at a price equal to its true value. One is fraud in the value of the product, the other has to do with sale process, and although there may be

---

[62] 1-ER-14

damage it cannot be assumed to be the full purchase price of the valuable product sold.

In *Figgie* the court found that "[i]t is reasonable to conclude from the record evidence that consumers purchased the [sic] heat detectors in reliance upon respondent's express and implied claim that heat detectors will provide necessary warning" to be safe. 994 F.2d at 605. No such evidence is present here. Instead, the evidence acknowledged by the District Court was that "the FTC's only evidence of one-day shipping promises comes from Defendants' Google AdWords advertisements, which accounts for only 10 to 11% of Defendants' total hand sanitizer sales." [63] Therefore, it is reasonable to conclude that 89% of consumers never saw and never relied on the offending Google Ad.

The District Court also found that "over 30,000 orders took more than 10 days to ship for order placed between March and May 2020...."[64] However, the fact that most of the orders (67% of the 45,000 orders) took more than 10 days to ship is not a violation of MITOR. MITOR is clear that when an order results from ads that contained no shipping times, then the merchant has up to 30 days to ship these orders.[65] In other words, this finding shows that the overwhelming majority of orders were timely shipped. Given the record, it was improper for the District

---

[63] 1-ER-4
[64] 1-ER-5
[65] 16 C.F.R. § 435.2(a)(i)–(ii)

Court to apply the presumption of reliance to all of the sales. Instead, there is an important issue of fact as to whether the Ad was actually seen and used to purchase the sanitizer.

The District Court also errored by finding that a presumption of reliance equals a presumption of injury in the full amount of the price paid for the hand sanitizer. Even if the District Court was correct in presuming that all consumers relied on the "in stock, ships today" Google Ad, this is a different question of whether all consumers were injured from this ad. Reliance does not necessarily mean injury. The District Court made no findings as to injury from any delay in shipping.

The decision in *Noland* and here are inconsistent and should be reconciled.

## E.  The District Court Ignored the Evidence Presented to Rebut the Presumption of Reliance.

In its order, the District Court states "[b]ecause Defendants have 'presented no evidence to rebut the presumption of reliance, injury to consumers has been established."[66] This finding is incorrect for several reasons.

First, as discussed above, the fact of reliance does not mean injury. Even if the consumer relied on the shipping time claim, this does not equate to damage equal to the full amount of the product the minute it is late. One who received it a

---

[66] 1-ER-16

day late is different than one who received it a week late, and it different than one who received it 30 days late. No evidence whatsoever of any damage or injury was provided.

Second, the fact that only 11% of the sales were generated by the offending Google Ad means that the other 89% did not rely on the ad. This is clear evidence rebutting the presumption of reliance. The District Court acknowledged that "the FTC's only evidence of one-day shipping promises comes from Defendants' Google AdWords advertisements, which accounted for only 10 to 11% of Defendants' total hand sanitizer sales."[67] Yet, the District Court failed to acknowledge that this was a direct rebuttable to the presumption that all customers relied on the shipping claims.

Third, the District Court failed to acknowledge that there were hundreds of repeat customers.[68] Repeat customers indicate satisfaction which rebuts any presumptions of reliance or dissatisfaction.

Fourth, Appellants submitted evidence of customers that were so happy that they send letters of compliment.[69] This evidence was also ignored by the District Court, but this further rebuts the reliance presumption.

---

[67] 1-ER-4
[68] 4-ER-398; 4-ER-416
[69] 5-ER-885

In short, the District Court erred in ignoring the substantial evidence that rebutted the reliance presumption. At the very least ther is a question of fact as to whether the presumption of reliance was rebutted.

## II. <u>Representations Concerning Basic Immune IGG</u>

The District Court erred in granting summary judgement for Section 5(a) violations when it was based on disputed facts regarding Ms. Nguyen's statement during an interview.

The District Court acknowledged that certain statements made by Ms. Nguyen in her Vietnamese TV interview "could be reasonably interpreted to mean only that Basic Immune IGG helps boost users' immune systems, which is exactly what the product was designed to do." [70] Yet, the District Court cited a specific passage during the interview and concluded that Ms. Nguyen said "she 'guaranteed' that users would 'stay safe' if they washed their hands and used Basic Immune IGG citing the product's 'FDA [] verification and approval.'"[71] The District Judge found that this alleged statement "misleadingly implied that Basic Immune IGG users would stay safe from COVID-19 and that it was FDA approved for that purpose." *Id.* Based on this specific passage, the District Court concluded that Ms. Nguyen had violated Section 5(a) of the FTC Act.

---

[70] 1-ER-11
[71] 1-ER-11

Ms. Nguyen submitted her own declaration, based on her personal knowledge, refuting the interpretation of the FTC's interpreter.[72] In her declaration, Ms. Nguyen stated the following:

Nam: (male INTERVIEWER):

We tried our best to avoid and wash your hands often via singing the "Happy Birthday song" in addition, add on to take this bottle supplement for 1 month to guarantee something? Does it guarantee for better health?

Nguyen: This bottle supplement is guaranteed to make in FDA facility and it has all the certifications.[73]

According to Ms. Nguyen, she was guaranteeing that "the product is safe to take as it is made by Entera Health" which is an FDA certified facility.[74] This is drastically different from saying the product is guaranteed to make the users safe as concluded by the District Court. This is an important distinction because the District Court's entire conclusion that Ms. Nguyen had violated Sec. 5(a) is based on this passage. If the proper meaning of this passage is a disputed issue of fact, then the District Court erred in granting summary judgment on this issue. Indeed, the FTC's translator imputed the word "Covid" into the passage when it was never used. This is improper.

_____

[72] 5-ER-673
[73] 5-ER-677–78
[74] 5-ER-677–78

The District Court summarily rejected Ms. Nguyen's interpretation of her own words. The District Court failed to cite any authority allowing it to ignore a persons description of her own statement. Without summarily rejecting Ms. Nguyen's declaration[75], the District Court could not have granted summary judgment on this issue, as this was a question of fact as to what was said.

The District Court acknowledged that "[i]n judging evidence at the summary judgment state, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all reasonable inferences in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir. 1987)."[76] However, after acknowledging this, the District Court completely rejected and refused to consider Ms. Nguyen's declaration  -- given under penalty of perjury – of her own statements during the Vietnamese interview. Ms. Nguyen was not acting as a 3rd party interpreter that is required to be qualified and provide an affirmative oath that the translation is true. *See Federal Rules of Evidence 64.* Rather, Ms. Nguyen's declaration stated what she said verbatim during the interview. Ms. Nguyen's declaration was based on her having personal knowledge of the actual words she used and the meaning behind her words.

---

[75] 1-ER-11

[76] 1-ER-7

When Ms. Nguyen gave the interview, she was speaking in her native language (Vietnamese), and, given it was her words, she is competent to state what she said. It is well known that foreign languages can be interpreted differently, but the one who utters the words should be able to say what they are. The District Court was without power to ascribe more weight to what the statement meant as this was a motion for summary judgment. There is a critical factual dispute between the FTC's interpreter and Ms. Nguyen's evidence of her own statement. Thus, the District Court erred in granting the Sec. 5(a) violation based on the acceptance of the third parties' interpretation and summary rejection of Ms. Nguyen's statement of her own words.

The fact that Ms. Nguyen sold only $14,000 of the Basic Immune IGG product is evidence that her interpretation of what she said is the correct version. If, as contended by the FTC, she told the audience that she guaranteed users would be safe from COVID-19 and that this had been verified and approved by the FDA, then presumably much more than $14,000 would have been sold.

### III. The Injunction Issues

## A. The District Court Abused its Discretion in Ordering an Injunction, as the Appellants' Changed Their Business Model, so that there is No Possibility of Violating MITOR in the Future.

Injunctive relief is not a remedy to address past violations. If the past violation is not likely to recur, then an injunction is inappropriate. *FTC v. Evans Products Co.* 775 F.2d 1084, 1089 (9th Cir. 1985). Indeed, the FTC Act sets forth the standard that an injunction should not issue unless the FTC shows that the defendant "is violating or is about to violate" the law. *Sec. 13(b)(1)*. See also *FTC v. Shire Viropharma, Inc.* 917 F.3d 147, 156 (2019; 3rd Cir.) ("We conclude that this language is unambiguous…Simply put, Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant "is" committing or 'is about to" commit another violation.).

Here, injunctive relief is not appropriate because there is no chance of any future MITOR violations. That is, for more than two years there have been no violations.

First, the only period of potential violative conduct was limited to the early months of the pandemic. By May 2020, the Appellants achieved 100% shipping compliance.

Second, in the summer of 2020, QYK fundamentally changed its business model from marketing directly to consumers through the internet to selling to retail businesses on a wholesale basis and fulfilling government contracts. From August 2020 to the present, QYK's consumer sales have only been about $3,000. The remaining 99.9% of all sales are wholesale business or government fulfillment sales.[77] With wholesales and government fulfillment contracts, the purchase price is not paid until after the product is received; thus, there is no possibility of any MITOR violations. The possibility of future MITOR violations is impossible because "shipping" under MITOR commences when the customer pays for the product. 16 C.F.R § 435.1(c). Since the product is not paid until after it is received, there can be no possibility of late shipment.

Given QYK's compliance in the midst of the pandemic's unprecedented and unforeseeable destruction of the supply chain and QYK fundamentally changing its business model making violations virtually impossible, there can be no showing of a future violations. Therefore, an injunction would be inappropriate. At the very least, there are material issues of fact regarding the potential of any future violations precluding summary judgment on this issue.

In finding that injunctive relief was warranted, the District Court found that there was a high degree of scienter and a high frequency of violative hand sanitizer

---

[77] 5-ER-890

sales.[78]  The high degree of scienter was based primarily on a podcast that

Appellant Tammabattula gave where the District Court stated "Tammabattula

publicly acknowledged that Defendants lacked supplies to keep up with

demand."[79] The District Court then cited to *United States v. Zaken Corp.,* 57

F.Supp.3d 1233 (C.D. Cal. 2014) to find that an injunction was appropriate.

However, the District Court erred in two regards. First, the podcast (known

as the Daily Caller) which the District Court relied on, shows that the court erred in

what it thinks Mr. Tammabattula said. In this podcast, Mr. Tammabattula was

discussing the importance and need of establishing domestic manufacturing of PPE

to relieve the country from our dependence on foreign sources. Mr.

Tammabattula's comments as to the issue with ingredients and packaging was

about the industry in general and was not about QYK. At no time did he say in this

interview that QYK did not have inventory available. It is unclear how the District

Court concluded what it did, but it was error to do so. A copy of the podcast can be

accessed at https://youtu.be/ulsq18k8whM.

Second, *Zaken Corp., supra,* concerned a case where the promotor of at

home wealth-building businesses had been misrepresenting to purchasers for "over

ten years" about the business' ability to generate income where the evidence was

---

[78] 1-ER-16
[79] 1-ER-15

that "over 99.8% of the purchasers never earned any commissions whatsoever."

*Zaken Corp.* 57 Supp.3d 1233, 1242.

Here, there were no long term or frequent violations. Moreover, the injunction in *Zaken* was as tailored to the model employed by the defendant (i.e. the selling of at home wealth generating businesses) and was not tailored to a type of product, because without the injunction a new wealth generating product could be substituted. Unlike *Zaken*, QYK changed its entire business model, thus there can be no transferability to any different product and no possibility of future MITOR violations.

**B.** **Even if the District Court had the Discretion to Enjoin the Appellants from Violating MITOR or Section 5(a) in the Future, the District Court Abused its Discretion by Ordering a Permanent Ban from the PPE Industry as to ALL Appellants.**

"An injunction must be narrowly tailored to give only the relief to which Appellees are entitled." *Fed. Trade Commn. v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006, 1011 (C.D. Cal. 2012), aff'd sub nom. *F.T.C. v. John Beck Amazing Profits, LLC*, 644 Fed. Appx. 709 (9th Cir. 2016)(unpublished); (See also *Lamb-eston, Inc. v. McCain Foods, Ltdl,* 941 F.2d 970, 974 ["injunctive relief …must be tailored to remedy the specific harm alleged."]). The scope of the

injunction must bear "a reasonable relationship to the violation." *FTC v. John Beck Amazing Profits LLC,* 888 F. Supp. 2d 1006 (C.D. Cal. 2012).

The United States Supreme Court furthter mandates that "injunctive relief should be no more burdensome to the Defendants than necessary to provide complete relief to the Plaintiffs." *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979). And it is well settled that an overboard injunction is an abuse of discretion. [Citation Omitted]" *Lamb-Weston, Inc. v. McCain Foods, Ltd.* 941 F.2d 970, 974 (9th Cir. 1991) (emphasis added).

The specific harm alleged by the FTC in this matter was (1) representations over a 1–2-month period of shipping times where the shipping times were not met, and (2) an implied representation by Ms. Jacqueline Nguyen that the Basic IGG (of which only $14,000 was sold before it was pulled) could resist contracting COVID. An injunction prohibiting the Appellants from violating the MITOR rule and from making any misrepresentations regarding COVID (or other health claims) fully addresses this harm. Any more injunctive relief than these are punitive, not necessary, overbroad, and not equitable.

Yet, the injunction granted by the District Court included not only a prohibition against violating MITOR and Sec. 5(a), but also contained a permanent ban from ever engaging in the PPE as to *all* Appellants. This permanent ban on the PPE industry was not asked for in the Complaint. It was not asked for in the

Amended Complaint. It was not part of the Preliminary Injunction. It is the most drastic of possible remedies, and is not merited here.

In every case reviewed where the drastic remedy of a permanent ban from an entire industry/practice was granted, it involved a recalcitrant defendant who showed a long history and pattern of continuous, repeated violative conduct. *See F.T.C. v. John Beck Amazing Profits, LLC*, 888 F.Supp.2d 1006, 1011 (C.D. Cal. 2012) (holding that permanent injunction was warranted because Defendants had prior consumer fraud cases against them and had "been charged numerous times for violating consumer protection laws . . ."); *see also F.T.C. v. Grant Connect LLC*, 763 F.3d 1094, 1097 (9th Cir. 2014) (involving defendant with "fraudulent business practices … [that drew] FTC scrutiny for over a decade, and have resulted in three distinct enforcement actions against him."); *see also Litton Industries, Inc. v. F.T.C.*, 676 F.2d 364, 367, 372 (concerning that even after the FTC questioned the defendant's ads, he continued disseminating the deceptive advertisements over a 2 year period).

Courts are permitted to place reasonable "fencing-in" orders, but these must be "necessary to prevent similar and related violations in the future." *F.T.C. v. John Beck Amazing Profits, LLC*, supra, at 1011. However, the "framing of the scope of the injunction depends upon the circumstances of each case," and the "[f]encing-in provisions must bear a reasonable relation to the unlawful practices

48

found to exist." *Id.* The factors to consider are whether (1) the Defendants have exhibited "blatant and utter disregard of the law," (2) the "defendant's history of engaging in unfair trade practices," and (3) "the transferability of the technique of deception to an advertising campaign for some other product." *Id.* at 1012.

Here, this is a first-time offense that concerned representations over a 1 to 2 month period of shipping times, and an implied representation by Ms. Nguyen that the Basic IGG could resist COVID which is disputed. This is not a situation of recalcitrant offenders who repeatedly engaged in multiple schemes of deception, even after being warned and subjected to multiple enforcement actions. Although shipping delays briefly occurred, the delays were quickly remedied and the Appellants have not exhibited a "blatant and  utter disregard of the law." Since May of 2020 -- more than two years – there has not been one incident or potential incident for a MITOR violation.

Moreover, other than Ms. Nguyen, none of the Appellants have any blemish on their commercial history. Ms. Nguyen's situation, which was unrelated to a violation of the FTC Act, occurred almost a decade ago (2014) and was a single incident in an unblemished career as a pharmacist of more than 20 years.

Granting this permanent ban ignores that in August of 2020, QYK changed its entire business model to a wholesale manufacturer of PPE and spent more than $6,000,000 to reequip itself for production.  Most importantly, Appellants made

the investment and fundamental business model change that now makes it impossible to violate MITOR because government contracts and business wholesales are paid *after* the product is delivered. There can be "no transferability of the technique of deception to an advertising campaign for some other product," as the Appellants no longer sell products to the consumer that can violate MITOR.

This is a much different situation then what occurred in *F.T.C. v. John Beck Amazing Profits, LLC*, supra. In *John Beck*, the problem was the business model of promoting at home wealth creating programs could be transferred to a myriad of at home businesses. Therefore, the court felt it necessary to ban the Defendants from the model of selling at home wealth creating products, as the deceptive selling techniques could be transferred to any at home wealth creating product. This was because of the Defendants "long history of blatantly disregarding the law." *Id.* at 1013. Indeed, the Defendants in *John Beck* had "been charged numerous times for violating consumer protection laws." *Id.*

Here, the business model does not allow for further violations, therefore banning QYK from selling all products from the PPE industry does not relate to the specific harm alleged and does not bear a reasonable relation to the unlawful practices found to exist. The only purpose of the permanent ban would be to punish the Appellants.

Furthermore, in granting the permanent ban, the District Court did not

discuss or analyze the factors cited in *John Beck Amazing Profits*. Instead, the

District Court merely analyzed whether an injunction was merited in the first place

but failed to address the proper scope of the injunction. That is, the District Court

confused whether an injunction was merited at all versus the proper scope of the

injunction. By ignoring the factors leading to whether a permanent ban was

merited the District Court committed error.

## IV. <u>The Pandemic Issue</u>

The shipment issues that form the basis of this FTC action occurred during

an unprecedented global pandemic that was unforeseen to anyone, including our

own government. As the FTC points out, the World Health Organization officially

declared the global pandemic on March 11, 2020. This pandemic destroyed the

global supply chain and played havoc with traditional shippers such as Fed Ex and

the USPS. These delays became so severe that on March 24, 2020 Fed Ex

suspended its delivery guarantees

The pandemic also affected the USPS. *See* "The 2020 Mail Delays: Stats &

Charts," https://www.savethepostoffice.com/2020-mail-delays-stats-charts/.

Despite the pandemic, QYK braved the potential of contracting a terrible

disease and worked 16-18-hour days to provide the country with hand sanitizer.

The packages would be waiting in postal bins to be picked up and on some days

the USPS would fail to pick-up. When they were picked up, the Postal Service
would fail to scan the packages which is necessary to create a "first scan."
Sometimes these first scans did not occur for days or weeks until after the pick-up
occurred which gave the impression that the sanitizer was shipped out long after it
was actually shipped.[80]

The Appellants did this when virtually all the other retail hand sanitizer
merchants had shut down in the face of the COVID pandemic--- and they
succeeded in providing hand sanitizer to the American consumer, albeit at times
later than expected.

None of these problems created by the Global pandemic were caused by the
Appellants and the Appellants had no control over these events. Yet, the District
Court applied MITOR as a strict liability rule that has no defense like Force
Majeure or Impossibility of Performance. Indeed, the District Court used
Appellants comments on the pandemic and turned it against them by stating it
proves "Defendants have shown no recognition of their own culpability."[81]  This is
simply not true. Of course, the Appellants would have liked all order to be timely
shipped. The reason they pointed to the pandemic wasn't to show a lack of

---

[80] 4-ER-393–94
[81] 1-ER-16

remorse, but rather to place proper context, and place the District Sourt in their shoes during this tumultuous time.

This is especially important in this case, as this case involves the equitable jurisdiction of this Court. It is unfair to hold QYK liable when any violation was caused by events out of its control. Moreover, QYK was one of the few companies, perhaps the only company, with employees who braved the pandemic and worked endless hours to provide a product to the nation. It would be inequitable to now punish them for their heroic effort.

# CONCLUSION

For the reasons stated above, Appellants respectively request that this Court vacate the judgment and remand to the District Court with instructions to (1) determine what injury, if any, was incurred from the MITOR violations; and (2) condition any refund on the return of the hand sanitizer or a proper credit for the value of the hand sanitizer, if used. The Appellants further requests that the District Court vacate the injunction; or, at the minimum, modify the injunction to eliminate the permanent ban from the PPE industry, at least as to all Appellants other than Ms. Nguyen.

Date:  July 6, 2022

Wellman & Warren, LLP

*s/ Scott Wellman*

*Attorneys for Appellants*
QYK BRANDS LLC d/b/a Glowyy,
DRJSNATURAL LLC,  EASII, INC.,
THEO PHARMACEUTICALS, INC. ,
RAKESH TAMMABATTULA,
JACQUELINE THAO NGUYEN

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 22-55446

The undersigned attorney or self-represented party states the following:

[ X ]   I am unaware of any related cases currently pending in this court.

[  ]   I am unaware of any related cases currently pending in this court other than the
case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]   I am aware of one or more related cases currently pending in this court. The case
number and name of each related case and its relationship to this case are:

**Signature** *s/ Scott Wellman*                    **Date**        July 6, 2022
*(use "*s/[typed name]*" to sign electronically filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-55446

I am the attorney or self-represented party.

**This brief contains 11,001** **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Scott Wellman* **Date** July 6, 2022
*(use "*s/[typed name]*" to sign electronically filed documents)*